*11 cv 639*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MINNESOTA

RECEIVED *RHK/JJG*

-------------------------------------------------------------------------x

MAR 11 2011

CLERK
U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

Tom Brady, Drew Brees, Vincent Jackson, Ben Leber,
Logan Mankins, Peyton Manning, Von Miller, Brian
Robison, Osi Umenyiora, and Mike Vrabel,
individually, and on behalf of all others similarly
situated,

Plaintiffs,

Civil Action No:

v.

National Football League, Arizona Cardinals, Inc.,
Atlanta Falcons Football Club LLC, Baltimore Ravens
Limited Partnership, Buffalo Bills, Inc., Panthers
Football LLC, Chicago Bears Football Club, Inc.,
Cincinnati Bengals, Inc., Cleveland Browns LLC,
Dallas Cowboys Football Club, Ltd., Denver Broncos
Football Club, Detroit Lions, Inc., Green Bay Packers,
Inc., Houston NFL Holdings LP, Indianapolis Colts,
Inc., Jacksonville Jaguars Ltd., Kansas City Chiefs
Football Club, Inc., Miami Dolphins, Ltd., Minnesota
Vikings Football Club LLC, New England Patriots, LP,
New Orleans Louisiana Saints, LLC, New York
Football Giants, Inc., New York Jets Football Club,
Inc., Oakland Raiders LP, Philadelphia Eagles
Football Club, Inc., Pittsburgh Steelers Sports, Inc.,
San Diego Chargers Football Co., San Francisco
Forty Niners Ltd., Football Northwest LLC, The Rams
Football Co. LLC, Buccaneers Limited Partnership,
Tennessee Football, Inc., Washington Football Inc.

Defendants.

CLASS ACTION COMPLAINT

-------------------------------------------------------------------------x

| | |
|---|---|
| Weil, Gotshal & Manges LLP | Dewey & LeBoeuf LLP |
| James W. Quinn | Jeffrey L. Kessler |
| Bruce S. Meyer | David G. Feher |
| 767 Fifth Avenue | 1301 Avenue of the Americas |
| New York, NY 10153 | New York, NY 10019 |
| (212) 310-8000 | (212) 259-8000 |

SCANNED
MAR 11 2011
U.S. DISTRICT COURT MPLS

Plaintiffs, by their undersigned attorneys, for their Complaint herein allege as follows:

## INTRODUCTION

1.     This class action is brought to enjoin violations by each defendant of the federal antitrust laws and state contract and tort laws.    Plaintiffs are eight professional football players and one prospective professional football player who have entered into, and/or who seek to enter into, player contracts with National Football League ("NFL") teams, and the class of similar players whom they seek to represent.

2.     Defendants, the NFL and its separately-owned and independently-operated member teams, have jointly agreed and conspired to deny Plaintiffs the ability to provide and/or market their services in the major league market for professional football players through a patently unlawful group boycott and price-fixing arrangement or, in the alternative, a unilaterally-imposed set of anticompetitive restrictions on player movement, free agency, and competitive market freedom.

3.     The NFL Defendants' anticompetitive agreements include a so-called "lockout" aimed at shutting down the entire free agent marketplace for players no longer under contract, as well as a boycott of rookie players seeking an NFL contract for the first time, and even players currently under NFL contracts who will not be permitted to enjoy the benefits of those contracts.    The stated anticompetitive purpose of this group boycott is to coerce Plaintiffs and the other players to agree to a new anticompetitive system of player restraints which will, among other things, drastically

2

reduce player compensation levels below those that existed in the past and that would

exist in a competitive market.

      4.    The group boycotts, concerted refusals to deal and price fixing which

Defendants are carrying out are per se illegal acts under Section 1 of the Sherman Act,

15 U.S.C. § 1.   They also constitute an unreasonable restraint of trade under the rule of

reason.   As a result of Defendants' anticompetitive agreements, Plaintiffs and other

similarly situated current and future professional football players who are employed by

or seeking employment by an NFL club will be prevented from offering or providing their

services in a competitive market and from receiving a competitive market value for their

services, and will be denied the freedom of movement available to employees in

virtually every other industry in the United States.

      5.    The NFL Defendants cannot defend their violations of the federal

antitrust laws by hiding behind the non-statutory labor exemption to the antitrust laws.

That exemption only conceivably applies as long as a collective bargaining relationship

exists between the NFL Defendants and the players.   The players, however, have

ended the role of the NFLPA as their collective bargaining representative and no longer

have a collective bargaining relationship with the NFL Defendants.   As has been

previously decided by this Court, and acknowledged by the United States Supreme

Court, the result of this is that there can no longer be any labor exemption defense.

6.     Additionally, in the class action Stipulation and Settlement

Agreement ("SSA") of the White v. NFL case brought in this Court, the NFL Defendants

waived any right to claim that the players' decision to end the status of the NFLPA as

their collective bargaining representative is in any way ineffective to end Defendants'

labor exemption defense.     See SSA, Art. XVIII § 5(b).

7.     Finally, the NFL Defendants' "lockout" also gives rise to class claims

on behalf of Plaintiffs and class members who are already under contract with NFL

teams for the 2011 season for breach of contract and tortious interference with

contract.    There is simply no legal justification for the NFL Defendants agreeing not to

adhere to the terms of player contracts that are in full force and effect and that require

Defendants to compensate players for their services as professional football players.

## JURISDICTION AND VENUE

8.     These claims arise and are brought under Sections 4 and 16 of the

Clayton Act, 15 U.S.C. §§ 15, 26, and Section 1 of the Sherman Antitrust Act, 15 U.S.C. §

1, as well as state contract and tort laws.

9.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and

1367.

10.    This Court also has exclusive jurisdiction under Article XX, Section 1,

of the SSA to enforce and interpret the terms of the SSA.

4

11.    Venue in this action is proper pursuant to 28 U.S.C. § 1391 and 15

U.S.C. § 22.    Each of the Defendants can be found, resides, has an agent, or transacts

business in the District of Minnesota, and the unlawful activities were or will be carried

on in part by one or more of the Defendants within this district.    Additionally, Plaintiffs

Leber and Robison were and/or continue to be employed within this district by the

Minnesota Vikings and maintain residences within this district.

## THE PARTIES

12.    Plaintiff Tom Brady is a professional football player who, from 2000

to 2010, was employed in interstate commerce by the New England Patriots.    His

contract with the Patriots extends from the 2011 through 2014 NFL seasons.

13.    Plaintiff Drew Brees is a professional football player who, from 2006

to 2010, was employed in interstate commerce by the New Orleans Saints.    His

contract with the Saints also covers the 2011 NFL season.    From 2001 to 2006, Mr.

Brees was employed as a professional football player in interstate commerce by the San

Diego Chargers.    His contract with the Chargers expired at the end of the 2005 NFL

League Year, at which time he became a free agent and proceeded to sign his current

contract with the Saints.

14.    Plaintiff Vincent Jackson is a professional football player who, from

2005 to 2010, was employed in interstate commerce by the San Diego Chargers.    His

contract with the Chargers expired on March 3, 2011.

15. Plaintiff Ben Leber is a professional football player who, from 2006 to 2010, was employed in interstate commerce by the Minnesota Vikings. His contract with the Vikings expired on March 3, 2011. From 2002 to 2006, Mr. Leber was employed as a professional football player in interstate commerce by the San Diego Chargers. His contract with the Chargers expired at the end of the 2005 NFL League Year, at which time he became a free agent and proceeded to sign his recent contract with the Vikings.

16. Plaintiff Logan Mankins is a professional football player who, from 2005 to 2010, was employed in interstate commerce by the New England Patriots. His contract with the Patriots expired on March 3, 2011.

17. Plaintiff Peyton Manning is a professional football player who, from 1998 to 2010, was employed in interstate commerce by the Indianapolis Colts. His contract with the Colts expired on March 3, 2011.

18. Plaintiff Von Miller currently attends Texas A&M University where he played collegiate football. Mr. Miller was named to first team All-Big 12 honors in both 2009 and 2010. He was named to first-team All-American honors and won the Butkus Award in 2010. Mr. Miller has chosen to enter the 2011 NFL draft and intends to play professional football in the NFL.

6

19.   Plaintiff Brian Robison is a professional football player who, from 2007 to 2010, was employed in interstate commerce by the Minnesota Vikings.   His contract with the Vikings extends from the 2011 through 2013 NFL seasons.

20.   Plaintiff Osi Umenyiora is a professional football player who, from 2003 to 2010, was employed in interstate commerce by the New York Giants.   His contract with the Giants extends from the 2011 through 2012 NFL seasons.

21.   Plaintiff Mike Vrabel is a professional football player who, from 2009 to 2010, was employed in interstate commerce by the Kansas City Chiefs.   His contract with the Chiefs expired on March 3, 2011.   From 2001 to 2009, Mr. Vrabel was employed as a professional football player in interstate commerce by the New England Patriots and was traded in 2009 to the Chiefs.   From 1997 to 2001, Mr. Vrabel was employed as a professional football player in interstate commerce by the Pittsburgh Steelers.

22.   Defendant NFL, which maintains its offices at 280 Park Avenue, New York, New York, is an unincorporated association consisting of the 32 separately-owned and independently-operated professional football teams that are listed in paragraph 23. The NFL is engaged in interstate commerce in the business of, among other things, operating the sole major professional football league in the United States.

23.   The other Defendants are the 32 NFL member teams, each of which, upon information and belief, is a corporation, except where noted below (collectively

with the NFL, the "NFL Defendants").   Upon information and belief, each of the

defendant teams is a separately-owned and independent entity which operates a

professional football franchise for profit under the team name and in the cities set forth

below:

| NFL Defendant Team Owner | State of Organization | Team Name (City) |
|---|---|---|
| Arizona Cardinals, Inc. | Arizona | Arizona Cardinals |
| Atlanta Falcons Football Club LLC | Georgia | Atlanta Falcons |
| Baltimore Ravens Limited Partnership | Maryland | Baltimore Ravens |
| Buffalo Bills, Inc. | New York | Buffalo Bills |
| Panthers Football LLC | North Carolina | Carolina Panthers |
| Chicago Bears Football Club, Inc. | Delaware | Chicago Bears |
| Cincinnati Bengals, Inc. | Ohio | Cincinnati Bengals |
| Cleveland Browns LLC | Delaware | Cleveland Browns |
| Dallas Cowboys Football Club, Ltd. | Texas | Dallas Cowboys |
| Denver Broncos Football Club | Colorado | Denver Broncos |
| Detroit Lions, Inc. | Michigan | Detroit Lions |
| Green Bay Packers, Inc. | Wisconsin | Green Bay Packers |
| Houston NFL Holdings LP | Delaware | Houston Texans |
| Indianapolis Colts, Inc. | Delaware | Indianapolis Colts |
| Jacksonville Jaguars Ltd. | Florida | Jacksonville Jaguars |

| Kansas City Chiefs Football Club, Inc. | Texas | Kansas City Chiefs |
|---|---|---|
| Miami Dolphins, Ltd. | Florida | Miami Dolphins |
| Minnesota Vikings Football Club LLC | Minnesota | Minnesota Vikings |
| New England Patriots, LP | Delaware | New England Patriots |
| New Orleans Louisiana Saints LLC | Texas | New Orleans Saints |
| New York Football Giants, Inc. | New York | New York Giants |
| New York Jets Football Club, Inc. | Delaware | New York Jets |
| Oakland Raiders LP | California | Oakland Raiders |
| Philadelphia Eagles Football Club, Inc. | Delaware | Philadelphia Eagles |
| Pittsburgh Steelers Sports, Inc. | Pennsylvania | Pittsburgh Steelers |
| San Diego Chargers Football Co. | California | San Diego Chargers |
| San Francisco Forty Niners Ltd. | California | San Francisco 49ers |
| Football Northwest LLC | Washington | Seattle Seahawks |
| The Rams Football Company LLC | Delaware | St. Louis Rams |
| Buccaneers Limited Partnership | Delaware | Tampa Bay Buccaneers |
| Tennessee Football, Inc. | Delaware | Tennessee Titans |
| Washington Football Inc. | Maryland | Washington Redskins |

## CLASS ACTION

24.    Plaintiffs Tom Brady, Drew Brees, Vincent Jackson, Ben Leber, Logan Mankins, Peyton Manning, Von Miller, Brian Robison, and Mike Vrabel (collectively "Plaintiffs") are representatives of a class, as defined by Rule 23(b)(1) and/or Rule 23(b)(2) of the Federal Rules of Civil Procedure, and bring this action on behalf of themselves and the class members as described in paragraph 25.

25.    The class represented by Plaintiffs is comprised of (i) all players who are under contract to play professional football for an NFL team at any time from March 4, 2011 to the date of final judgment in this action and the determination of any appeal therefrom (the "Under-Contract Subclass"), (ii) all players who are not under contract with an NFL team and are seeking employment as professional football players for an NFL team at any time from March 4, 2011 to the date of final judgment in this action and the determination of any appeal therefrom (the "Free Agent Subclass"), and (iii) all college and other football players who have not previously been under contract with any NFL team and, as of March 4, 2011, to the date of final judgment in this action and the determination of any appeal therefrom, are or will be eligible to play football as a rookie for an NFL team (the "Rookie Subclass").

26.    The class and each subclass are so numerous and geographically so widely dispersed that joinder of all members is impracticable.    There are questions of law and fact common to the class.    Plaintiffs' claims are typical of the claims of the

10

class or subclass that they represent, and the Plaintiffs will fairly and adequately protect
the interests of the class or subclass that they represent.

27.   Each person in the class or subclass is, has been, and/or will be
subject to uniform agreements, rules and practices among the Defendants that restrain
competition for player services, including, but not limited to, those known as a
"lockout," the "Franchise Player" designation, and the "Entering Player Pool," and any
and all similar player restraints which are or will be uniformly imposed by the NFL
Defendants on members of the class or subclass.

28.   Except for provisions as to individual compensation and other
variations which do not materially affect this action, the contracts signed by NFL players
are virtually identical throughout the NFL.

29.   The prosecution of separate actions by individual members of the
class would create the risk of:

> (a) inconsistent or varying adjudications with respect to
> individual class members that would establish incompatible
> standards of conduct for the party opposing the class; or
>
> (b) adjudications with respect to individual class members
> that, as a practical matter, would be dispositive of the interests of
> the other members not parties to the individual adjudications or

would substantially impair or impede their ability to protect their

interests;

30.   In construing and enforcing their uniform agreements, rules and

practices, and in taking and planning to take the actions described in this complaint, the

Defendants have acted or refused to act on grounds that apply generally to the class, so

that final injunctive relief or corresponding declaratory relief would be appropriate for

the class as a whole.

31.   A class action may be maintained under Rule 23(b)(2) also because,

as this Court held in White, this is a case in which Plaintiffs' class claims for injunctive

relief predominate over its claims for damages.    White v. NFL, 822 F. Supp. 1389, 1411

(D. Minn. 1993).

## NATURE OF INTERSTATE TRADE AND COMMERCE

32.   The primary business in which Defendants are engaged is the

operation of major league professional football teams and the sale of tickets and

telecast rights to the public for the exhibition of the individual and collective football

talents of players such as Plaintiffs.    To conduct this business, the NFL Defendants must

compete with each other for and retain the professional services of players, such as

Plaintiffs, who are signed to contracts to play football for the various NFL defendant

teams.

33. The business of major league professional football is distinct from other professional sports businesses, as well as from college and minor league professional football. Its distinguishing features include: the rules of the sport and the season during which it is played; the talents of and rates of compensation for the players, for whom playing football is their full-time profession; the nature and amounts of trade and commerce involved; and the unique demand for the NFL Defendants' games by the consuming public, both as ticket purchasers and as home viewers of and listeners to television and radio.

34. The NFL Defendants' operation of and engagement in the business of major league professional football involves a substantial volume of interstate trade and commerce, including, inter alia, the following interstate activities: travel; communications; purchases and movement of equipment; broadcasts and telecasts of league games; advertisements; promotions; sales of tickets and concession items; sales of merchandise and apparel; employment of players and referees; and negotiations for all of the above.

35. The NFL Defendants' aforesaid interstate transactions involve collective annual expenditures and receipts in excess of $8.5 billion.

36. The Plaintiffs have been employed by and/or are seeking new employment with, or will seek future employment with one or more of the defendant teams in interstate commerce as professional football players.

## BACKGROUND

### The NFL's History of Antitrust Violations

37.    The NFL Defendants enjoy a monopoly in the market for major league professional football in the United States, and have willfully acquired or maintained that monopoly in violation of Section 2 of the Sherman Act.   See United States Football League v. NFL, 644 F. Supp. 1040, 1042 (S.D.N.Y. 1986), aff'd on other grounds, 842 F.2d 1335 (2d Cir. 1988); see McNeil v. NFL, 790 F. Supp. 871, 896 (D. Minn. 1992) (finding that the NFL and its member teams were "precluded from relitigating the existence of their monopoly power in the relevant market of major league professional football in the United States").   The relevant market for assessing the restraint of trade at issue is the market for the services of major league professional football players in the United States.   See McNeil, 790 F. Supp. at 893 (citing Smith v. Pro Football, Inc., 420 F. Supp. 738 (D.D.C. 1976) and Mackey v. NFL, 407 F. Supp. 1000 (D. Minn. 1975)).   This is another market in which Defendants have been found to exercise monopoly power.   See also Clarett v. NFL, 306 F.Supp.2d 379, 407 (S.D.N.Y. 2004) ("That the League has exclusive market power in this arena [the market for player services] is obvious; the very fact that it can establish a Rule that excludes players from the market altogether demonstrates its market domination."), rev'd on other grounds, 369 F.3d 124 (2d. Cir. 2004).

38.    The NFL Defendants comprise the only major professional football league in the United States.    The NFL Defendants are the only United States market participants for the services of major league professional football players.    Together, they monopolize and/or restrain trade in, and/or have combined and conspired to monopolize and/or restrain trade in the United States market for the services of major league professional football players.    The only actual or potential competition that exists in this market is among the separately-owned and independently-operated NFL teams.    Rather than engaging in competition for the players' services, however, the NFL Defendants have combined and conspired to eliminate such competition among themselves for NFL players through group boycotts, price-fixing arrangements, and concerted refusals to deal.    This is being accomplished by the NFL Defendants jointly adopting and imposing "rules" and "policies", including a "lockout", that have the purpose and effect of preventing players from offering their services to NFL teams in a competitive market.

39.    The NFL has a long history of violating federal antitrust law in an effort to minimize its labor costs.    As a result, over the years, NFL players have been forced to bring multiple antitrust lawsuits against the NFL and its teams.    Indeed, the so-called "Rozelle Rule" (adopted by the NFL teams in 1963 as an amendment to their Constitution and By-Laws) was an early anticompetitive restraint that the players were forced to challenge in court.    This rule essentially provided that an NFL team desiring

the services of a veteran player whose contract had expired could not sign that player

without paying "compensation" to the player's former team.     It further provided that

the Commissioner of the League, Pete Rozelle, would assess the compensation after the

fact if the two teams could not agree on it.     The Rozelle Rule substantially restrained

competition among the NFL teams for players' services.     It tended to artificially bind

players to one team throughout their careers, and denied players the right to sell their

services in a competitive market.

40.     In 1972, several players brought an action challenging the legality of

the Rozelle Rule under the antitrust laws.     After an extensive non-jury trial, the district

court found the Rozelle Rule to be both a per se violation of the antitrust laws as well as

invalid under the rule of reason.     See Mackey v. NFL, 407 F. Supp. 1000 (D. Minn.

1975).     The Eighth Circuit affirmed on the basis of the rule of reason, holding that the

Rozelle Rule constituted an unreasonable restraint of trade in violation of Section 1 of

the Sherman Act.     See Mackey v. NFL, 543 F.2d 606 (8th Cir. 1976).     A subsequent

class action was filed on behalf of NFL players who had been subject to the Rozelle Rule,

and that action resulted in a settlement which included a payment to the players of

more than \$13 million in damages.

41.     Another example of the NFL Defendants' anticompetitive behavior in

the player market occurred in 1990.     After the NFL players ended their collective

bargaining relationship with the NFL Defendants, eight individual football players filed a

16

lawsuit against the NFL and all of its member teams, alleging, inter alia, that the imposition of certain player restraints known as "Plan B" constituted a violation of Section 1 of the Sherman Act.   McNeil v. National Football League, No. 4-90-476 (D. Minn.).

42.   The McNeil plaintiffs moved for partial summary judgment against the NFL Defendants' assertion of a labor exemption defense on the ground that, because the NFLPA had ended its role as a collective bargaining representative, the non-statutory labor exemption could not apply. This court in McNeil granted the plaintiffs' motion, finding that the non-statutory labor exemption ended no later than December 5, 1989, since the players were "no longer part of an 'ongoing collective bargaining relationship' with the [NFL] Defendants."   Powell v. NFL & McNeil v. NFL, 764 F. Supp. 1351, 1358 (D. Minn. 1991).   On September 10, 1992, the McNeil jury found that the "Plan B" restraints implemented by the NFL violated Section 1 of the Sherman Act and that the McNeil plaintiffs suffered economic injury as a result.

43.   Subsequent to McNeil, players were again forced to resort to the courts to stop the NFL's violation of antitrust laws.   In 1992, ten players brought suit seeking relief for injuries they suffered as a result of the very same anticompetitive restraints that the McNeil jury found violated Section 1 of the Sherman Act.   Jackson v. NFL, No. 4-92-876 (D. Minn.).   The Jackson plaintiffs moved for a temporary restraining order to prohibit the Defendants from continuing to restrict plaintiffs pursuant to these

restraints.    In Jackson, this Court granted plaintiffs' motion for the temporary

restraining order, and found, inter alia, that the plaintiffs made "a sufficient showing of

irreparable harm because they suffer irreparable injury each week that they remain

restricted under an illegal system of player restraints."    Jackson v. NFL, 802 F. Supp.

226, 230-31 (D. Minn. 1992).

44.    In 1993, a Stipulation and Settlement Agreement ("SSA") resolved

White v. National Football League, No. 4-92-906 (D. Minn.).    As the Eighth Circuit

summarized:

> The 1993 settlement represented the resolution to a decades-old
> dispute between football players and team owners.    Although
> professional football generates significant revenue, players and
> owners often have differing ideas about how the money should be
> spent. . . .    For many years, team owners worked together to
> minimize labor costs . . . . After several successful antitrust lawsuits
> brought by individual players, Reggie White and four other named
> plaintiffs filed a lawsuit . . . on behalf of (i) all players who have been,
> are now, or will be under contract to play professional football for an
> NFL club at any time from August 31, 1987, to the date of final
> judgment . . . and (ii) all college and other football players who, as of
> August 31, 1987, to the date of final judgment . . . have been, are
> now, or will be eligible to play football as a rookie for an NFL team.
>
> The complaint sought antitrust injunctive relief and damages
> stemming from various League rules . . . .    On April 30, 1993, the
> district court approved a consent decree that provided the players
> with monetary relief and made a variety of significant changes to
> League rules.    The [SSA] also allowed for recertification of the
> [NFLPA] and the resumption of the collective bargaining relationship
> between the players and owners.

White v. NFL, 585 F.3d 1129, 1133-34 (8th Cir. 2009).

45. In the SSA, the NFL insisted on the right to terminate the SSA if the players did not reform a union within thirty days. In exchange for this provision, the NFL Defendants agreed that, if a majority of players later decided to end their collective bargaining representation upon or after the SSA's expiration, the Defendants would waive their right to assert the non-statutory labor exemption on the ground that the players' actions were a sham or otherwise ineffective to end the labor exemption. See SSA, Art. XVIII § 5(b). Relying upon this promise, the players decided to reform the NFLPA as their collective bargaining representative and entered into a new CBA, which, among other things, mirrored the terms of the SSA.

**The NFL's Decision to Terminate the SSA and CBA**

46. Since 1993, both the SSA and the CBA have been amended several times, most recently in 2006. Pursuant to the 2006 amendments, the SSA and the CBA were both set to expire at the end of the 2012 League Year (2012 season), which would have been February 28, 2013.

47. The SSA, as well as the CBA, most recently provided players with approximately 50% of all NFL revenues (with a Salary Cap set at 57.5% of "Total Revenues" as defined in the CBA, after approximately $1 billion in expenses were deducted from NFL revenues).

48. Since at least early 2008, the NFL has expressed its unhappiness with the SSA and CBA, including that the Salary Cap (i.e., the artificial ceiling imposed on player compensation) was too high.

49. On May 20, 2008, the NFL Defendants announced that they were opting out of the SSA and CBA two years early, thus making the 2010 NFL season the final season under those agreements. The NFL Defendants' stated reason for terminating these agreements was their desire to seek a greater share of revenues at the expense of the players and to impose a new, more onerous set of restraints upon the players (i.e. a wage scale on rookies). As explained by the NFL's Executive Vice President of Business Operations Eric Grubman, the NFL Defendants are not claiming that they lost money under the recently expired CBA: "We have a healthy business. We are not losing money. We have never said that." Instead, the NFL Defendants have stated that their goal is to increase their profit margins by reducing the amount of money they pay to their players and subjecting them to a new set of anticompetitive player restraints.

50. The NFLPA has spent over two years attempting to negotiate a new CBA with the NFL Defendants. These efforts, however, have proved fruitless. The NFL Defendants have insisted on substantial give-backs from the players, which would total more than $1 billion annually and a wage scale which would suppress player salaries for rookies and veterans alike. The NFL Defendants have also refused to

disclose relevant team financial information to support the enormous economic concessions they have been demanding from the players.

51. As a result, no new CBA could be negotiated, and the SSA and CBA will expire at midnight on March 11, 2011.

52. With the SSA and CBA about to expire, the NFL Defendants have made clear their intention to implement a "lockout" beginning on March 12, 2011 and extending through the 2011 NFL season and beyond, thereby preventing NFL players from selling their services in a competitive market as professional football players unless and until they are willing to agree to substantially reduced wages and a new set of anticompetitive restrictions sought by the NFL Defendants.

53. Indeed, on information and belief, the NFL Defendants have been planning their lockout strategy since at least some time in 2007 and have decided that they are willing to use this group boycott as a coercive weapon to try to force the players to agree to the anticompetitive restrictions and wage reductions that the NFL Defendants are demanding.

## Renunciation of any Collective Bargaining Representation by the NFL Players' Union

54. As in 1989, the players in the NFL have determined that it is not in their interest to remain unionized if the existence of such a union would serve to allow the NFL to impose anticompetitive restrictions with impunity. Accordingly, the players have taken steps to terminate the NFLPA's status as their collective bargaining representative effective at 4 p.m. Eastern time on March 11, 2011.

21

55.     By March 11, 2011, a substantial majority of NFL players had voted to end the collective bargaining status of the NFLPA, effective as of 4:00 p.m. Eastern time on March 11, 2011.

56.     Further, the player representatives of the NFLPA, which serves as its governing body, have met and voted to restructure the organization as a professional association instead of a union.

57.     On March 11, 2011, the NFLPA notified the NFL that it was disclaiming interest in acting as the collective bargaining representative of NFL players, effective as of 4:00 p.m. Eastern time on March 11, 2011.

58.     By March 11, 2011, the NFLPA had amended its bylaws to prohibit it or its members from engaging in collective bargaining with the NFL, the NFL's member clubs or their agents.

59.     The NFLPA is in the process of filing a labor organization termination notice with the Department of Labor.

60.     An application is being filed with the IRS to reclassify the NFLPA for tax purposes as a professional association rather than a labor organization.

61.     On March 11, 2011, the NFLPA informed the NFL that, effective as of 4:00 p.m. Eastern time on March 11, 2011, the NFLPA no longer represented players in grievances under the expired CBA, and that players must pursue or defend any grievance with the NFL or its members on an individual basis.

62.    By March 12, 2011, the NFLPA will have ceased the regulation of player agents and other activities associated with being the collective bargaining representative of NFL players.

**The NFL's Imposition of Anticompetitive Restrictions Upon NFL Players**

**The "Lockout"**

63.    Upon information and belief, the NFL Defendants have jointly conspired and agreed to impose, on and after March 12, 2011, a "lockout" prohibiting all competition for player services, player signings, and employment and/or a system of anticompetitive restraints on player movement, salaries, contract signings, and payment of compensation due under existing contracts.

64.    As part of this "lockout," all NFL Defendants have conspired and agreed to prevent NFL teams from negotiating, or even communicating with, or employing NFL players, thereby completely eliminating a competitive market for player services.    In addition, NFL teams have conspired and agreed not to honor existing contracts with NFL players, by not paying them and precluding their access to team facilities and personnel.

65.    The owners' collective purpose in imposing the "lockout" is to force the non-unionized NFL players to agree to the massive wage reductions and anticompetitive restrictions, which the NFL Defendants are seeking from the players.

66.    The "lockout" on player signings and/or employment by the NFL Defendants constitutes an illegal group boycott, price-fixing agreement, and/or restraint of trade in violation of the Sherman Act, under both the per se rule and the rule of reason standard.

**The Draft with "Entering Player Pool"**

67.    The NFL and its teams have also announced that they will hold the 2011 College Draft on April 28 – 30, 2011.   The College Draft is one of the longest-running restraints on competition for player services in the NFL.    It has the purpose and effect of dividing the market for first year or "rookie" player services among the NFL teams, who would otherwise compete against each other for rookie players, through a number of anticompetitive restraints, including a limitation on the compensation that can be paid to those players.

68.    For College Drafts prior to the 2011 College Draft, the SSA and CBA provided for a limitation on compensation to drafted players by what was known as the "Entering Player Pool."   The "Entering Player Pool" was a league-wide limit on the total amount of salary that all of the NFL teams could pay to sign drafted rookies.

69.    There is no agreement in the SSA or CBA concerning an "Entering Player Pool," or any similar restraint, for the 2011 College Draft or any College Draft thereafter.

70.    The limitation on total compensation embodied by the Draft with

"Entering Player Pool," or any similar restriction, will be enforced by a group boycott

among the NFL Defendants.    This group boycott takes the form of a concerted refusal

to deal with potential NFL players except through restrictive anticompetitive practices,

including a price-fixing agreement.

### Other Anticompetitive Restrictions: Salary Cap and Free Agency Restrictions

71.    In the event the NFL Defendants do not continue to impose a

"lockout," on information and belief, the NFL Defendants have a fall back plan to impose

a new set of anticompetitive restrictions on players—such as a price-fixed cap on player

salaries, limitations on the free agency of players whose contracts have expired, and

other anticompetitive restrictions on the ability of players not under contract to

negotiate freely with any NFL team.    Such restrictions would constitute unreasonable

restraints of trade in violation of Section 1 of the Sherman Act, under both the per se

rule and the rule of reason standards.

72.    Indeed, the NFL has already informed its member teams that they

have the right to designate players under the anticompetitive player restriction known

as the "Franchise Player" designation.    NFL Executive Vice President & General Counsel

Jeff Pash has been quoted as stating:    "I expect the franchise tag to continue to

operate as it has in prior seasons and clubs to be permitted to exercise their rights

under the tag."

73. Multiple NFL teams have designated players as a "Franchise Player," including Plaintiffs Peyton Manning, Vincent Jackson, and Logan Mankins, among others.

74. Under the so-called "Franchise Player" designation, the NFL Defendants have agreed to implement a restriction which essentially prohibits a designated player from receiving a contract from any NFL team other than that player's immediately prior team, even though that player is not under contract with any NFL team.

75. In addition to the "Franchise Player" designation, the NFL Defendants have also agreed to implement an anticompetitive restriction known as the "Transition Player" designation, which severely limits a designated player's ability to receive a contract from any NFL team other than that player's immediately prior team, even though that player is not under contract with any NFL team. The NFL Defendants have also agreed to fix the amount of compensation for so-called "Transition Players."

76. While the SSA provided for a "Franchise Player" and "Transition Player" designation during its term, there is no agreement between the NFL Defendants and the players which provides for such anticompetitive restrictions to be enforced after the SSA and CBA expire, when there are no offsetting benefits of the SSA and CBA agreements to be provided to the players.

77.    In addition, for the majority of League Years under the expired CBA, an NFL team could use either a single "Franchise Player" or single "Transition Player" designation in any given League Year.    It was only in the Final League Year (which was the 2010 League Year as a result of the NFL's termination of the CBA), that NFL teams had the ability to use both a single "Franchise Player" and single "Transition Player" designation.    Yet, the NFL Defendants have agreed to allow teams to use both a "Franchise Player" designation and a "Transition Player" designation for at least the 2011 NFL season.

**The Lack of Any Non-Statutory Labor Exemption Defense**

78.    The NFL Defendants are expected to argue, as in the past, that their anticompetitive restraints are immune from antitrust scrutiny because of the non-statutory labor exemption defense.    However, the law, the SSA, and the CBA make clear that no such defense is available here.

79.    As noted above, this Court in McNeil v. National Football League, No. 4-90-476 (D. Minn.), found that the non-statutory labor exemption did not apply after renunciation by the players of the NFLPA's role as their collective bargaining representative since the players were "no longer part of an 'ongoing collective bargaining relationship' with the [NFL] Defendants."    Powell & McNeil, 764 F. Supp. at 1358.    The Court cited the following actions taken by the NFL players as establishing the end of the collective bargaining relationship:

> On November 3, 1989, the NFLPA's Executive Committee voted to
> renounce collective bargaining.   On November 6, 1989, the
> Committee advised the NFL Defendants that it would no longer
> engage in collective bargaining or represent players in grievances.
> Next, approximately sixty-two percent of the active players signed
> petitions revoking the authority of the NFLPA or any other entity to
> engage in collective bargaining on their behalf.   On December 5,
> 1989, the NFLPA's player representatives unanimously adopted new
> bylaws that ended the organization's status as a collective bargaining
> representative.   Under the new bylaws, no officer, employee or
> member of the NFLPA is authorized to discuss, deal or negotiate with
> the NFL or any of its member clubs or their agents.   The NFLPA thus
> terminated its status as a labor organization. Reflecting its change in
> character and purpose, the NFLPA filed a labor organization
> termination notice with the United States Department of Labor.
> The Internal Revenue Service also changed the organization's tax-
> exempt status from that of a "labor organization" under § 501(c)(5)
> of the Internal Revenue Code to that of a "business league" under §
> 501(c)(6).

Id. at 1356.

      80.   Further, the Supreme Court of the United States, in evaluating

whether the non-statutory labor exemption survived bargaining impasse over a

particular issue where, unlike here, the collective bargaining relationship remained

intact, explained that:

> Our holding is not intended to insulate from antitrust review every
> joint imposition of terms by employers, for an agreement among
> employers could be sufficiently distant in time and in circumstances
> from the collective-bargaining process that a rule permitting
> antitrust intervention would not significantly interfere with that
> process.   See, e.g., 50 F.3d, at 1057 (suggesting that exemption lasts
> until collapse of the collective-bargaining relationship, as evidenced
> by decertification of the union) . . . .

28

Brown v. Pro Football, Inc., 518 U.S. 231, 250 (1996) (emphasis added).

81.    In addition, as part of settling the White litigation and entering into

the SSA, the players required the NFL to waive any right, after the expiration of the SSA,

to assert a labor exemption defense based upon any claim that a future renunciation by

the players of the NFLPA's role as their collective bargaining representative is in any way

improper.    The SSA, thus, expressly provides that:

> [T]he parties agree that, after the expiration of the express term of
> any CBA, in the event that at that time or any time thereafter a
> majority of players indicate that they wish to end the collective
> bargaining status of any Players Union on or after expiration of any
> such CBA, the Defendants and their respective heirs, executors,
> administrators, representatives, agents, successors and assigns
> waive any rights they may have to assert any antitrust labor
> exemption defense based upon any claim that the termination by
> the players or any Players Union of its status as a collective
> bargaining representative is or would be a sham, pretext, ineffective,
> requires additional steps, or has not in fact occurred.

SSA, Art. XVIII § 5(b).

82.    Virtually identical language appears in Article LVII, Section 3(b) of the

CBA.

83.    In a 1997 court proceeding in White, former Executive Director of

the NFLPA Gene Upshaw explained that:

> The only reason I agreed to recommend that the NFLPA be
> converted from a trade association back into a union, however, is
> because the owners demanded that as a condition for the
> Settlement Agreement, but also agreed to a provision that, at the
> end of the settlement, a majority of players could indicate their
> desire to terminate the union and the owners couldn't then use
> against the players the existence of the union during the term of the

29

Settlement Agreement.   I would never have recommended that the players reform the NFLPA as a union in 1993, shortly after the White Settlement Agreement had been agreed to, and agreed to a Collective Bargaining Agreement with the NFL owners, if the union could be used to hurt the players.   Indeed, if that were the result, I would not hesitate to recommend that the players immediately decertify the NFLPA as their collective bargaining representative.

84.   As a result of the above, the non-statutory labor exemption offers the NFL Defendants no basis to avoid liability under the federal antitrust laws.   Despite this fact, however, the NFL Defendants have already taken the position that the actions of the players to end their collective bargaining representation is ineffective, which is in violation of Defendants' express promises in the SSA.

**The Irreparable Injuries of Plaintiffs and the Class**

85.   Upon information and belief, the NFL Defendants intend to continue to impose their "lockout," the "Franchise Player" designation, the "Transition Player" designation, and the Draft with "Entering Player Pool," and/or other restrictions with anticompetitive effects in the U.S. market for the services of major league professional football players.   Absent such restrictions, the Plaintiffs and class members would be free to work in the 2011 off-season and beyond, and to offer their services to NFL teams in a competitive market.   Plaintiffs and class members will suffer severe and irreparable harm if they are prevented from working during the 2011 NFL off-season and season and/or offering their services to NFL teams in a competitive market.

86.   The injuries which the Plaintiffs and class members are incurring and will continue to incur will not be fully compensable by monetary damages.   This is

particularly true due to the short length of NFL careers, the virtually constant need for

NFL players to demonstrate their skill and value on the football practice and playing

fields, and the difficulty in estimating and proving the amount of monetary damages

suffered by Plaintiffs as a result of the NFL Defendants unlawful conduct.   The

threatened injuries to the Plaintiffs and class members are irreparable, warranting the

issuance of preliminary and permanent injunctive relief for the class.

**Tom Brady**

       87.   Plaintiff Tom Brady, a member of the Under-Contract Subclass, has

been a quarterback for the New England Patriots since 2000.   He was selected by the

Patriots in the 2000 NFL draft.   Mr. Brady is widely considered to be one of the premier

quarterbacks in the NFL.   He has been selected to the Pro Bowl six times, was named

the NFL's Comeback Player of the Year in 2009, is a two time NFL MVP, and was named

the MVP of Super Bowls XXXVI and XXXIX.

       88.   On September 10, 2010, Mr. Brady signed a contract extension with

the Patriots that extended through the 2014 NFL season.   Under that contract

extension, Mr. Brady is set to earn a base salary of $5,750,000 and a $4,000,000 roster

bonus for the 2011 season.   That contract extension also provides a base salary of

$5,750,000 and a $6,000,000 roster bonus for the 2012 NFL season and a base salary of

$9,750,000 and a $5,000,000 roster bonus for each of the 2013 and 2014 NFL seasons.

As a result of the "lockout," the NFL Defendants are in breach of, and tortiously interfering with, Mr. Brady's contract.

89.   The "lockout" may also prevent Mr. Brady from playing for any NFL team during the 2011 NFL season or beyond.

**Drew Brees**

90.   Plaintiff Drew Brees, a member of the Under-Contract Subclass, has been a quarterback for the New Orleans Saints since 2006.   Mr. Brees is widely considered to be one of the premier quarterbacks in the NFL.   He has been selected to the Pro Bowl five times, was named the NFL's Comeback Player of the Year in 2004, Offensive Player of the Year in 2008, and the MVP of Super Bowl XLIV.

91.   On or about March 16, 2006, Mr. Brees signed a six-year $60 million contract with the Saints.   This contract was renegotiated in 2009 to provide certain relief to the Saints under the salary cap.   The renegotiation consisted of adding a two-year voidable extension covering the 2012 and 2013 NFL seasons.   Under the contract, Mr. Brees is set to earn a base salary of $7,393,500 and a $200,000 workout bonus for the 2011 season.   That contract also provides base salaries of $9,290,000 for the 2012 NFL season and $10,980,000 for the 2013 NFL season.   As a result of the "lockout," the NFL Defendants are in breach of, and/or tortiously interfering with, Mr. Brees' contract.

**Vincent Jackson**

92.   Plaintiff Vincent Jackson, a member of the Free Agent Subclass, has been a receiver for the San Diego Chargers since 2005.   The Chargers acquired exclusive negotiating rights with Mr. Jackson in a draft conducted by the NFL in 2005.

93.   Mr. Jackson has been selected to one Pro Bowl and finished in the top fifteen and top ten in the NFL for receiving yards during the 2008 and 2009 NFL seasons, respectively.

94.   Mr. Jackson is not under contract with any NFL team.   On or about, February 15, 2011, the San Diego Charges purported to designate Mr. Jackson as a "Franchise Player" under the CBA.

95.   The "lockout" and/or any other restrictions imposed unilaterally by the NFL Defendants, including the "Franchise Designation," will prevent Mr. Jackson from receiving the market value of his services.   Moreover, the lockout may deprive Mr. Jackson of the ability to market his services or play for any NFL team during the 2011 NFL season or beyond.

**Ben Leber**

96.   Plaintiff Ben Leber, a member of the Free Agent Subclass, has been a linebacker for the Minnesota Vikings since 2006.   He was originally selected by the San Diego Chargers in the 2002 NFL draft.

97.   Mr. Leber is not under contract with any NFL team.   The "lockout" and/or any other restrictions imposed unilaterally by the NFL Defendants will prevent Mr. Leber from receiving the market value of his services.   The lockout may also prevent him from marketing his services or playing for any NFL team during the 2011 season and beyond.

**Logan Mankins**

98.   Plaintiff Logan Mankins, a member of the Free Agent Subclass, has been an offensive lineman for the New England Patriots since 2005.   The Patriots acquired exclusive negotiating rights with Mr. Mankins in a draft conducted by the NFL in 2005.   Mr. Mankins has been selected to three Pro Bowls.

99.   Mr. Mankins is not under contract with any NFL team.   On or about, February 14, 2011, the New England Patriots purported to designate Mr. Mankins as a "Franchise Player" under the CBA.

100.  The "lockout" and/or any other restrictions imposed unilaterally by the NFL Defendants, including the "Franchise Player" designation, will prevent Mr. Mankins from receiving the market value of his services.   It may also deprive Mr. Mankins of the ability to market his services to or play for any NFL club during the 2011 season or beyond.

**Peyton Manning**

101.   Plaintiff Peyton Manning, a member of the Free Agent Subclass, has been a quarterback for the Indianapolis Colts since 1998.   The Colts acquired exclusive negotiating rights with Mr. Manning in a draft conducted by the NFL in 1998.

102.   Mr. Manning is widely regarded as one the premier quarterbacks in the NFL.   He was the first overall pick in the 1998 NFL draft and has been selected to the Pro Bowl eleven times.   He is a four-time NFL MVP and was the 2005 recipient of the Walter Payton Man of the Year Award, among numerous other awards and honors.

103.   Mr. Manning is not under contract with any NFL team.   On or about, February 15, 2011, the Colts purported to designate Mr. Manning as a "Franchise Player" under the CBA.

104.   Additionally, in discussing potentially signing Mr. Manning to a new long term contract, Colts owner Jim Irsay acknowledged that the contract will be "the biggest in history; there's not much doubt about that."   Mr. Irsay further described a new contract for Mr. Manning as "the easy one to do, because you know it's going to have to be the highest ever."

105.   Notwithstanding the above, the "lockout" and/or any other restrictions imposed unilaterally by the NFL Defendants, including the "Franchise Player" designation, will prevent Mr. Manning from receiving the market value of his services.

The lockout may also prevent him from marketing his services to or playing for any NFL team during the 2011 NFL season or beyond.

**Von Miller**

106.   Plaintiff Von Miller, a member of the Rookie Subclass, played collegiate football at Texas A&M University as a defensive end and linebacker.   Mr. Miller is widely considered to be one of the top defensive players available in the 2011 NFL draft, and is expected to be chosen in the top of the first round.

107.   The Draft with "Entering Player Pool," or any similar restriction, will be enforced by a group boycott among the NFL Defendants which takes the form of a concerted refusal to deal with potential NFL players except through a price-fixing agreement, and it will restrict Mr. Miller's ability to negotiate with the NFL team that selects him in the Draft, as well as limit the compensation he receives from that team. Moreover, the lockout may prevent Mr. Miller from playing for any NFL team during the 2011 season and beyond.

**Brian Robison**

108.   Plaintiff Brian Robison, a member of the Under-Contract Subclass, has been a defensive lineman for the Minnesota Vikings since 2007.   The Vikings acquired exclusive negotiating rights with Mr. Robison in a draft conducted by the NFL in 2007.

109.   On or about March 3, 2011, Mr. Robison signed a three-year $13.5 million contract extension with the Vikings.   Under the extension, Mr. Robison is set to earn an average of $4.5 million per season in base salary, in addition to various bonuses. As a result of the "lockout," the NFL Defendants are in breach of, and/or tortiously interfering with, Mr. Robison's contract.

**Osi Umenyiora**

110.   Plaintiff Osi Umenyiora, a member of the Under-Contract Subclass, has been a defensive end for the New York Giants since 2003.   He was selected by the Giants in the 2003 NFL draft.   Mr. Umenyiora has been selected to the Pro Bowl two times, and also earned All-Pro recognition in 2007.

111.   On December 23, 2005, Mr. Umenyiora signed a six-year $41 million contract extension with the Giants, which runs through the 2012 season.   Under that contract, Mr. Umenyiora is entitled to a base salary of $3.125 million for the 2011 season and $3.975 million for the 2012 season, in addition to various bonuses equaling approximately $1.5 million, including a $31,250 bonus for each game in the 2011 and

2012 seasons that Mr. Umenyiora is on the active 53 man roster.   As a result of the "lockout," the NFL Defendants are in breach of, and tortiously interfering with, Mr. Umenyiora's contract.

112.   The "lockout" may also prevent Mr. Umenyiora from playing for any NFL team during the 2011 NFL season or beyond.

**Mike Vrabel**

113.   Plaintiff Mike Vrabel, a member of the Free Agent Subclass, has been a linebacker for the Kansas City Chiefs since 2009.   He was originally selected by the Pittsburgh Steelers in the 1997 NFL draft and played from 2001 to 2009 for the New England Patriots.

114.   Mr. Vrabel is a Pro Bowl and NFL All-Pro Selection, and he was an integral part of three Super Bowl championship teams.

115.   Mr. Vrabel is not under contract with any NFL team.   The "lockout" and/or any other restrictions imposed unilaterally by the NFL Defendants will prevent Mr. Vrabel from receiving the market value of his services.   Moreover, the lockout may deprive Mr. Vrabel of the ability to market his services or play for any NFL team during the 2011 NFL season or beyond.

## COUNT I

## Violation of Section 1 of the Sherman Act:   The "Lockout"

116.  Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 though 115.

117.  There is a relevant market for the services of major league professional football players in the United States.   The "lockout" orchestrated by the NFL Defendants will substantially restrain and injure competition in that market and will continue to do so.

118.  The "lockout" constitutes an agreement among competitors to eliminate competition for the services of major league professional football players in the United States and to refuse to pay contractually-owed compensation to players currently under contract with the NFL Defendants for the 2011 season and beyond, in violation of Section 1 of the Sherman Act.

119.  The "lockout" operates as a perpetual horizontal group boycott and price-fixing agreement, which is per se unlawful.

120.  The "lockout" also constitutes an unreasonable restraint of trade under the rule of reason.   The NFL Defendants have market power in the relevant market.   The NFL Defendants' group boycott and price-fixing agreement is a naked restraint of trade without any pro-competitive purpose or effect.   In fact, its stated objective is to reduce player wages and increase the profits of the NFL Defendants

through the imposition of a concerted refusal to deal.    Moreover, the "lockout" agreement is not in any way necessary for the production of NFL football or the achievement of any pro-competitive objective.

121.  Each of the NFL Defendants is a participant in this unlawful combination or conspiracy.

122.  The Plaintiffs and class members have suffered and will suffer antitrust injury to their business or property by reason of the continuation of this unlawful combination or conspiracy.   The "lockout" has injured and will continue to injure Plaintiffs and class members by depriving them of the ability to work as, receive contractually-mandated compensation for, and/or offer their services as professional football players in a free and open market.

123.  Monetary damages are not adequate to compensate Plaintiffs or other class members for the irreparable harm they have and will continue to suffer, warranting injunctive relief.

124.  The conduct of the NFL Defendants has caused monetary injuries to Plaintiffs and other class members, also entitling them to damages.

## COUNT II

## Violation of Section 1 of the Sherman Act:    The Draft with "Entering Player Pool"

125.  Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 though 124.

126.  The imposition of the Draft with "Entering Player Pool" is an anticompetitive, horizontal agreement between competing NFL teams, which allocates the right to negotiate with and sign rookie professional football players and fixes their wages.    The Draft with "Entering Player Pool" is per se unlawful.

127.  This anticompetitive set of restrictions also constitutes an unreasonable restraint of trade under the rule of reason.    The NFL Defendants have market power in the relevant United States market for the services of major league professional football players.    The restrictions imposed by the NFL Defendants completely eliminate and prevent any competition for the services of rookie NFL players and are not necessary to achieve any pro-competitive objective.    Indeed, a less restrictive draft system, which did not contain an "Entering Player Pool" price-fixing restraint, was previously held to be an antitrust violation and that finding is binding on the NFL.    See Smith v. Pro-Football, Inc., 420 F. Supp. 738 (D.D.C. 1976).

128.  Plaintiff Von Miller and the members of the Rookie Subclass have suffered and will suffer antitrust injury to their business or property by reason of the continuation of the Draft with "Entering Player Pool," or any similar restrictions which

will deprive them of the ability to offer their services as professional football players in a free and open market.

129.  Monetary damages are not adequate to compensate Plaintiffs or other class members for the irreparable harm they have and will continue to suffer, warranting injunctive relief.

130.  The conduct of the NFL Defendants has caused monetary injuries to Plaintiffs and other class members, also entitling them to damages.

## COUNT III

## Violation of Section 1 of the Sherman Act:    The Salary Cap and Free Agent Restrictions

131.  Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 though 130.

132.  The NFL Defendants' imposition of restrictions on competition for player services, such as the Salary Cap, the "Franchise Player" restriction, the "Transition Player" restriction, or other restrictions on player free agency, are part of an overall combination and conspiracy by the NFL Defendants to suppress competition in the United States market for the services of major league professional football players. These restrictions are intended to fix prices and eliminate competition in a manner that is per se unlawful under Section 1 of the Sherman Act.

133.  These anticompetitive restrictions also constitute an unreasonable restraint of trade under the rule of reason.    The NFL Defendants have market power in

the relevant market.   The restrictions which they seek to impose are intended to suppress competition in that market and are not necessary to achieve any pro-competitive objective.

134.  The Plaintiffs and the class members have suffered and will suffer antitrust injury to their business or property by reason of the continuation of the anticompetitive restrictions which the NFL Defendants are seeking to impose.   Such restriction will, among other things, deprive Plaintiffs and the class members of the ability to offer their services as professional football players in a free and open market.

135.  Monetary damages are not adequate to compensate Plaintiffs or other class members for the irreparable harm they have and will continue to suffer, warranting injunctive relief.

136.  The conduct of the NFL Defendants has caused monetary injuries to Plaintiffs and other class members, also entitling them to damages.

## COUNT IV

### Breach of Contract

137.  Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 though 136.

138.  Plaintiffs and the Under-Contract Subclass include players who, as of March 4, 2011, are under contract to play professional football for an NFL team in what would have been the 2011 NFL season and thereafter.   Pursuant to the "lockout," NFL

teams will prevent members of the Under-Contract Subclass from working as professional football players and will refuse to pay them the compensation mandated by their existing contracts.   The aforesaid conduct violates the individual state contract laws, which apply to these contracts.

139.  Plaintiffs and the Under-Contract Subclass members will be damaged by the NFL Defendants breaches of their contracts by a failure to receive amounts that are contractually owed, and also by being deprived of the opportunity to play professional football and further demonstrate their abilities on the football field.

140.  Monetary damages are not adequate to compensate Plaintiffs or other class members for the irreparable harm they have and will continue to suffer, warranting injunctive relief.

141.  The conduct of the NFL Defendants has caused monetary injuries to Plaintiffs and other class members, also entitling them to damages.

## COUNT V

### Tortious Interference with Prospective Contractual Relations

142.  Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 though 141.

143.  By jointly conspiring and agreeing to impose a "lockout," each of the NFL Defendants intentionally interfered with the rights of Plaintiffs Manning, Jackson, Vrabel, Mankins, Leber, and Miller and Free Agent Subclass and Rookie Subclass

members to enter into prospective contracts with NFL teams.    Absent these restrictions, these Plaintiffs and subclass members, in reasonable probability, would have entered into contracts with NFL teams.

144.  The aforesaid conduct was taken intentionally by the NFL Defendants and is improper as it is intended to harm the players and earn monopoly profits for the NFL Defendants by suppressing the market for player services in violation of federal law.

145.  Plaintiffs Manning, Jackson, Mankins, Vrabel, Leber, and Miller and the Free Agent and Rookie Subclass members will be injured by the deprivation, by reason of the restrictions imposed by the NFL Defendants, of the ability to negotiate and enter into contracts with NFL teams.    These Plaintiffs and Free Agent and Rookie Subclass members will suffer severe and irreparable harm if they are prevented from entering into contracts with NFL teams for the 2011 season or beyond.

146.  Monetary damages are not adequate to compensate Plaintiffs or other class members for the irreparable harm they have and will continue to suffer, warranting injunctive relief.

147.  The conduct of the NFL Defendants has caused monetary injuries to Plaintiffs and other class members, also entitling them to damages.

148.  The NFL Defendants' conduct violates tort laws in the states in which their tortuous interference with prospective economic advantage is taking place.

## COUNT VI

### Tortious Interference With Contract

149.  Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 though 148.

150.  Each of the NFL Defendants was aware of the contracts entered into by Plaintiffs Brady, Brees, Robison, and Umenyiora and the members of the Under-Contract Subclass with individual NFL teams.   The NFL Defendants then intentionally procured the breaches of those contracts with improper motive and without justification.

151.  By jointly conspiring and agreeing to refuse to make contractually-owed payments, each of the NFL Defendants intentionally interfered with the rights of those Plaintiffs and class members with NFL Player Contracts for the 2011 NFL season to receive the compensation and other benefits due under those contracts.   Absent these restrictions, the Plaintiffs and Subclass members with NFL Player Contracts for the 2011 season would have received payments mandated by their contracts with NFL teams. Plaintiffs Brady, Brees, Robison, and Umenyiora and Under-Contract Subclass members have suffered injury as a result of the NFL Defendants' actions.

152.  Plaintiffs and Subclass members with 2011 NFL Player Contracts have suffered significant and irreparable injury as a result of the NFL Defendants' tortious interference with contract.   Among other things, these Plaintiffs and Subclass members

are being deprived of the ability to practice and compete as NFL players during their
very short NFL careers.

153.  Monetary damages are not adequate to compensate Plaintiffs or
other class members for the irreparable harm they have and will continue to suffer,
warranting injunctive relief.

154.  The conduct of the NFL Defendants has caused monetary injuries to
Plaintiffs and other class members, also entitling them to damages.

155.  The NFL Defendants' tortious interference with contract violates tort
laws in the states in which such conduct is taking place.

### COUNT VII

### Declaratory Judgment:   Interpretation of the SSA

156.  Plaintiffs repeat and reallege each of the allegations contained in
paragraphs 1 through 155.

157.  Article XX, Section 1, of the SSA provides:    "Pursuant to the Final
Consent Judgment in this Action, the Court shall retain jurisdiction over this Action to
effectuate and enforce the terms of this Agreement and the Final Consent Judgment."
Thus this Court has exclusive jurisdiction to enforce and interpret the terms of the SSA.

158.  Article XVIII, Section 5(b) of the SSA provides:

> In effectuation of this Agreement, the Parties agree that, after the
> expiration of the express term of and CBA, in the event that at that
> time or any time thereafter a majority of players indicate that they
> wish to end the collective bargaining status of any Players Union on

or after expiration of any such CBA, the Defendants and their respective heirs, executors, administrators, representatives, agents, successors and assigns waive any rights they may have to assert any antitrust labor exemption defense based upon any claim that the termination by the players or any Players Union of its status as a collective bargaining representative is or would be a sham, pretext, ineffective, requires additional steps, or has not in fact occurred.

159. The NFL defendants have already indicated that they will breach this provision of the SSA by claiming that the renunciation of the NFLPA's status as the players' collective bargaining representative is ineffectual, and, thus, there is an actual controversy over this provision.

160. Plaintiffs and class members seek a declaration, pursuant to 28 U.S.C. § 2201, that, under the SSA, the NFL Defendants have waived any right to assert any labor exemption defense based on any claim that the players' decision to terminate the status of the NFLPA as their collective bargaining representative is in any way a sham, pretext, ineffective, requires additional steps, or has not in fact occurred.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment with respect to their Complaint as follows:

1. Declaring that the "lockout" violates Section 1 of the Sherman Act, and enjoining said "lockout";

2. Declaring that the NFL Defendants imposing the anticompetitive Draft with an "Entering Player Pool" violates Section 1 of the Sherman Act, and enjoining said restriction;

48

3.      Declaring that the NFL Defendants imposition of other anticompetitive restrictions, including the Salary Cap, "Franchise Player" designation, "Transition Player" designation, and/or other player restrictions, violate Section 1 of the Sherman Act, and enjoining said restrictions;

4.      Enjoining the NFL Defendants from agreeing to deprive the players of the ability to work as professional football players or negotiate the terms of that employment in a competitive market.

5.      Enjoining the NFL Defendants from agreeing to withhold contractually-owed amounts to players currently under contract for the 2011 NFL season and beyond.

6.      Awarding Plaintiffs and class members treble the amount of damages they sustained as a result of the violations of the antitrust laws alleged herein.

7.      Awarding Plaintiffs and Under-Contract Subclass members the damages they sustained as a result of the NFL Defendants' breaches of contract, or voiding their contracts, at the option of each Under-Contract Subclass member.

8.      Awarding Plaintiffs and Free Agent Subclass members the damages they sustained as a result of the NFL Defendants' interference with their entering into prospective contracts.

9.      Awarding Plaintiffs and Under-Contract Subclass members the damages they sustained as a result of the NFL Defendants' interference with their

contracts, or voiding their contracts, at the option of each Under-Contract Subclass member.

10.    Declaring that the NFL Defendants are obligated to pay all contractually-owed amounts to Plaintiffs and Under-Contract Subclass members regardless of whether or not the "lockout" imposed by the NFL Defendants continues, and that if the NFL Defendants fail to pay any such required payments to any player, that player's contract shall, at the player's option, be declared null and void.

11.    Declaring that, pursuant to the SSA over which this Court has exclusive jurisdiction, the NFL Defendants have waived any right to assert any antitrust labor exemption defense based upon any claim that the termination of the NFLPA's status as the players' collective bargaining representative is a sham, pretext, ineffective, requires additional steps, or has not in fact occurred.

12.    Awarding Plaintiffs their costs and disbursements in this action, including reasonable attorneys' fees;

13.    Granting Plaintiffs and class members such other and further relief as may be appropriate.

## DEMAND FOR JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs

demand a trial by jury.

Dated:       March 11, 2011              Respectfully Submitted,

*Barbara P. Berens*

Barbara P. Berens # 209788
Justi Rae Miller #387330
Berens & Miller, P.A.
3720 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 349-6171
(612) 349-6416 (fax)
bberens@berensmiller.com
jmiller@berensmiller.com

Timothy R. Thornton # 109630
Briggs & Morgan, P.A.
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 977-8550
(612) 977-8650 (fax)
Pvolk@briggs.com

James W. Quinn
Bruce S. Meyer
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

and

51

Jeffery L. Kessler
David G. Feher
David L. Greenspan
Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY 10019
(212) 259-8000

***Attorneys for Plaintiffs***