IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                          :
Tom Brady, Drew Brees, Vincent Jackson, Ben   :
Leber, Logan Mankins, Peyton Manning, Von     :
Miller, Brian Robison, Osi Umenyiora, and     :
Mike Vrabel, individually, and on behalf of all  :
others similarly situated,                    :          No.
                          Plaintiffs,         :
                                              :
           v.                                 :
                                              :
NATIONAL FOOTBALL LEAGUE, et al.,             :
                                              :
                          Defendants.         :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

SCANNED
MAR 1 1 2011
U.S. DISTRICT COURT MPLS

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

    A.    The Parties ........................................................................................ 3

    B.    NFL Players Previously Gave Up Their Union to Pursue Their
        Antitrust Rights ................................................................................. 4

    C.    The Status Quo Since 1993: The White SSA ................................... 6

    D.    The NFL Players Have Exercised Their Right To End Their Union
        And Collective Bargaining Relationship In Order To Assert Their
        Antitrust Rights ................................................................................. 9

    E.    Defendants' Price-Fixing & Group Boycott ................................... 10

    F.    The Severe And Irreparable Harm Caused By the NFL Defendants'
        Group Boycott ................................................................................. 11

ARGUMENT ......................................................................................................... 14

    A.    Defendants' Unlawful Lockout Will Cause Irreparable Injury to
        Plaintiffs and All Other Members of the Putative Class ............... 15

    B.    Plaintiffs Are Highly Likely to Prevail on the Merits of Their Claims ....... 17

        1.    The Group Boycott By the NFL Owners is a Clear
            Violation of Section 1 Under Any Antitrust Test ............................. 17

        2.    The Group Boycott and Price Fixing By the NFL Owners
            is Per Se Illegal ................................................................................ 18

        3.    Defendants' Lockout Violates Section 1 Even if the Rule
            of Reason is Applied ........................................................................ 22

        4.    The NFL Defendants' Concerted Refusal to Deal is Not
            Protected By the Non-Statutory Labor Exemption .......................... 25

        5.    This Court is Fully Empowered to Grant Injunctive Relief
            Against the NFL Defendants' Lockout ............................................. 27

C.    Both the Balance of the Hardships and the Public Interest Favor
Granting the Requested Relief .................................................................... 27

CONCLUSION .................................................................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Am. Needle, Inc. v. NFL,
     130 S. Ct. 2201 (2010)..........................................................................*passim*

Anderson v. Shipowners Ass'n of Pac. Coast,
     272 U.S. 359 (1926) .....................................................................................21

Boris v. USFL,
     No. Cv. 83-4980 LEW (Kx), 1984 WL 894 (C.D. Cal. Feb. 28, 1984)................17, 20

Bowman v. NFL,
     402 F. Supp. 754 (D. Minn. 1975) .......................................................16, 17

Brown v. Pro Football, Inc.,
     782 F. Supp. 125 (D.D.C. 1991)................................................................17

Brown v. Pro Football, Inc.,
     50 F.3d 1041 (D.C. Cir. 1995) ...........................................................17, 26

Brown v. Pro Football, Inc.,
     518 U.S. 231 (1996) ................................................................2, 17, 25, 26

Burlington N. R.R. Co. v. Bhd. of Maint. of Way Emps.,
     481 U.S. 429 (1987) ......................................................................................27

Cal. Dental Ass'n v. FTC,
     526 U.S. 756 (1999) ......................................................................................23

Capitol Records, Inc. v. Thomas-Rasset,
     680 F. Supp. 2d 1045 (D. Minn. 2010) .......................................................28

Chicago Prof'l Sports Ltd. P'ship v. NBA,
     754 F. Supp. 1336 (N.D. Ill. 1991)................................................22, 24, 28

Clarett v. NFL,
     306 F. Supp. 2d 379 (S.D.N.Y. 2004) ........................................... *passim*

Dataphase Sys., Inc. v. C L Sys., Inc.,
     640 F.2d 109 (8th Cir. 1981) ..................................................... 14-15

Denver Rockets v. All-Pro Mgmt., Inc.,
     325 F. Supp. 1049 (C.D. Cal. 1971) ("Haywood").................................. *passim*

Deutscher Tennis Bund v. ATP Tour, Inc.,
    610 F.3d 820 (3d Cir. 2010) ......................................................................24

Flegel v. Christian Hosp., Northeast-Northwest,
    4 F.3d 682 (8th Cir. 1993) ........................................................................19

Flood v. Kuhn,
    316 F. Supp. 271 (S.D.N.Y. 1970) .............................................................27

FTC v. Ind. Fed'n of Dentists,
    476 U.S. 447 (1986) ..................................................................................24

FTC v. Superior Court Trial Lawyers Ass'n,
    493 U.S. 411 (1990) .............................................................................18, 19

Full Draw Prods. v. Easton Sports, Inc.,
    182 F.3d 745 (10th Cir. 1999) ...................................................................20

Gilder v. PGA Tour, Inc.,
    936 F.2d 417 (9th Cir. 1991) .....................................................................16

Hettler v. Petters,
    No. Civ.02-1837 ADM/SRN, 2005 WL 715933 (D. Minn. Mar. 29, 2005)...............28

In re Mich. State Med. Soc'y,
    101 F.T.C. 191 (1983) ...............................................................................24

Jackson v. NFL,
    802 F. Supp. 226 (D. Minn. 1992) ...................................................... passim

Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n,
    457 U.S. 702 (1982) ..................................................................................27

Kapp v. NFL,
    390 F. Supp. 73 (N.D. Cal. 1974)...............................................................17

Law v. NCAA,
    134 F.3d 1010 (10th Cir. 1998) ....................................................22, 23, 25

Linseman v. World Hockey Ass'n,
    439 F. Supp. 1315 (D. Conn. 1977) .............................................16, 17, 20, 28

Mackey v. NFL,
    543 F.2d 606 (8th Cir. 1976)......................................................................17

McCourt v. Cal. Sports, Inc.,
    460 F. Supp. 904 (E.D. Mich. 1978) ..........................................................16

McNeil v. NFL,
 790 F. Supp. 871 (D. Minn. 1992) .................................................................. 18

McNeil v. NFL,
 No. 4-90-476, 1992 WL 315292 (D. Minn. Sept. 10, 1992)
 ("McNeil Verdict") ....................................................................... *passim*

Nat'l Soc'y of Prof'l Eng'rs v. U.S.,
 435 U.S. 679 (1978) ....................................................................... 18

NBA v. Williams,
 857 F. Supp. 1069 (S.D.N.Y. 1994) ....................................................... 26

NCAA v. Board of Regents of Univ. of Okla.,
 468 U.S. 85 (1984) ("NCAA") ......................................................... *passim*

NFL Players Ass'n v. NFL,
 598 F. Supp. 2d 971 (D. Minn. 2008) ("StarCaps") ............................... *passim*

Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,
 472 U.S. 284 (1985) ....................................................................... 18

Paramount Famous Lasky Corp. v. U.S.,
 282 U.S. 30 (1930) ....................................................................... 21

Powell & McNeil v. NFL,
 764 F. Supp. 1351 (D. Minn. 1991) .............................................. *passim*

Robertson v. NBA,
 389 F. Supp. 867 (S.D.N.Y 1975) ............................................... *passim*

Robertson v. NBA,
 No. 70 Civ. 1526, 1970 WL 532 (S.D.N.Y. Apr. 17, 1970) ........................ 16

Silverman v. MLB Player Relations Comm., Inc.,
 67 F.3d 1054 (2d Cir. 1995) ............................................................ 15

Smith v. Pro-Football, Inc.,
 420 F. Supp. 738 (D.D.C. 1976) ....................................................... 17

St. Paul Fire & Marine Ins. Co. v. Barry,
 438 U.S. 531 (1978) ....................................................................... 21

U.S. v. Adobe Systems, Inc.,
 75 F.R. 60820-01, 2010 WL 3811388 (D.D.C. Sept. 24, 2010). ................ 22

U.S. v. Ass'n of Family Practice Residency Directors,
    No. 96-575-CV-W-2 (W.D. Mo. May 28, 1996), available at
    http://www.justice.gov/atr/cases/f0700/0774.htm.........................................................22

U.S. v. Brown Univ. in Providence in State of R.I.,
    5 F.3d 658 (3rd Cir. 1993)...........................................................................................24

U.S. v. First Nat'l Pictures, Inc.,
    282 U.S. 44 (1930) ......................................................................................................21

U.S. v. LucasFilm Ltd.,
    No. 1:10-cv-02220, 2010 WL 5344347 (D.D.C. Dec. 21, 2010)..................................22

Wash. State Bowling Proprietors Ass'n v. Pac. Lanes, Inc.,
    356 F.2d 371 (9th Cir. 1966) .......................................................................................20

White v. NFL,
    585 F.3d 1129 (8th Cir. 2009) ...................................................................................6, 8

White v. NFL,
    822 F. Supp. 1389 (D. Minn. 1993) .................................................................5-6, 7, 26

White v. NFL,
    836 F. Supp. 1458 (D. Minn. 1993) ..........................................................................6, 7

White v. NFL,
    No. 4-92-906, 2011 WL 706319 (D. Minn. Mar. 1, 2011)
    ("Broadcast Contracts").............................................................................................4, 9

Wilk v. Am. Med. Ass'n,
    895 F.2d 352 (7th Cir. 1990) .......................................................................................24

**STATUTES**

15 U.S.C. § 1 ................................................................................................ *passim*
    § 2 ................................................................................................ *passim*
    § 26 ......................................................................................................14

29 U.S.C. § 101 ..............................................................................................27
    § 157 ....................................................................................................2

**TREATISES AND PERIODICALS**

HERBERT HOVENKAMP, THE LAW OF COMPETITION AND ITS PRACTICE § 19.7 (3d Ed.
    2005), *available at* Westlaw ANTITRPOL-HB ...........................................................21

Howard Fendrich, <u>NFL, Union Have 'Lot of Risk' in Case of Lockout</u>, THE
WASHINGTON TIMES, Jan. 27, 2011, available at www.washingtontimes.com ...........11

Len Pasquarelli, <u>Irsay Plans to Break Bank for Peyton</u>, Feb. 2, 2010, available at
www.sports.espn.go.com.............................................................................................14

## PRELIMINARY STATEMENT

Plaintiffs, nine professional football players and one prospective professional football player, seek a preliminary injunction to prevent Defendants, the National Football League ("NFL") and the 32 separately owned and independently operated NFL teams (collectively, the "NFL Owners" or "NFL Defendants"), from shutting down a multi-billion dollar industry by engaging in a group boycott and price-fixing agreement that is patently illegal under the antitrust laws. Defendants' self-described "lockout" will eliminate all competition for the services of major league professional football players and jeopardize the 2011 NFL season. Specifically, Defendants have agreed not to negotiate with players, not to honor existing player contracts, not to enter into new player contracts, and not to otherwise compete for, or conduct any business with, Plaintiffs or the class they represent. There is no conceivable pro-competitive objective for Defendants' group boycott. Rather, Defendants' stated objective is to further increase NFL owners' profits by forcing players to agree to a system of anticompetitive restraints and a massive reduction in player compensation.

Since 1993, NFL players and the NFL Defendants have been operating under an antitrust class action settlement agreement–the White Stipulation and Settlement Agreement (the "SSA")–that was entered into after a jury in this very Court found that Defendants had violated Section 1 of the Sherman Act, 15 U.S.C. § 1, ("Section 1") by unreasonably suppressing competition for the services of NFL players. History now repeats itself, except this time through a naked and more egregious violation of the antitrust laws: a complete "lockout," or group boycott, of all players.

The NFL Defendants' purported "defense" for their lockout will be the non-statutory labor exemption to the antitrust laws. But as this Court knows, the exemption does not apply where, as here, a majority of employees have decided to relinquish their labor law rights in favor of asserting their antitrust rights, just as NFL players did more than twenty years ago, immediately prior to the McNeil litigation. See, e.g., Brown v. Pro Football, Inc., 518 U.S. 231, 235-50 (1996) (reciting history); Jackson v. NFL, 802 F. Supp. 226, 230-31 (D. Minn. 1992). As this Court held then, and should hold again now, the players have an absolute right under labor and antitrust laws to renounce collective bargaining and exercise their antitrust rights against the NFL Defendants' unlawful restraints. See, e.g., Powell & McNeil v. NFL, 764 F. Supp. 1351, 1356-58 (D. Minn. 1991) ("[E]mployees have an unconditional right 'to refrain' from self-organization and collective bargaining which is guaranteed by Section 7 of the National Labor Relations Act.").[1]

In addition, as part of both the SSA and the 2006-2012 NFL Collective Bargaining Agreement ("CBA"), the NFL Defendants expressly waived any right to contest a decision by the majority of NFL players to change their status to non-unionized employees, with full antitrust protections, after the White SSA expires. SSA, Art. XVIII§ 5(b); CBA, Art. LVII§3(b). As this Court knows, the NFL players would not have undertaken—at the NFL's insistence—to form a union following the execution of the White

---

[1] The Defendants' "lockout" will also breach and tortiously interfere with the contracts of players in the Under-Contract Subclass. See Compl., Counts 4 and 6. This is significant because there is no conceivable defense that Defendants can assert against these contract and tort claims in the absence of a collective bargaining relationship.

SSA if not for the NFL Defendants' agreement to waive any challenge to the NFL players' right to renounce their union and assert antitrust rights at the expiration of the SSA. See Declaration of Richard A. Berthelsen ("Berthelsen Decl."), at ¶¶ 8-9 (filed concurrently herewith); and Exhibit A to the Berthelsen Decl. (Declaration of Eugene Upshaw, dated August 27, 1997 ("Upshaw Decl."), at ¶ 8). Defendants nevertheless have already taken the position that the players' renunciation of the NFLPA is a "sham" or somehow ineffective. That claim is wrong not only as a matter of antitrust and labor law, but it is also a breach of the White SSA.

Defendants have indicated that they will continue their anticompetitive lockout unless and until the non-unionized players agree to anticompetitive restraints that drastically reduce their compensation and competitive opportunities. Preliminary injunctive relief is necessary to stop Defendants' illegal boycott and to protect Plaintiffs, the putative class, and the public's interest in saving the 2011 NFL season.

## STATEMENT OF FACTS[2]

### A.   THE PARTIES

1.   Plaintiffs are professional football players currently employed by or seeking employment with an NFL team, and the class of similarly situated players whom they seek to represent.

---

[2] The facts supporting Plaintiffs' motion are set forth in the Berthelsen Declaration, the Upshaw Declaration and the accompanying declarations of Anthony Agnone ("Agnone Decl."), Frank Bauer ("Bauer Decl."), Joby Branion ("Branion Decl."), Tom Condon ("Condon Decl."), Neil Cornrich ("Cornrich Decl."), William Vann McElroy ("McElroy Decl."), Neil Schwartz ("Schwartz Decl."), and Donald Yee ("Yee Decl.").

2.     Defendant National Football League ("NFL") is an unincorporated association comprising the 32 separately-owned and independently operated NFL professional football teams.

3.     The other Defendants are the 32 NFL member teams, each of which is a separately-owned and independent entity which operates a professional football franchise for profit.

4.     The NFL member teams are competitors for the services of major league professional football players and constitute the only participants in the United States market for the services of such players. The NFL Defendants possess uncontested monopoly power in this relevant employment market. See, e.g., McNeil v. NFL, No. 4-90-476, 1992 WL 315292, at *3 (D. Minn. Sept. 10, 1992) ("McNeil Verdict") ("The NFL Defendants are the only purchasers of players' services in th[e] relevant market."); Clarett v. NFL, 306 F. Supp. 2d 379, 407 (S.D.N.Y. 2004) ("That the League has exclusive market power in [the market for player services] is obvious; the very fact that it can establish a Rule that excludes players from the market altogether demonstrates its market domination."), rev'd on other grounds, 369 F.3d 124 (2d. Cir. 2004). Indeed, the "enormous market power" of the NFL was just reaffirmed on March 1, 2011 by this very Court. White v. NFL, No. 4-92-906, 2011 WL 706319, at *9 n.6 (D. Minn. Mar. 1, 2011) ("Broadcast Contracts").

B.     **NFL PLAYERS PREVIOUSLY GAVE UP THEIR UNION TO PURSUE THEIR ANTITRUST RIGHTS**

1.     In 1989, prior to eight individual players filing the McNeil case, NFL players ended their collective bargaining relationship with Defendants who, as

alleged in <u>McNeil</u>, were violating Section 1 by implementing illegal restraints under the

Right of First Refusal/Compensation Rules of Plan B.   <u>Powell & McNeil</u>, 764 F. Supp. at

1353-54.

      2.    The collective bargaining relationship was terminated in 1989 as

follows:

- The Executive Committee of the National Football League Players Association ("NFLPA") abandoned "all collective bargaining rights in an effort to end the labor exemption defense to the NFL Defendants' system of player restraints." <u>Id.</u>

- A "substantial majority" of players agreed to end union representation and player representatives from NFL teams "met and unanimously voted to end the NFLPA's status as the players' collective bargaining representative and to restructure the organization as a voluntary professional association." <u>Id.</u>

- The NFLPA filed a labor organization termination notice with the United States Department of Labor and its tax status was reclassified by the Internal Revenue Service as that of a business league. <u>Id.</u>

- The NFLPA ceased representing NFL players in collective bargaining and informed NFL management that it "would no longer represent the players in grievance proceedings . . . ." <u>Id.</u>

      3.    Based on the foregoing, this Court held that the collective bargaining

relationship and, thus, the non-statutory labor exemption, had ended. <u>Id.</u> at 1358-59.

      4.    Following that decision, the <u>McNeil</u> case was submitted to a jury,

which found that each plaintiff established antitrust injury and the NFL had implemented

unreasonable restraints on competition for player services in violation of Section 1.

<u>McNeil Verdict</u>, 1992 WL 315292, at *1.

      5.    Shortly after the <u>McNeil</u> decision, and at approximately the same

time that this Court entered a preliminary injunction against the NFL's continued

imposition of unlawful restraints in <u>Jackson</u>, 802 F. Supp. at 234-35, the <u>White</u> case was

filed by five NFL players on behalf of an injunctive relief class. That class action

asserted antitrust challenges to various NFL restraints on the market for player services,

including Plan B. <u>See</u> <u>White v. NFL</u>, 822 F. Supp. 1389, 1395-96 (D. Minn. 1993).

Ultimately, the lawsuit was settled by the parties just prior to this Court ruling on the

plaintiffs' motion for a preliminary injunction, resulting in the <u>White</u> SSA. <u>Id.</u>

**C.      THE STATUS QUO SINCE 1993:  THE WHITE SSA**

1.      The SSA was designed to end the <u>White</u> case and "a wide range of

related litigation," <u>id.</u>, and "represent[ed] the resolution to a decades-old dispute" in which

NFL owners "worked together to minimize labor costs" and the players' economic share of

the game's success. <u>White v. NFL</u>, 585 F.3d 1129, 1133-34 (8th Cir. 2009).

2.      The parties in <u>White</u> originally entered the SSA on February 26,

1993. <u>White</u>, 822 F. Supp. at 1395-96. The Court approved the SSA on April 30, 1993,

concluding that it was "fair, reasonable and adequate" to the class. <u>Id.</u> at 1417-34.

3.      As part of the <u>White</u> settlement, the NFL Defendants insisted on the

right to terminate the agreement unless the players re-formed a union and entered into a

new CBA embodying the terms of the SSA within 30 days. In exchange, the <u>White</u> class

demanded that the NFL Defendants agree to waive any right to challenge a decision by

the majority of NFL players to give up their union and pursue their antitrust rights once

the SSA expires. <u>See id.</u> at 1431 (approving initial SSA and reviewing procedural

history); <u>White v. NFL</u>, 836 F. Supp. 1458, 1497-1501 (D. Minn. 1993) (approving

amended SSA and reviewing application of non-statutory labor exemption); <u>see also</u>

Berthelsen Decl. at¶¶8-9, Upshaw Decl. at¶8. Thus, it was agreed, and so-ordered by this Court, that the NFL could not assert any claimed exemption to the antitrust laws based on an allegation that the action by a majority of NFL players to renounce collective bargaining is somehow ineffective or a sham.  SSA, Art. XVIII§5(b).

        4.      With the protections of the SSA in place, NFL players subsequently reconstituted the NFLPA as a union and entered into a CBA with the NFL that incorporated the terms of the SSA with various amendments not inconsistent with the SSA.  See White, 822 F. Supp. at 1431; White, 836 F. Supp. at 1497-1501.

        5.      The amendments were approved by the Court on August 19, 1993, with the Court concluding that the amended SSA was "fair, reasonable and adequate" to the class.  Id. at 1496, 1505.

        6.      The Court incorporated the SSA into its Final Consent Judgment of August 20, 1993, ordering the parties to, among other things, "consummate the terms and provisions of the" SSA.  Id. at 1511.

        7.      The SSA and the Final Consent Judgment provide that the Court has continuing jurisdiction to effectuate and enforce the SSA.  SSA, Art. XX§1; White, 836 F. Supp. at 1511.

        8.      For example, this Court has exclusive jurisdiction to interpret the provisions of the SSA, including the provision that precludes the NFL Defendants from asserting any labor exemption from the antitrust laws by contesting a decision of the majority of players to end any collective bargaining relationship with the NFL:

> [T]he Parties agree that, after the expiration of the express term of any CBA, in the event that at that time or any time thereafter a majority of

players indicate that they wish to end the collective bargaining status of any Players Union on or after expiration of any such CBA, <u>the Defendants . . . waive any rights they may have to assert any antitrust labor exemption defense based upon any claim that the termination by the players or any Players Union of its status as a collective bargaining representative is or would be a sham, pretext, [or] ineffective . . . .</u>

<u>See</u> SSA, Art. XVIII§5(b) (emphasis added); CBA, Art. LVII§3(b) (same).

9.   The parties subsequently amended and extended the SSA on four occasions, and each time, in 1996, 1999, 2002, and 2006, the Court approved the amendments as "fair, reasonable and adequate" to the class. <u>See, e.g.</u>, <u>White</u>, 585 F.3d at 1134.

10.   On May 20, 2008, the NFL Defendants gave notice that they were terminating the CBA and the SSA two years early. The Defendants' stated reason for doing so was to seek a massive redistribution of revenues from the players to the NFL Defendants through the imposition of a new, more restrictive, system of player restraints. <u>See</u> Berthelsen Decl. at ¶¶14-15.

11.   Since May 20, 2008, the parties have tried to negotiate an extension of the CBA and SSA without success. During the negotiations, the NFL Defendants made it clear that if the players did not agree to the NFL's demands for a massive reduction in player salaries and competitive freedom, the NFL Defendants would let the agreements expire and claim a labor law right to lock out the players in an attempt to coerce them into capitulating to the NFL's demands. <u>Id.</u> at ¶16.

12.   This Court has already recognized that the NFL Defendants have been planning, at least since May 2008, to let the CBA and SSA expire at the end of the 2010 league year and to lock out the players in 2011 with the aim of forcing a CBA more

favorable to Defendants: "In May 2008, the NFL opted out of the final two years of the CBA, and recognized that a lockout in 2011 would help achieve a more favorable CBA." Broadcast Contracts, 2011 WL 706319, at *8.

13.     On information and belief, the NFL Defendants intend to lock out the Plaintiffs and all other professional football players currently employed by or seeking employment with an NFL club commencing immediately after the midnight March 11th expiration of the SSA and CBA, to carry out the lockout plan they formulated as early as 2008.

## D.    THE NFL PLAYERS HAVE EXERCISED THEIR RIGHT TO END THEIR UNION AND COLLECTIVE BARGAINING RELATIONSHIP IN ORDER TO ASSERT THEIR ANTITRUST RIGHTS

1.     Prior to the midnight March 11, 2011 expiration of the SSA and CBA, the following activities were carried out by NFL players, which terminated their collective bargaining relationship with Defendants and thus ended the non-statutory labor exemption:

2.     By 4 p.m. Eastern time on March 11, 2011 (prior to the midnight expiration of the SSA and CBA), a substantial majority of NFL players voted to end the NFLPA's status as their collective bargaining representative and to restructure the NFLPA as a voluntary professional association. The players' majority vote meant that they gave up all rights to bargain collectively, the right to strike, and all other labor law rights that are only available to unionized employees. See Berthelsen Decl. at ¶ 19, 27.

3.     On the afternoon of March 11, 2011, Roger Goodell, Commissioner of the NFL, was informed of the players' renunciation and disclaimer of any collective

bargaining rights. The NFLPA also disavowed any interest in continuing to represent the players in collective bargaining. Id. at¶20.

4.     Also on March 11, 2011, all certified player-agents were notified that, as of 4 p.m. Eastern time, they were no longer representatives of the NFLPA and that their conduct was no longer subject to regulation by the NFLPA. The NFL was promptly informed of this change in agent status. Id. at¶25.

5.     The NFLPA has withdrawn from all pending fine appeals and all pending injury and non-injury grievances, and the affected players have been advised that the NFLPA will no longer represent them in grievances. Id. at¶24.

6.     The NFLPA has also ended all participation in the benefit application process or other business being conducted by the Bert Bell Plan or any other benefit plans provided by the expiring CBA. The NFL has been notified of the same. Id. at¶26.

7.     Finally, the NFLPA is in the process of filing a labor organization termination notice with the United States Department of Labor, and an application is being filed with the Internal Revenue Service for the NFLPA to become a business league for tax status purposes. Id. at¶22-23.

## E.     DEFENDANTS' PRICE-FIXING & GROUP BOYCOTT

1.     The NFL Defendants have made it clear that they intend to implement a group boycott, or"lockout," of plaintiffs and all professional football players employed by or seeking employment with an NFL club commencing at midnight on March 11, 2011. Under the lockout: (i) no players will be paid for the 2011 NFL season;

(ii) no competition for player services or player contract negotiations will be permitted; (iii) all team training facilities will be shut down; and (iv) the 2011 NFL pre-season and regular season will not commence. See Berthelsen Decl. at ¶28.

     2.    In public statements, NFL officials have acknowledged that the NFL Defendants are profitable. Nonetheless, they have made it clear that what they are seeking through the lockout is, among other things, a massive reduction in player wages and reduced competition for players so that the NFL team owners can be even more profitable. See, e.g., Howard Fendrich, NFL, Union Have 'Lot of Risk' in Case of Lockout, THE WASHINGTON TIMES, Jan. 27, 2011, available at www.washingtontimes.com (quoting Eric Grubman, NFL Executive Vice President of Business Operations: "We have a healthy business. We are not losing money").

     3.    On March 11, 2011, immediately after the players renounced their union, this antitrust class action was filed to prevent the NFL Owners from carrying out their scheme to use a group boycott to fix wages, eliminate competition and coerce the players into agreeing to a new, anticompetitive system of restraints upon competition for player services under the pain of losing a season or more in the very short window they are able to work as professional football players.

## F. THE SEVERE AND IRREPARABLE HARM CAUSED BY THE NFL DEFENDANTS' GROUP BOYCOTT

     1.    Plaintiffs and all other professional football players currently employed by or seeking employment with an NFL team will suffer severe and irreparable injury if Defendants are permitted to continue their lockout. The careers of professional football players are extremely brief. The threat of a career-ending injury is a constant

concern in the lives of NFL players. Defendants' lockout threatens to rob Plaintiffs and all other players of an entire year, or more, of their extremely short careers. The boycott will also deprive them of new contracts, negotiated in a free market, the precise terms of which will be impossible to recreate. See Berthelsen Decl. at¶33, Condon Decl. at¶14, Schwartz Decl. at¶14, Bauer Decl. at¶13, McElroy Decl. at¶15, Branion Decl. at¶15; Cornrich Decl. at¶9, Agnone Decl. at¶11.

2.      The irreparable injury inflicted on Plaintiffs and other class members is immediate. For example, Tom Brady, Drew Brees, Brian Robison and Osi Umenyiora are owed contracted-for salaries for 2011 or immediate bonuses, which Defendants' lockout will deprive them of. These players will not be able to practice or prepare for the 2011 NFL season and may be deprived of one or more years of their NFL careers, which can never be duplicated. See Condon Decl. at¶13, Yee Decl. at¶8, McElroy Decl. at¶16, Agnone Decl. at¶10.

3.      Other NFL Players, such as Peyton Manning, Vincent Jackson, Logan Mankins, Mike Vrabel and Ben Leber, whose contracts have expired, and all other free agents will be unable to determine even which team they might play for, since they are unable to negotiate or sign contracts with any NFL team. As a result, these players cannot determine their future as NFL players in the absence of a market in which to offer their services. See Condon Decl. at¶14, Schwartz Decl. at¶13, Bauer Decl. at¶12, McElroy Decl. at¶15, Cornrich Decl. at¶9.

4.      Defendants' boycott will cause severe and irreparable harm to Plaintiffs and other players at all stages of their careers. For example, consider the

irreparable harm caused to young players like Von Miller who, if forced to forego an entire season, will likely never be able to recapture that lost competitive opportunity. The experience and exposure that comes from playing against NFL-level competition and receiving NFL coaching is a necessity for young players. Further, if the entire 2011 NFL season is cancelled, these players will be competing for roster spots next year against a new group of incoming players who will not have missed an entire year of high level competition. Additionally, many young players maximize their value by negotiating extensions of their current contracts before they reach free agency. See Branion Decl. at¶ 15, Berthelsen Decl. at¶32. Defendants' group boycott will foreclose those opportunities.

5.      Similarly, the lockout will cause severe and irreparable injuries to veteran players, such as Peyton Manning, Osi Umenyiora and Mike Vrabel, who may have only a limited number of years remaining in the league before they retire. The skills of such players can diminish from lack of competition, making it difficult for them to regain the full talents exhibited prior to an absence from play. For these players, the cancellation of the season may also mean the premature termination of their careers. At the very least, these players' opportunity to earn NFL remuneration is truncated. See Condon Decl. at¶13, Agnone Decl. at¶10-11, Cornrich Decl. at¶8.

6.      The unlawful group boycott by the NFL owners will inflict additional irreparable injury on players who would otherwise be negotiating extensions of their current NFL contracts. Id. at¶14. For example, in discussing potentially signing Plaintiff Manning to a new contract, Colts owner Jim Irsay has stated that the contract will be "the biggest in history; there's not much doubt about that." Mr. Irsay expects Mr.

Manning's new contract to be "the easy one to do, because you know it's going to have to be the highest ever." Len Pasquarelli, <u>Irsay Plans to Break Bank for Peyton</u>, Feb. 2, 2010, available at www.sports.espn.go.com.

7.      Defendants' lockout will also cause irreparable harm to rookie players, such as Von Miller, who will be unable to negotiate with NFL teams that select them in the Draft, to meet with their new team's coaches or trainers, or to train, practice or play with their new teammates at team facilities. The absence of such training opportunities could cost rookie players the chance to start or even make a team when competing against established veterans. Branion Decl. at ¶ 11.

8.      In all cases, Plaintiffs and other players will never be able to recover from the harm they will suffer if they lose even part of an NFL season as a result of Defendants' lockout. There is no way to calculate a damages amount that could fully compensate NFL players for these injuries.

## **ARGUMENT**

Section 16 of the Clayton Act broadly empowers the Court to grant preliminary injunctions "against threatened loss or damage by a violation of the antitrust laws" based upon "a showing that the danger of irreparable loss or damage is immediate." 15 U.S.C. § 26. The factors to be considered in granting preliminary relief are:

1.      The threat of irreparable harm to the movant;

2.      The state of the balance of this harm and the injury that granting the injunction will inflict on other parties in the litigation;

3.      The probability that movant will succeed on the merits; and

4.      The public interest.

Jackson, 802 F. Supp. at 229 (citing Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc)); NFL Players Ass'n v. NFL, 598 F. Supp. 2d 971, 977 (D. Minn. 2008) ('StarCaps'). No factor is determinative; rather, the equities must be balanced to achieve a just determination. Dataphase, 640 F.2d at 113.

## A. DEFENDANTS' UNLAWFUL LOCKOUT WILL CAUSE IRREPARABLE INJURY TO PLAINTIFFS AND ALL OTHER MEMBERS OF THE PUTATIVE CLASS

Plaintiffs and all other professional football players currently employed by or seeking employment with one of the NFL teams will suffer severe harm if Defendants' lockout is not immediately enjoined. There is no question that the careers of professional athletes are short and precarious so that being denied the opportunity to play constitutes an irreparable injury, which cannot be fully compensated with monetary damages.[3] See Silverman v. MLB Player Relations Comm., Inc., 67 F.3d 1054, 1062 (2d Cir. 1995) ('Given the short careers of professional athletes and the deterioration of physical abilities through aging, the irreparable harm requirement has been met'); Jackson, 802 F. Supp. at 231 ('The existence of irreparable injury is underscored by the undisputed brevity and precariousness of the players' careers in professional sports, particularly in the NFL'); StarCaps, 598 F. Supp. 2d at 982 ('The failure to make the playoffs . . . is not

---

[3] For example, in McNeil, four of the eight plaintiffs did not recover any monetary damages, despite the jury's determination that they all suffered economic injury, because of the difficulty in determining the precise amount of their damages. See Jackson, 802 F. Supp. at 231 (discussing McNeil).

compensable monetarily and is therefore an irreparable harm."). See Declarations submitted herewith, cited supra p. 3, n.2.[4]

This Court has not hesitated to grant preliminary injunctive relief where, as here, anticompetitive restraints by sports leagues have prevented professional athletes from offering their services in a competitive market. See, e.g., Jackson, 802 F. Supp. at 230-31 (granting preliminary injunctive relief because athletes "suffer irreparable injury each week that they remain restricted under an illegal system of player restraints").

The irreparable harm here is particularly compelling because all NFL players are being deprived entirely of any market to offer their services and may be deprived of an entire year, or more, in their potentially very brief major league professional football careers. Indeed, the potential cancellation of the 2011 NFL season as a result of Defendants' lockout would inevitably result in irreparable injury to professional football players at all levels of skill and experience. See supra p. 11.

---

[4] See also Transcript of Record, Robertson v. NBA, No. 70 Civ. 1526, 1970 WL 532, at *1 (S.D.N.Y. Apr. 17, 1970); Denver Rockets v. All-Pro Mgmt., Inc., 325 F. Supp. 1049, 1057 (C.D. Cal. 1971) ("Haywood"), injunction reinstated sub nom., Haywood v. NBA, 401 U.S. 1204 (1971); Gilder v. PGA Tour, Inc., 936 F.2d 417, 423 (9th Cir. 1991); McCourt v. Cal. Sports, Inc., 460 F. Supp. 904, 912 (E.D. Mich. 1978), vacated on other grounds, 600 F.2d 1193 (6th Cir. 1979); Linseman v. World Hockey Ass'n, 439 F. Supp. 1315, 1319-20 (D. Conn. 1977); Bowman v. NFL, 402 F. Supp. 754, 756 (D. Minn. 1975).

**B.   PLAINTIFFS ARE HIGHLY LIKELY TO PREVAIL ON THE MERITS OF THEIR CLAIMS**

   1.   **The Group Boycott By The NFL Owners Is A Clear Violation Of Section 1 Under Any Antitrust Test**

Absent the non-statutory labor exemption, courts have repeatedly held that owner-imposed restrictions on competition for player services violate Section 1.[5] This conclusion applies, a fortiori, to the lockout here, which eliminates all competition for player services and cannot even arguably further any purportedly pro-competitive objective.

In case after case, and most recently by the Supreme Court in American Needle, it has been held that NFL and other sports team owners are horizontal competitors for, among other things, the services of professional athletes:

> Each of the teams is a substantial, independently owned, and independently managed business. "[T]heir general corporate actions are guided or determined' by "separate corporate consciousnesses," and "[t]heir objectives are' not "common." The teams compete with one another, not only on the playing field, but to attract fans, for gate receipts and for contracts with managerial and playing personnel.

---

[5] See, e.g., Smith v. Pro-Football, Inc., 420 F. Supp. 738 (D.D.C. 1976), affd on other grounds, 593 F.2d 1173 (D.C. Cir. 1978); Mackey v. NFL, 543 F.2d 606 (8th Cir. 1976); Brown v. Pro Football, Inc., 782 F. Supp. 125 (D.D.C. 1991), rev'd on other grounds, 50 F.3d 1041 (D.C. Cir. 1995), affd, 518 U.S. 231; Robertson v. NBA, 389 F. Supp. 867 (S.D.N.Y. 1975); McNeil Verdict, 1992 WL 315292; Jackson, 802 F. Supp. 226; Boris v. USFL, No. Cv. 83-4980 LEW (Kx), 1984 WL 894 (C.D. Cal. Feb. 28, 1984); Linseman, 439 F. Supp. 1315; Bowman, 402 F. Supp. 754; Kapp v. NFL, 390 F. Supp. 73, 82 (N.D. Cal. 1974); Haywood, 325 F. Supp. 1049.

Am. Needle, Inc. v. NFL, 130 S. Ct. 2201, 2212-2213 (2010) (citations omitted);

Robertson, 389 F. Supp. at 893; Haywood, 325 F. Supp. at 1054-55; McNeil v. NFL, 790

F. Supp. 871, 880 (D. Minn. 1992).[6]

In ascertaining whether a particular agreement between competitors (like

Defendants' lockout) unreasonably restrains trade, courts apply either the per se rule or the

rule of reason.  See Nat'l Soc'y of Prof'l Eng'rs v. U.S., 435 U.S. 679, 692 (1978).

Regardless of which test applies, the "ultimate focus" is not changed: "Both per se rules and

the Rule of Reason are employed "to form a judgment about the competitive significance

of the restraint." NCAA v. Board of Regents of Univ. of Okla., 468 U.S. 85, 103 (1984)

(citation omitted) ("NCAA").

## 2. The Group Boycott And Price Fixing By The NFL Owners Is Per Se Illegal

Defendants' agreement to refuse to negotiate with, pay, or otherwise deal

with NFL players is a naked restraint of trade that operates as both a group boycott and a

horizontal agreement to fix prices for player services, and is therefore per se illegal.

See, e.g., FTC v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 434 (1990) (per se

rule applied to group boycott designed to force higher wages); Nw. Wholesale Stationers,

Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 290 (1985) ("concerted refusals to

deal" are "so likely to restrict competition without any offsetting efficiency gains that they

---

[6] Indeed, the NFL Defendants argued in American Needle that they should be treated as a "single entity" for intellectual property licensing purposes, but even they acknowledged that a purported "single entity" status would not apply to the market for player services.  Br. for the NFL Respondents, at 34 n.11, Am. Needle, 130 S. Ct. 2201 (2010) (No. 08-661).

should be condemned"as per se illegal); Flegel v. Christian Hosp., Northeast-Northwest, 4

F.3d 682, 687 (8th Cir. 1993) ("the per se rule should be invoked for a group boycott").[7]

Indeed, as the Supreme Court has emphasized, where a concerted refusal to

deal is designed "to obtain non-competitive wages," it must be condemned not only as a

boycott "but also a horizontal price-fixing arrangement–a type of conspiracy that has been

consistently analyzed as a per se violation for many decades." Superior Court Trial

Lawyers Ass'n, 493 U.S. at 436 (emphasis added); see also NCAA, 468 U.S. at 100

("Horizontal price fixing [is] ordinarily condemned as a matter of law under an 'illegal per

se' approach . . . .").

For example, in Robertson, the court held that the then extant NBA reserve

clause, uniform player contract, and college draft were per se violations of the Sherman

Act as both group boycotts and price-fixing agreements:

- "The player draft and perpetual reserve system are readily susceptible to condemnation as group boycotts based on the NBA's concerted refusal to deal with the players save through these uniform restrictive practices." 389 F. Supp. at 893 (emphasis added).

- The restraints are "also analogous to price-fixing devices condemned as per se violative of the Sherman Act, for the draft and a perpetual reserve system allow competing teams to eliminate competition in the hiring of players and invariably lower the cost of doing business[.]" Id. (emphasis added).

---

[7] The Supreme Court's decision in American Needle is consistent with applying the per se approach here. There, the Court acknowledged that, if a restraint on competition is not 'essential if the product is to be available at all," the per se rules may apply. 130 S. Ct. at 2213-15 (emphasis added). The concerted refusal to deal here is designed to increase the already undisputed profitability of Defendants, who do not even try to claim that their economic demands or lockout are necessary for NFL football to be available at all.

- A proposed merger by the NBA with a rival league is <u>per se</u> violative of Section 1 and/or Section 2 of the Sherman Act because it would "result in the <u>total elimination of competition</u> in the major league market." <u>Id.</u> at 894 (emphasis added).

Courts have repeatedly held that sports industry group boycotts cannot survive <u>per se</u> scrutiny. <u>See, e.g.</u>, <u>Haywood</u>, 325 F. Supp. at 1066 (preliminarily enjoining a <u>per se</u> illegal group boycott by NBA owners of certain players); <u>Wash. State Bowling Proprietors Ass'n v. Pac. Lanes, Inc.</u>, 356 F.2d 371, 375-76 (9th Cir. 1966) (rules imposed by the Bowling Proprietors Association restricting eligibility of players to participate in tournaments condemned as <u>per se</u> illegal group boycott); <u>Boris</u>, 1984 WL 894 ("eligibility" rule by the United States Football League and member teams struck down as <u>per se</u> illegal group boycott); <u>Linseman</u>, 439 F. Supp. at 1323 (World Hockey Association regulation excluding hockey players under the age of 20 from playing for any WHA team constituted <u>per se</u> illegal arrangement); <u>Full Draw Prods. v. Easton Sports, Inc.</u>, 182 F.3d 745, 750 (10th Cir. 1999) (applying <u>per se</u> rule to group boycott).

Unlike cases where courts have applied the rule of reason to certain NFL agreements (<u>e.g.</u>, <u>American Needle</u>, <u>Clarett</u>, <u>McNeil</u>), Defendants' lockout involves not only a group boycott, but also a horizontal price-fixing arrangement, and would totally eliminate competition without any arguable pro-competitive objective or effect (such as the maintenance of competitive balance). Thus, notwithstanding the sports league context which often leads to some variation of the rule of reason, the NFL Defendants' refusal to deal for the purpose of coercing a massive reduction in player wages and other unreasonable restraints, warrants <u>per se</u> condemnation.

This has long been the rule. In <u>Paramount Famous Lasky Corp. v. U.S.</u>, 282 U.S. 30 (1930), competing film distributors would only do business with exhibitors who would agree to a particular standard contract. The Court condemned this group boycott because its "manifest purpose" was to "coerce the exhibitor and limit the freedom of trade." <u>Id.</u> at 41. Similarly, in <u>U.S. v. First National Pictures, Inc.</u>, 282 U.S. 44 (1930), film distributors would not deal with exhibitors who refused particular contractual terms. <u>Id.</u> at 54. The Court struck down this group boycott as being <u>per se</u> illegal. <u>Id.</u> at 54-55; <u>see also</u> <u>St. Paul Fire & Marine Ins. Co. v. Barry</u>, 438 U.S. 531, 543-44 (1978) (it is unlawful to engage in "concerted refusals to deal" against a customer who refuses to accede to particular contractual terms); <u>Anderson v. Shipowners Ass'n of Pac. Coast</u>, 272 U.S. 359, 361-65 (1926) (finding unlawful an agreement by an association of ship owners to refuse to deal with seamen except pursuant to the association's fixed terms of employment).

Here, too, Defendants' lockout is unequivocally intended to coerce standard contract terms and must be summarily repudiated. This conclusion is also compelled by the complete absence of any pro-competitive objective for the lockout, which renders Defendants' conduct unlawful under even the most narrow view of the <u>per se</u> rule. Indeed, absent a labor exemption, it was held long ago that a strike by competing employees to coerce better terms of employment would violate the Sherman Act. HERBERT HOVENKAMP, THE LAW OF COMPETITION AND ITS PRACTICE § 19.7 (3d Ed. 2005), *available at* Westlaw ANTITRPOL-HB. The exact same analysis leads to the conclusion that the

Sherman Act necessarily prohibits any lockout by competing employers for the same anticompetitive purpose.[8]

### 3. Defendants' Lockout Violates Section 1 Even if the Rule of Reason Is Applied

The NFL Defendants' concerted refusal to deal is equally unable to pass the 'flexible' rule of reason, which 'may not require a detailed analysis; it 'can sometimes be applied in the twinkling of an eye'." Am. Needle, 130 S. Ct. at 2217 (citation omitted). As an agreement among competitors with market power that has no purpose other than to suppress competition, Defendants' lockout would, at a minimum, be subject to immediate condemnation under the 'quick look' approach. Chicago Prof'l Sports Ltd. P'ship v. NBA, 754 F. Supp. 1336, 1357 (N.D. Ill. 1991), aff'd, 961 F.2d 667 (7th Cir. 1992); Law v. NCAA, 134 F.3d 1010, 1020 (10th Cir. 1998).

In Clarett, the plaintiff brought antitrust claims against an NFL rule limiting employment eligibility to players three college seasons removed from high school graduation. With just a 'quick look," the court held that the restriction violated Section 1:

> [The rule is] perfect example of a policy that is appropriately analyzed under the quick look standard because its anticompetitive effects are so obvious. Indeed, one can scarcely think of a more blatantly anticompetitive policy than one that excludes certain competitors from the market

---

[8] The Antitrust Division of the Department of Justice has repeatedly challenged restraints on employment terms as per se illegal. See, e.g., U.S. v. LucasFilm Ltd., No. 1:10-cv-02220, 2010 WL 5344347 (D.D.C. Dec. 21, 2010) (charging a per se violation for an agreement by competing employers not to recruit each other's employees); U.S. v. Adobe Systems, Inc., 75 F.R. 60820-01, 2010 WL 3811388 (D.D.C. Oct. 1, 2010) (same); Complaint at 6, U.S. v. Ass'n of Family Practice Residency Directors, No. 96-575-CV-W-2 (W.D. Mo. May 28, 1996), available at http://www.justice.gov/atr/cases/f0700/0774.htm (same).

> altogether.  Because the rule has the actual anticompetitive effect of
> excluding players . . . from the NFL, it is a naked restriction.

306 F. Supp. 2d at 408 (emphasis added).  See also NCAA, 468 U.S. at 109 ('when there

is an agreement not to compete in terms of price or output, 'no elaborate industry analysis

is required to demonstrate the anticompetitive character of such an agreement'); Law, 134

F.3d 1010 (NCAA rule restricting salaries of college coaches held to violate Section 1

under 'quick look' test).

    As in Clarett, the anticompetitive effects of Defendants' concerted refusal to

deal are so obvious that 'an observer with even a rudimentary understanding of economics

could conclude that' it will have an 'anticompetitive effect.' Cal. Dental Ass'n v. FTC, 526

U.S. 756, 770 (1999).  Because Defendants' actions eliminate all competition in the

market for player services, absent evidence 'which competitively justifies' the need for

such a severe restraint, the lockout cannot survive the 'quick look' test.  NCAA, 468 U.S.

at 113; Law, 134 F.3d at 1020 ('where a practice has obvious anticompetitive effects'

courts should 'proceed[] directly to the question of whether the pro-competitive

justifications advanced for the restraint outweigh the anticompetitive effects').

    Defendants cannot meet their 'heavy burden of establishing' such a

justification.  NCAA, 468 U.S. at 113.  Their stated objective for the lockout is to make

the NFL Owners more profitable, but this is not a cognizable pro-competitive

justification: 'the NFL's desire to keep its costs down is not a legitimate pro-competitive

justification.  The fact that the League and its teams will save money' by their

anticompetitive restraints does not justify them.  Clarett, 306 F. Supp. 2d at 409; see also

Chicago Prof'l Sports, 754 F. Supp. at 1359 ("[I]t's more profitable is not a defense under the Sherman Act.").

Indeed, even if a full-blown rule of reason analysis was applied, Plaintiffs' likelihood of success on the merits would still be virtually assured. See, e.g., FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 459 (1986) (an agreement "impeding the 'ordinary give and take of the market place' cannot survive the rule of reason) (citation omitted).[9] Plaintiffs here easily meet their initial burden under the rule of reason to show that Defendants' boycott will yield "adverse, anticompetitive effects within the relevant product and geographic markets." Deutscher Tennis Bund v. ATP Tour, Inc., 610 F.3d 820, 830 (3d Cir. 2010) (citing U.S. v. Brown Univ. in Providence in State of R.I., 5 F.3d 658, 668 (3d Cir. 1993). In fact, it has already been established that, as the only participants in the United States market for the services of major league professional football players, Defendants undeniably possess not just market, but monopoly power in the market for professional football players' services. See McNeil Verdict, 1992 WL 315292, at *1-3; see also Clarett, 306 F. Supp. 2d at 407.

Finally, under the rule of reason, the proponent of a facially anticompetitive agreement must establish that the agreement is "reasonably necessary" to achieve a purported pro-competitive objective. McNeil Verdict, 1992 WL 315292, at *5 (to survive rule of reason antitrust scrutiny it must be "shown that the restraint is no more restrictive than reasonably necessary to achieve" a pro-competitive purpose); Jackson, 802

_____

[9] See also In re Mich. State Med. Soc'y, 101 F.T.C. 191 (1983); Wilk v. Am. Med. Ass'n., 895 F.2d 352 (7th Cir. 1990).

F. Supp. at 228 n.2; <u>Law</u>, 134 F.3d at 1023.  There is no way, as a matter of law, that a

<u>total</u> elimination of competition in the market for player services can be justified as

"reasonably necessary" to achieve any purportedly pro-competitive objective of the NFL

Defendants.  To the contrary, Defendants' lockout is admittedly designed to increase their

own profits and is clearly not even arguably necessary to achieve <u>any</u> claimed pro-

competitive objective, such as maintaining competitive balance.

### 4. The NFL Defendants' Concerted Refusal To Deal Is Not <u>Protected By The Non-Statutory Labor Exemption</u>

The Supreme Court's decision in <u>Brown</u> and this Court's decision in  <u>Powell</u>

<u>& McNeil</u> dispose of any labor exemption pretenses:  the non-statutory labor exemption

ends where, as here, the former union has disclaimed interest in collective bargaining and

a majority of the former union's members have indicated that they no longer wish to be

represented in collective bargaining.[10]  <u>Brown</u>, 518 U.S. at 250; <u>Powell & McNeil</u>, 764 F.

Supp. at 1356-57.  As the Supreme Court explained in <u>Brown</u>, which (unlike here)

involved the imposition of terms of employment negotiated while a union was in place,

the non-statutory labor exemption ceases to be available when the circumstances are

sufficiently distant from the previous collective bargaining process, such as when a

collective bargaining representative is no longer in existence.  518 U.S. at 250;[11] <u>see also</u>

---

[10] This Court also held in <u>Powell & McNeil</u> that it is not necessary for the players to have a formal NLRB decertification election to effectively end their collective bargaining relationship with the NFL.  <u>Id.</u> at 1357.  A disclaimer of interest does not require any NLRB vote or action.

[11]"Our holding is not intended to insulate from antitrust review every joint imposition of terms by employers, for an agreement among employers could be sufficiently distant in ...(continued)

NBA v. Williams, 857 F. Supp. 1069, 1078 (S.D.N.Y. 1994) (ending the union to bring

an antitrust claim "is certainly an option the players have"), affd, 45 F.3d 684 (2d Cir.

1995). This Court has already held that the type of renunciation actions taken by the

players here is sufficient to overcome the non-statutory labor exemption defense. Powell

& McNeil, 764 F. Supp. at 1353-54.

      In addition, the NFL Defendants are precluded by the express terms of the

SSA from invoking any labor exemption to shield their anticompetitive conduct by

challenging the players' decision to forego union representation. SSA, Art. XVIII§5(b);

CBA, Art. LVII§3(b). This was the SSA quid pro quo, which was relied upon by the

players in deciding to re-unionize after the execution of the SSA, and was an important

consideration in this Court's approval of the SSA. See White, 822 F. Supp. at 1395, 1431

("A central issue . . . is the applicability of the non-statutory labor exemption to the NFL's

player rules. As part of the compromise of those issues, class counsel has agreed that the

new rules would be protected by the labor exemption" only "for the express term of any

new collective bargaining agreement in which such rules are incorporated"). Defendants

nevertheless have already taken the position that the players' actions are somehow

insufficient to end their collective bargaining relationship. The NFL Defendants are not

permitted to renege on their promises in the White SSA by making such a claim.

---

...(continued)

time and in circumstances from the collective-bargaining process that a rule permitting
antitrust intervention would not significantly interfere with that process." 518 U.S. at 235,
250 (citing Brown v. Pro Football, Inc., 50 F.3d 1041, 1057 (D.C. Cir. 1995) (labor
exemption lasts until end of the collective-bargaining relationship, as evidenced by
decertification of the union)).

**5.    This Court is Fully Empowered to Grant Injunctive Relief Against the NFL Defendants' Lockout**

Nor can Defendants argue that the Norris-LaGuardia Act (the "Act") bars preliminary relief. That argument has already been rejected by this Court in similar circumstances: where the bargaining relationship between an employer and its employees has ended, the Act does not "preclude injunctive relief . . . because such relief [would] not undermine any labor policy set forth in the Act." Jackson, 802 F. Supp. at 232-33.[12] Indeed, the Act does not apply where, as here, its "basic policy against the injunction of activities of labor unions" is not at issue. Burlington N. R.R. Co. v. Bhd. of Maint. of Way Emps., 481 U.S. 429, 437 (1987) (emphasis added); see also Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n, 457 U.S. 702, 715 (1982).[13]

**C.    BOTH THE BALANCE OF THE HARDSHIPS AND THE PUBLIC INTEREST FAVOR GRANTING THE REQUESTED RELIEF**

Plaintiffs' motion for a preliminary injunction against Defendants' lockout would reinstate the status quo. Once preliminary relief is granted, the NFL Defendants would be free to implement whatever player restrictions they desire, provided they are consistent with the antitrust laws. The players and the owners could then, if necessary,

---

[12] See also Robertson, 389 F. Supp. at 880 (rejecting as "patently meritless" argument that the Act should be used to dissolve an injunction that prevented the merger of two rival basketball leagues); Flood v. Kuhn, 316 F. Supp. 271, 280 n.15 (S.D.N.Y. 1970) (Act does not apply to action by baseball player challenging professional baseball's reserve system).

[13] Further, the Norris-LaGuardia Act "is not a blanket prohibition on any injunction," even in a labor case. StarCaps, 598 F. Supp. 2d at 978; Jackson, 802 F. Supp. at 232-33.

resolve their legal differences in court without causing irreparable injury to the players and cancelling the upcoming NFL season.

Defendants will not suffer a cognizable hardship if they are preliminarily enjoined from engaging in an unlawful group boycott. Jackson, 802 F. Supp. at 232 ("Defendants have no justifiable interest in continuing to violate the Sherman Act by preserving an illegal status quo."); Hettler v. Petters, No. Civ. 02-1837 ADM/SRN, 2005 WL 715933, at*2 (D. Minn. Mar. 29, 2005) (same); Capitol Records, Inc. v. Thomas-Rasset, 680 F. Supp. 2d 1045, 1060 (D. Minn. 2010) (same). Indeed, it would be "the very antithesis of the concept of balancing the equities" if the inability of Defendants to use an illegal group boycott to reap monopoly profits was considered a basis for not granting preliminary relief. Linseman, 439 F. Supp. at 1325; Chicago Prof'l Sports, 754 F. Supp. at 1359.

Finally, a preliminary injunction would strongly serve the public interest by ending the NFL Defendants' lockout and making it possible for the 2011 NFL season to commence. Players could return to work, and the communities, workers and businesses that depend on the NFL would prosper, and NFL fans would have their games.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction.

Dated:  March 11, 2011                          Respectfully Submitted,

_Barbara P. Berens_

Barbara P. Berens # 209788
Justi Rae Miller, #387330
Berens & Miller, P.A.
3720 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 349-6171
(612) 349-6416 (fax)
bberens@berensmiller.com
jmiller@berensmiller.com

Timothy R. Thornton # 109630
Briggs & Morgan, P.A.
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 977-8550
(612) 977-8650 (fax)
Pvolk@briggs.com

James W. Quinn
Bruce S. Meyer
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

and

Jeffery L. Kessler
David G. Feher
David L. Greenspan
Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY 10019
(212) 259-8000

**_Attorneys for Plaintiffs_**