IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| TOM BRADY, *et al.*, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) No. 0:11-cv-00639-SRN-JJG |
| | ) |
| v. | ) |
| | ) |
| NATIONAL FOOTBALL LEAGUE, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Memorandum of Law
of the National Football League and Its Member Clubs
In Opposition to Plaintiffs' Motion for a Preliminary Injunction

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................. i

TABLE OF AUTHORITIES .................................................................... iii

INTRODUCTION ....................................................................................... 1

BACKGROUND FACTS............................................................................ 4

I.    The Norris-LaGuardia Act Divests this Court of Jurisdiction to
      Grant the Requested Injunctive Relief. ................................................ 9

      A.    This case "involves" and "grows out of" a "labor dispute." .......... 11

      B.    The NFLPA's purported "disclaimer" does not affect  the
            withdrawal of jurisdiction. ........................................................... 12

      C.    The Norris-LaGuardia Act bars injunctions against strikes
            and lockouts alike. ....................................................................... 14

II.   Resolution of Plaintiffs' Suit Requires Determination of Issues
      Within the Primary Jurisdiction of the NLRB..................................... 17

      A.    The primary jurisdiction doctrine requires courts to stay
            actions that implicate issues falling within the specialized
            knowledge of the NLRB................................................................ 18

      B.    Plaintiffs' antitrust suit rests on a predicate issue that falls
            squarely within the primary jurisdiction of the NLRB. .............. 19

III.  Plaintiffs Cannot Meet Their Heavy Burden of Proving that
      Preliminary Injunctive Relief is Warranted. ...................................... 28

      A.    Plaintiffs cannot show a likelihood of success on the merits. ..... 28

            1.    The nonstatutory labor exemption protects lockouts
                  by multiemployer bargaining units. ................................... 29

            2.    The exemption continues to apply until the
                  challenged conduct is sufficiently distant in time and
                  in circumstances from the collective bargaining
                  process. ................................................................................ 31

3. The exemption protects the challenged lockout from antitrust scrutiny. ................................................................ 36

4. Plaintiffs' "waiver" argument lacks any merit. .................. 39

B. Plaintiffs will not suffer irreparable harm in the absence of temporary injunctive relief. ........................................................... 42

C. The balance of harms favors the NFL. ....................................... 45

D. The public interest will be furthered only if the Court denies plaintiffs' motion. ............................................................. 47

CONCLUSION ................................................................................................ 49

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Needle, Inc. v. NFL,*
   130 S. Ct. 2201 (2010)............................................................................ 45, 46

*Anderson v. Ford Motor Co.,*
   803 F.2d 953 (8th Cir. 1986).................................................................. 29, 48

*Anytime Fitness, Inc. v. Family Fitness of Royal, LLC,*
   2010 WL 145259 (D. Minn. Jan. 8, 2010) .................................................... 28

*Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade,*
   412 U.S. 800 (1973)...................................................................................... 19

*Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co.,*
   353 U.S. 30 (1957)........................................................................................ 16

*Brown v. Pro Football, Inc.,*
   50 F.3d 1041 (D.C. Cir. 1995), *aff'd*, 518 U.S. 231 (1996)......... 26, 30, 48, 49

*Brown v. Pro-Football, Inc.,*
   518 U.S. 231 (1996)...............................................................................*passim*

*Burlington N. R.R. Co. v. Bhd. of Maint. of Way Emps.,*
   481 U.S. 429 (1987)...................................................................................... 11

*Burlington N. Santa Fe Ry. Co. v. Int'l Bhd. of Teamsters Local 174,*
   203 F.3d 703 (9th Cir. 2000) (en banc) ....................................................... 13

*Camping Constr. Co. v. Dist. Council of Iron Workers,*
   915 F.2d 1333 (9th Cir. 1990)..................................................................... 16

*CDI Energy Servs., Inc. v. W. River Pumps, Inc.,*
   567 F.3d 398 (8th Cir. 2009)................................................................. 29, 42

*Charles D. Bonanno Linen Serv. Inc.,* 243 NLRB 1093 (1979),
   *enf'd* 630 F.2d 25 (1st Cir. 1980), *aff'd* 454 U.S. 404 (1982). ...................... 23

*Chi. Midtown Milk Distribs. v. Dean Foods Co.,*
   1970 WL 2761 (7th Cir. July 9, 1970)......................................................... 14

*Chi. Rock Is. & Pac. R.R.  Co. v. Switchmen's Union of N. Am.*,
292 F.2d 61 (2d Cir. 1961) ........................................................... 16

*Columbia River Packers Ass'n v. Hinton*,
315 U.S. 143 (1942) ..................................................................... 13

*Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*,
421 U.S. 616 (1975) ..................................................................... 19

*Conoco, Inc.*,
287 NLRB 548 (1987) .................................................................. 42

*Cormier v. Simplex Techs., Inc.*
1999 WL 628120 (D.N.H. Mar. 4, 1999) ..................................... 25

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
640 F.2d 109 (8th Cir. 1981) (en banc) ....................................... 28

*Detroit Newspaper Publ'rs Ass'n v. NLRB*,
372 F.2d 569 (6th Cir. 1967).......................................................  23

*In re Dist. No. 1-Pac. Coast Dist. Marine Eng'rs Beneficial Ass'n*
*(AFL-CIO)*, 723 F.2d 70 (D.C. Cir. 1983) .............................. 15, 48

*El Cerrito Mill & Lumber Co.*,
316 NLRB 1005 (1995) ................................................................ 26

*Gale v. Norwesco, Inc.*,
1990 WL 284504 (D. Minn. Dec. 11, 1990) ................................. 18

*Gen. Motors Corp. v. Harry Brown's, LLC*,
563 F.3d 312 (8th Cir. 2009)........................................................ 43

*Glenwood Bridge, Inc. v. City of Minneapolis*,
940 F.2d 367 (8th Cir. 1991)........................................................ 47

*H.A. Artists & Assocs., Inc. v. Actors' Equity Ass'n*,
451 U.S. 704 (1981).............................................................. 10, 16

*In re Haywood v. NBA*,
401 U.S. 1204 (1971) (Blackmun, J.) (in chambers) ................... 45

*Int'l Bhd. of Elec. Workers, AFL-CIO & Local 159 (Texlite, Inc.)*,
119 NLRB 1792 (1958), *enf'd* 266 F.2d 349 (5th Cir. 1959) ....... 21

*Jackson v. NFL,*
    802 F. Supp. 226 (D. Minn. 1992) ....................................... 16, 45

*Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n,*
    457 U.S. 702 (1982) ..................................................... 11

*John Peterson Motors, Inc. v. Gen. Motors Corp.,*
    613 F. Supp. 887 (D. Minn. 1985) ................................. 43

*Kaiser Steel Corp. v. Mullins,*
    455 U.S. 72 (1982) ...................................................... 19

*Local 926, Int'l Union of Operating Eng'rs v. Jones*
    460 U.S. 669 (1983) .................................................... 25

*Lodge 76, Int'l Ass'n of Machinists v. Wisc. Emp't Relations Comm'n,*
    427 U.S. 132 (1976) .................................................... 29

*Marine Cooks & Stewards, AFL v. Pan S.S. Co.,*
    362 U.S. 365 (1960) .................................................... 16

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) .................................................... 28

*McNeil v. NFL (sub nom. Powell v. NFL),*
    764 F. Supp. 1351 (D. Minn. 1991) ............................... 25

*Milk Wagon Drivers' Union, Local No. 753 v. Lake Valley Farm Prods.,*
    311 U.S. 91 (1940) ..................................................... 10

*Minn-Dak Farmers Co-op. Emps. Org. v. Minn-Dak Farmers Co-op,*
    3 F.3d 1199 (8th Cir. 1993) .......................................... 20

*NBA v. Williams,*
    45 F.3d 684 (2d Cir. 1995) ........................................... 30

*New Negro Alliance v. Sanitary Grocery Co.,*
    303 U.S. 552 (1938) .................................................... 13

*Newspaper Guild of Salem v. Ottaway Newspapers, Inc.,*
    79 F.3d 1273 (1st Cir. 1996) ......................................... 19

*News-Press Publ'g Co.,*
    145 NLRB 803 (1964) .................................................. 23

*NFLPA v. NFL,*
    598 F. Supp. 2d 971 (D. Minn. 2008) ........................................................... 44

*NLRB v. Columbia Tribune Publ'g Co.,*
    495 F.2d 1384 (8th Cir. 1974)............................................................... 20, 24

*Osthus ex rel. NLRB v. Laborers Dist. Council of Minn. & N.D.,*
    2010 WL 3927409 (D. Minn. Oct. 4, 2010) .................................................. 48

*Platt v. Jack Cooper Transp. Co.,*
    959 F.2d 91, 95 (8th Cir. 1992)................................................................... 25

*Plumbers & Steamfitters Local 598 v. Morris,*
    511 F. Supp. 1298 (E.D. Wash. 1981) .................................................. 12, 14

*Powell v. NFL,*
    678 F. Supp. 777 (D. Minn. 1988) .............................................................. 24

*Powell v. NFL,*
    690 F. Supp. 812 (D. Minn. 1988) ............................................. 11, 47, 48, 49

*Powell v. NFL,*
    930 F.2d 1293 (8th Cir. 1989)................................................................*passim*

*Reiter v. Cooper,*
    507 U.S. 258 (1993) .................................................................................... 24

*Resolution Trust Corp. v. Home Savs. of Am.,*
    946 F.2d 93 (8th Cir. 1991)......................................................................... 42

*Retail Assocs, Inc.,*
    120 NLRB 388 (1958) ................................................................................. 21

*Reynolds v. NFL,*
    584 F.2d 280 (8th Cir. 1978)....................................................................... 46

*Rittmiller v. Blex Oil, Inc.,*
    624 F.2d 857 (8th Cir. 1980)....................................................................... 43

*S & M Constructors, Inc. v. Foley Co.,*
    959 F.2d 97 (8th Cir. 1992)......................................................................... 28

*Sampson v. Murray,*
    415 U.S. 61 (1974) ...................................................................................... 44

*San Diego Bldg. Trades Council v. Garmon,*
    359 U.S. 236 (1959) .......................................................... 18, 20, 24

*Teamsters Local Union 682 v. KCI Constr. Co.,*
    384 F.3d 532 (8th Cir. 2004) .......................................................... 26

*United States v. W. Pac. R.R. Co.,*
    352 U.S. 59 (1956) .......................................................... 18, 24

*W. Gulf Maritime Ass'n v. ILA Deep Sea Local 24,*
    751 F.2d 721 (5th Cir. 1985) .......................................................... 10

## STATUTES AND RULES

29 U.S.C. § 104 .......................................................... 9, 10, 11, 14

29 U.S.C. § 105 .......................................................... 10

29 U.S.C. § 113 .......................................................... 11, 12

29 U.S.C. § 152(5) .......................................................... 22

29 U.S.C. § 157 .......................................................... 18

29 U.S.C. § 158 .......................................................... 18, 25

29 U.S.C. § 176 .......................................................... 15

29 U.S.C. § 178 .......................................................... 15

Fed. R. Civ. P. 65(e)(1) .......................................................... 13

## OTHER AUTHORITIES

Black's Law Dictionary (9th ed. 2009) .......................................................... 29

Restatement (Second) of Contracts § 178 (1981) .......................................................... 42

Restatement (Second) of Contracts § 196 (1981) .......................................................... 42

S. Rep. No. 163, 72 Cong., 1st Sess. (1932) .......................................................... 15

## INTRODUCTION

Plaintiffs seek an injunction under the Sherman Act prohibiting the NFL's member clubs from imposing a lockout that is unquestionably lawful and permitted by federal labor law.  Plaintiffs contend that their union's purported disclaimer of interest in collective bargaining—undertaken literally *during* a collective bargaining session at the offices of the Federal Mediation and Conciliation Service—converts into an antitrust violation that may be enjoined by this Court the clubs' exercise of their labor law *right* to lock out their player-employees.

The law is not so easily manipulated.  One party to a collective bargaining relationship cannot, through its own tactical and unilateral conduct, instantaneously oust federal labor law or extinguish another party's labor law rights.  A union cannot, by a tactical declaration akin to the flip of a switch, transform a multiemployer bargaining unit's lawful use of economic tools afforded it under the labor laws into an antitrust violation giving rise to treble damages and injunctive relief.

The Court may not grant the requested injunction for three independent reasons, the first two of which are jurisdictional.

*First*, the Norris-LaGuardia Act withdraws jurisdiction from this Court to grant the requested relief.  Section 4 of the Act prohibits this Court from issuing an injunction against a lockout.  That prohibition applies regardless

of whether or not the NFLPA remains a union.  The jurisdictional bar applies as long as this case "involves *or grows out of*" a labor dispute, a test that is clearly satisfied here.

*Second*, and separately, plaintiffs' suit raises threshold questions about the representational status of their union and whether its purported disclaimer is valid under federal labor law.  Those questions fall squarely within the primary jurisdiction of the National Labor Relations Board.  The validity of the purported disclaimer is a threshold issue because, if it is invalid under the labor laws, the nonstatutory labor exemption unquestionably protects the NFL clubs' exercise of their labor law rights, including their right to lock out, from antitrust scrutiny.

The NLRB is now considering whether the union has purported to disclaim in order to gain a tactical bargaining advantage, rather than disclaiming unequivocally and in good faith, as the federal labor laws require.  If the Board finds such a violation, it will issue an order requiring the union to return to the collective bargaining table.  Under the primary jurisdiction doctrine, the Court must stay this case pending the outcome of the Board proceedings.

*Third*, even if this Court had jurisdiction to consider the request for an injunction, plaintiffs could not demonstrate that one should issue.

Plaintiffs are demonstrably unlikely to succeed on the merits of their antitrust claim.  The nonstatutory labor exemption protects from antitrust scrutiny the clubs' exercise of their labor law right to lock out—a right "directly related to [] the lawful operation of the bargaining process." *Brown v. Pro-Football, Inc.*, 518 U.S. 231, 250 (1996).

The nonstatutory labor exemption continues to apply until a point "sufficiently distant in time and in circumstances from the collective bargaining process that a rule permitting antitrust intervention would not significantly interfere with that process." *Id.*  Given the timing and circumstances presented here, the exemption undoubtedly remains in effect.  In any event, as the Supreme Court has held, the Court could not find the "sufficiently distant" test satisfied and the exemption inapplicable without considering "the detailed views of the Board." *Id.*

Plaintiffs allege that the NFL waived its ability to argue that the disclaimer is a sham.  That assertion ignores the plain language of the CBA; plaintiffs could have asserted a waiver only if the purported disclaimer had occurred *after* CBA expiration.  Here, presumably because the CBA would have barred antitrust claims for at least six months if the disclaimer had occurred *after* expiration, the union purported to disappear a full eight hours *before* the midnight expiration.  In any event, any purported waiver would not preclude either the League's charge before the NLRB, or any argument

that the exemption continues to apply under *Brown*'s "sufficiently distant" test.

Plaintiffs also cannot demonstrate irreparable harm; any alleged injury would be compensable in treble damages.  Given the obvious Catch-22 imposed by plaintiffs' request for an injunction (which, if granted, would expose the League to immediate, additional antitrust claims), the balance of hardships weighs in favor of the NFL, as does the public interest in multiemployer bargaining and judicial noninterference in labor disputes.

## BACKGROUND FACTS

The National Football League Management Council ("NFLMC") is the sole and exclusive collective bargaining representative of the 32 member clubs of the NFL.  The National Football League Players Association ("NFLPA" or "Union") is the sole and exclusive collective bargaining representative of all NFL players, including plaintiffs.  Between 1970 and 2006, the NFLPA and NFLMC negotiated a series of collective bargaining agreements governing the players' terms and conditions of employment.

The most recent CBA expired at 11:59 pm on Friday, March 11, 2011, except for provisions related to the 2011 NFL Draft.  Although they have been engaged in collective bargaining negotiations since at least June 2009 (Compl. ¶50; Pls.' Mem. 8 ¶11), the NFLPA and the NFLMC have not yet negotiated a successor agreement.

At 4:00 p.m. on March 11, 2011, while the parties literally were at the collective bargaining table, the NFLPA purported to disclaim interest in representing the players in further negotiations. (Compl. ¶57.) Within an hour, plaintiffs (who include two members of the NFLPA executive committee)—financed by the NFLPA and represented by the same NFLPA lawyers who had been at the bargaining table only moments earlier—filed this lawsuit, claiming, *inter alia*, that any lockout imposed in support of the NFL's collective bargaining position would be a concerted refusal to deal violating Section 1 of the Sherman Act. (*See* Pls.' Mem. 11 ¶3.)

Plaintiffs also challenge under the Sherman Act terms and conditions of player employment to which their Union had previously agreed, including "Franchise" and "Transition" designations, the College Draft, and the Entering Player Pool. (Compl. ¶¶126-132.)[1] Plaintiffs do not seek a preliminary injunction with respect to these terms; they instead seek an injunction requiring the resumption of football operations so that they can pursue treble damages for the NFL clubs' continued adherence to them.

<div align="center">*     *     *     *</div>

The last time that a CBA between the NFLPA and the NFLMC expired was in 1987. Over the six years that followed, the relationship between the

---

[1] The Declaration of Peter Ruocco explains these terms in more detail.

NFL and the NFL clubs, on the one hand, and the NFLPA and NFL players, on the other, included not only collective bargaining, but also (1) antitrust litigation brought by the NFLPA (*Powell v. NFL*, No. 87-917); (2) a purported disclaimer by the NFLPA of its role as the players' collective bargaining representative; (3) more antitrust litigation directed and financed by the NFLPA (*e.g.*, *McNeil v. NFL,* No. 90-476; *Jackson v. NFL,* No. 92-876; *White v. NFL,* No. 92-906); (4) settlement of the antitrust litigation on terms negotiated by the NFLPA's lawyers and executive director; (5) "resurrection" of the NFLPA's status as a union; and then (6) importation of the litigation settlement into a new CBA.

The NFLPA and plaintiffs seek to repeat that cycle here.

In 1989, the Eighth Circuit held in *Powell* that the nonstatutory labor exemption barred antitrust claims brought by the Union and its members against the League.  The NFLPA responded by purporting to disclaim interest in collective bargaining, in the hope that the purported absence of a union would permit its members to continue its antitrust challenge to the terms and conditions of their employment.

In support of that strategy, the Union repeatedly and unambiguously represented to the court that its disclaimer was *permanent* and *irreversible*, and *not* a bargaining tactic:

- "[T]he NFLPA's abandonment of collective bargaining rights was *permanent and irreversible*, and not designed to put pressure on the NFL to achieve a new collective bargaining agreement." Aff. of Jeffrey L. Kessler, *McNeil v. NFL,* No. 4-90-476, at 2 (Nov. 2, 1990) (emphasis in original) (Ex. A).[2]

- "[T]he NFLPA enacted by-laws preventing it from *ever* engaging in collective bargaining with the NFL." Pls.' Part. SJ Mem. at 3, *McNeil v. NFL* (Aug. 1, 1990) (emphasis added) (Ex. B).

- "[A]s far as ever being a labor organization again, that is a permanent status. We have no intentions, in the future or in my lifetime, to ever return to be a labor organization again." Dep. Testimony of Gene Upshaw, Executive Director of the NFLPA, in *McNeil v. NFL,* at 234 (Oct. 3, 1990) (Ex. C).

Despite these sworn representations of permanent, irreversible, and non-tactical disclaimer, the NFLPA negotiated a collective bargaining agreement less than three years later. (Berthelsen Decl. ¶6 (testifying to direct participation of NFLPA general counsel in settlement discussions).)

Statements of NFLPA representatives both before and *after* March 11, 2011, examples of which are excerpted below, confirm that its current "disclaimer" is a tactical ploy in support of precisely the same strategy:

- On September 29, 2010, Kevin Mawae, the president of the NFLPA, stated: "[T]he idea of decertification, the tactic and the strategy worked back in 1989... . [T]he whole purpose [of disclaimer] *is to have that ace in our sleeve ....* And at the end of the day, guys understand the strategy, it's been a part of the *union strategy* since I've been in the league ... ." (Ex. D at 10-11 (emphases added).)

---

[2] All cited exhibits ("Ex.") are attached to the Declaration of Daniel Connolly.

- On November 10, 2010, DeMeco Ryans, the Houston Texans' NFLPA player representative said: "I think [disclaimer is] a good decision and a good strategy *on our part as a union*." (Ex. E at 1 (emphasis added).)

- On March 2, 2011, Derrick Mason, the Baltimore Ravens' NFLPA player representative, said about the consequences of disclaimer: "*Still we stand behind DeMaurice* [Smith, Executive Director of the Union] and we stand behind the players in the NFL. So are we a union? Per se, no. *But we're still going to act as if we are one.* We're going to still talk amongst each other and *we're going to still try to as a whole get a deal done.*" (Ex. F at 6 (emphases added).)

- On March 11, 2011, *after* the NFLPA purported to decertify, Vonnie Holliday, the NFLPA representative for the Washington Redskins, was asked, "what do you want?" He replied, "We want a *fair CBA. That's it.*" (Ex. G at 2 (emphasis added).)

- On March 12, 2011, *after* the NFLPA purported to decertify, Jeff Saturday, the Vice-President of the NFLPA, stated in a radio interview: "From the players' perspective if we are going to negotiate this out and be locked out with a CBA expiration, then *it would be much better to be … negotiating while we're still playing football.* … [T]hat was the reason that we decertified. We decertified so that we could fight them from locking us out and go back to work. *And we feel like … we can still negotiate this anytime you want.*" (Ex. H at 11-12 (emphases added).)

- On March 18, 2011, plaintiff Mike Vrabel, a member of the NFLPA Executive Committee, was interviewed by ESPN—along with four other members of the Executive Committee, including plaintiff Drew Brees—and made clear that, notwithstanding its purported disclaimer, the NFLPA still wants to negotiate terms and conditions of employment on behalf of the players: "*We are willing to negotiate.* … But *our executive committee* needs to negotiate with … their executive committee. People that are willing *and can agree to a deal.*" (Ex. I at 1 (emphases added).)

The *NFLPA Guide to the Lockout*, distributed by the Union to its

player-members weeks ago, well in advance of both the Union's purported

disclaimer and the CBA's expiration, explains this strategy explicitly: "The

NFLPA ... would fund litigation with individual players, or classes of players, as named plaintiffs, just as *we* did in the *McNeil* and *White* cases. *We* would immediately fund a lawsuit which would seek an injunction ... and ... claim treble damages on behalf of the players." (Ex. J at 45 (emphasis added).)

This is precisely what has happened.

In light of the mountain of evidence demonstrating that the NFLPA had long been planning a tactical disclaimer, not one that is unequivocal and in good faith, the NFL filed a charge with the NLRB on February 14, 2011, asserting that the NFLPA had violated its statutory obligation imposed by the National Labor Relations Act ("NLRA") to bargain in good faith. (Ex. K.) The NFL has amended the charge to assert that the Union's purported "disclaimer" is invalid because it violates the NLRA. (Ex. L.) Proceedings before the Board are ongoing.

## ARGUMENT

I.    *The Norris-LaGuardia Act Divests this Court of Jurisdiction to Grant the Requested Injunctive Relief.*

Plaintiffs' request for a preliminary injunction fails at the threshold. In Section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104(a), Congress stripped federal courts of jurisdiction to enjoin work stoppages: "No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of

any labor dispute to prohibit any person or persons participating … in such dispute from doing … any of the following acts:  (a) Ceasing or refusing to perform any work or to remain in any relation of employment."

Section 4 "forbids courts to enjoin *work stoppages* in *any case* involving or growing out of any labor dispute." *W. Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 726 (5th Cir. 1985) (emphases added).

That plaintiffs have sued under the antitrust laws is irrelevant. Section 5 of the Act, 29 U.S.C. § 105, expressly provides that the removal of jurisdiction extends to injunctions sought under the antitrust laws:  "No court of the United States shall have jurisdiction to issue a restraining order or temporary or permanent injunction upon the ground that any of the persons participating or interested in a labor dispute constitute or are engaged in an unlawful combination or conspiracy because of the doing in concert of the acts enumerated in section 104 of this title."

The Act was meant to "end the granting of injunctions … based upon complaints charging conspiracies to violate the Sherman Antitrust Act." *Milk Wagon Drivers' Union, Local No. 753 v. Lake Valley Farm Prods.*, 311 U.S. 91, 101 (1940).  It "has been interpreted broadly as a statement of congressional policy that the courts must not use the antitrust laws as a vehicle to interfere in labor disputes." *H.A. Artists & Assocs., Inc. v. Actors' Equity Ass'n*, 451 U.S. 704, 714 (1981).

A.    This case "involves" and "grows out of" a "labor dispute."

Section 4 applies to plaintiffs' motion because this case both "involves" and "grows out of" a "labor dispute." 29 U.S.C. § 104(a). The Act defines "labor dispute" broadly to include "*any* controversy concerning terms or conditions of employment." 29 U.S.C. § 113(c) (emphasis added). Congress underscored the breadth of the term by extending the bar on injunctive relief not only to cases "involving" such disputes, but also to cases "growing out of" such disputes. *Id.* §§ 104, 113(a). Congress "wanted [these terms] to be broad" and the Supreme Court has "consistently declined to construe [them] narrowly." *Burlington N. R.R. Co. v. Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 441-42 (1987); *see also Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 708 (1982) ("This Court has consistently given the anti-injunction provisions of the [Act] a broad interpretation …."); *Powell v. NFL*, 690 F. Supp. 812, 814 (D. Minn. 1988).

A case "involve[s]" or "grow[s] out of" a labor dispute when, *inter alia*, "the case involves persons who are engaged in the same industry" and the dispute is "between one or more employers or associations of employers and one or more employees or associations of employees." 29 U.S.C. § 113(a). These terms also are meant to be construed broadly. *See Jacksonville Bulk*, 457 U.S. at 711-12; *Powell*, 690 F. Supp. at 814.

The lockout challenged here "involves or grows out of" a "labor dispute" under any common-sense meaning of those terms. The NFL member clubs imposed the lockout as part of a dispute with their player-employees over the terms and conditions of their employment. Plaintiffs and the NFL clubs are "engaged in the same industry" (professional football), and the dispute is between "one or more employers" (the NFL clubs) and "one or more employees" (the players). Plaintiffs contend that the purpose of the lockout is to coerce the clubs' player-employees to agree to new terms and conditions of employment such as those that had been proposed to the Union in collective bargaining. (Compl. ¶¶3, 53.) *See, e.g.*, *Plumbers & Steamfitters Local 598 v. Morris*, 511 F. Supp. 1298, 1311 (E.D. Wash. 1981) ("The complaint itself contends that the lockout occurred as a means to force concessions to terms in negotiation of a collective bargaining agreement. It is clear this case grows out of a labor dispute as defined in the Norris-LaGuardia Act.").

> B.    The NFLPA's purported "disclaimer" does not affect the withdrawal of jurisdiction.

Section 4 of the Norris-LaGuardia Act applies regardless of whether or not plaintiffs are represented by a union. The Act applies to disputes between employers and "employees *or* associations of employees." 29 U.S.C. § 113(a) (emphasis added). The Supreme Court has explained that the Act is

triggered simply by "disputes affecting the employer-employee relationship." *Columbia River Packers Ass'n v. Hinton*, 315 U.S. 143, 145 (1942).[3]

Accordingly, courts have found that the Act bars injunctions in cases in which no union is involved at all.  *See, e.g.*, *New Negro Alliance v. Sanitary Grocery Co.*, 303 U.S. 552, 559-60 (1938) (dispute between employer and nonlabor organization over nondiscriminatory conditions of employment is a labor dispute covered by the Act); *Burlington N. Santa Fe Ry. Co. v. Int'l Bhd. of Teamsters Local 174*, 203 F.3d 703, 709 n.6 (9th Cir. 2000) (en banc) ("Owing to this broad definition [of 'labor dispute'], the Supreme Court has found the term 'labor dispute' to capture a wide range of controversies," including "a dispute between an employer and a nonlabor organization" (citing *New Negro Alliance*)).

The NFLPA's purported disclaimer also does nothing to change the *origins* of this action.  This suit indisputably "grow[s] out of" a labor dispute: plaintiffs are suing to enjoin the League from exercising a labor law right in support of its position in negotiations over terms and conditions of employment; the lawsuit was filed only hours before the CBA was scheduled

---

[3]  Plaintiffs request an injunction pursuant to Federal Rule of Civil Procedure 65.  But that Rule expressly does not "modify ... any federal statute relating to temporary restraining orders or preliminary injunctions in actions *affecting employer or employee*."  Fed. R. Civ. P. 65(e)(1) (emphasis added).

to expire, and only minutes after the Union had walked away from federally-supervised negotiations regarding terms and conditions of employment; and the suit seeks damages for the member clubs' continued adherence to the *status quo ante* terms and conditions of employment.

> C.   The Norris-LaGuardia Act bars injunctions against strikes and lockouts alike.

Section 4(a) of the Act prohibits injunctions against both strikes and lockouts, including in cases brought by employees challenging a lockout under the antitrust laws. *See, e.g.*, *Chi. Midtown Milk Distribs. v. Dean Foods Co.*, 1970 WL 2761 (7th Cir. July 9, 1970).

As the Seventh Circuit explained, "regardless of plaintiffs' complaint charging an antitrust violation [as a result of a lockout] and any factual merit to their claim, this is a case involving or growing out of a labor dispute within the meaning of the Norris-LaGuardia Act... . Therefore, the federal district court is precluded by law from issuing 'any restraining order or temporary or permanent injunction.'" *Id.* at *1; *see also Plumbers & Steamfitters*, 511 F. Supp. at 1311 ("It is clear this [lockout] grows out of a labor dispute as defined in the Norris-LaGuardia Act ... . That Act removes the jurisdiction of the Court to issue an injunction in such a case. 29 U.S.C. § 104.").

If any more confirmation that the Norris-LaGuardia Act applies to lockouts were needed, the Labor Management Relations Act of 1947

("LMRA") provides it.  The LMRA authorizes the President of the United States to initiate procedures to enjoin "a threatened or actual strike *or lockout* affecting an entire industry or a substantial part thereof" if the President determines that the strike or lockout would "imperil the national health or safety."  29 U.S.C. § 176 (emphasis added).  To prevent a conflict in federal law, the LMRA expressly provides that the Norris-LaGuardia Act does not apply when the President directs the Attorney General to petition a federal court for such an injunction.  *See* 29 U.S.C. § 178(b).  By carving out a narrow category of presidentially-initiated injunctions against strikes *or lockouts* that imperil national health or safety, Congress confirmed in the LMRA that the anti-injunction provisions of the Norris-LaGuardia Act otherwise apply to *both* strikes *and* lockouts.

Thus, plaintiffs' contention that a preliminary injunction would "not undermine any labor policy set forth in the [Norris-LaGuardia] Act" (Pls.' Mem. 27), is simply wrong.  As the authorities cited above confirm, the Act prohibits injunctions against employer lockouts and employee strikes alike because the policy underlying the Act *opposes* "federal court intervention in private labor disputes."  *In re Dist. No. 1-Pac. Coast Dist. Marine Eng'rs Beneficial Ass'n (AFL-CIO)*, 723 F.2d 70, 75 (D.C. Cir. 1983); *see also* S. Rep. No. 163, 72 Cong., 1st Sess. 19 (1932) ("The same rule throughout the bill, wherever it is applicable, applies to both employers and employees.").

\*       \*       \*       \*

In sum, the injunction sought by plaintiffs here is precisely the kind of relief that Congress barred by enacting the Norris-LaGuardia Act.[4] *See H.A. Artists*, 451 U.S. at 714 ("[T]he courts must not use the antitrust laws as a vehicle to interfere in labor disputes."); *Marine Cooks & Stewards, AFL v. Pan. S.S. Co.*, 362 U.S. 365, 370 (1960) ("Congress was intent upon taking the federal courts out of the labor injunction business ... ."); *Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co.*, 353 U.S. 30, 40 (1957) (the Act was intended "to prevent the injunctions of the federal courts from upsetting the natural interplay of the competing economic forces of labor and capital").

Plaintiffs' motion thus fails at the jurisdictional threshold.  The Court need not—indeed, should not—go any further in rejecting the request for injunctive relief.

_____

[4] In *Jackson v. NFL*, 802 F. Supp. 226, 235 (D. Minn. 1992), Judge Doty temporarily enjoined the NFL's then-existing free agency rules.  That case did not involve a strike or lockout and therefore did not implicate the mandatory prohibition of Section 4.  *See Chi. Rock Is. & Pac. R.R. Co. v. Switchmen's Union of N. Am.*, 292 F.2d 61, 62 (2d Cir. 1961) ("Section 4 is a flat prohibition of certain types of injunctive orders."); *Camping Constr. Co. v. Dist. Council of Iron Workers*, 915 F.2d 1333, 1341 (9th Cir. 1990) (Section 4 "sets forth a list of specific acts against which the federal courts *may under no circumstances* issue an injunction" (emphasis added)).

Of course, *Jackson* was also decided prior to the Supreme Court's decision in *Brown* and at a time when there were no proceedings pending before the NLRB addressing the representational status of the Union or the duration of the nonstatutory labor exemption.  (*See* pages 17-39, *infra*.)

II.   *Resolution of Plaintiffs' Suit Requires Determination of Issues Within the Primary Jurisdiction of the NLRB.*

Separate and apart from the lack of jurisdiction under the Norris-LaGuardia Act, this Court could not grant plaintiffs' request for a preliminary injunction without considering whether the nonstatutory labor exemption protects the NFL's conduct from antitrust challenge.  And it cannot consider that issue without first determining (1) whether the NFLPA's purported disclaimer is valid and effective and, if so, (2) whether such disclaimer immediately ended the exemption's applicability.

The first question—the validity of the disclaimer—is unquestionably within the NLRB's primary jurisdiction.  "The labor laws give the Board, not antitrust courts, primary responsibility for policing the collective-bargaining process." *Brown*, 518 U.S. at 242.  The Board is already considering an unfair labor practice charge that raises the threshold labor-law issue of the validity of the Union's purported disclaimer.  The doctrine of primary jurisdiction requires this Court to stay plaintiffs' suit pending the outcome of those Board proceedings.

In addition, the conditional follow-on question—whether, if the Union's disclaimer is valid under the labor laws, at what point thereafter it "could" extinguish the labor exemption—also could not be answered in plaintiffs' favor without the "detailed views of the Board." *Id.* at 250.

A.   The primary jurisdiction doctrine requires courts to stay actions that implicate issues falling within the specialized knowledge of the NLRB.

"The doctrine of 'Primary Jurisdiction' requires [a] court to suspend the proceedings before it and refer the matter to an administrative body whenever enforcement of a judicial claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of that administrative body." *Gale v. Norwesco, Inc.,* 1990 WL 284504, at *3 (D. Minn. Dec. 11, 1990) (citing *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63-64 (1956)).  The doctrine has particular force when, as in this case, the issues implicate "the expert and specialized knowledge of the agencies." *W. Pac. R.R.*, 352 U.S. at 64.

Under the primary jurisdiction doctrine, federal courts generally do not have jurisdiction over activity that is "arguably subject to" Sections 7 and 8 of the NLRA, 29 U.S.C. §§ 157, 158, and they "must defer to the exclusive competence of the National Labor Relations Board." *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245 (1959).  Only *after* the Board has determined whether conduct is permissible under these Sections may a court entertain claims requiring assessment of such conduct. *Id.* at 244-45.

The primary jurisdiction doctrine applies in full force to requests for preliminary injunctive relief.  An injunction prior to adjudication by the agency "may indicate what the court believes is permitted by [the agency's]

policy, prior to an expression by the [agency] of its view. *This is precisely what the doctrine of primary jurisdiction is designed to avoid.*" *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 821 (1973) (emphasis added) (reversing grant of injunctive relief) (plurality op.); *see also, e.g., Newspaper Guild of Salem v. Ottaway Newspapers, Inc.,* 79 F.3d 1273, 1283 (1st Cir. 1996) (affirming denial of preliminary injunction because case raised representational issues within the NLRB's primary jurisdiction).

To be sure, in certain circumstances, courts will "decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies." *Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 626 (1975); *see also Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 85 (1982). But, as discussed below, the labor law questions here are threshold predicates—not collateral issues—to this suit.

B.   Plaintiffs' antitrust suit rests on a predicate issue that falls
    <u>squarely within the primary jurisdiction of the NLRB.</u>

The validity of the Union's purported disclaimer is a fundamental, threshold issue in this lawsuit. Plaintiffs expressly predicate their Sherman Act claims on two related assertions: *First*, that the collective bargaining relationship between the parties to this case ended instantaneously at 4:00 p.m. on March 11, 2011, when, eight hours before the 2006 CBA expired and during negotiations for a successor agreement, the NFLPA purported to

disclaim interest in representing its members in collective bargaining; and *second*, that the NFLPA's purported disclaimer instantly extinguished the nonstatutory labor exemption and thereby converted the NFL member clubs' decision to lock out from a valid exercise of their labor law rights into an antitrust violation.  (Compl. ¶¶54-62, 79; Pls.' Mem. 9-10, 25-26.)

These predicates raise fundamental questions that go to the heart of multiemployer bargaining and federal labor law and policy.

The Court could not find the labor exemption inapplicable without intruding upon the Board's primary jurisdiction because the validity of the NFLPA's disclaimer itself is a threshold issue implicating the National Labor Relations Act.  *See, e.g., Garmon*, 359 U.S. at 244-45; *Minn-Dak Farmers Co-op Emps. Org. v. Minn-Dak Farmers Co-op. Emps. Org.*, 3 F.3d 1199, 1201 (8th Cir. 1993) (declining to exercise jurisdiction because the NLRB "has exclusive jurisdiction to decide questions concerning representation"); *NLRB v. Columbia Tribune Publ'g Co.*, 495 F.2d 1385, 1389 (8th Cir. 1974) ("The determination that a party has failed to bargain in good faith must, in the first instance, be made by the National Labor Relations Board.").  The Board's claim to primary jurisdiction is at its zenith in cases, like this case, that involve a pending Board matter arising from the same labor dispute and affecting the same employers and employees.

Indeed, the question whether the NFLPA remains a collective-bargaining representative is fundamental to determining numerous rights and responsibilities of the parties under the labor laws. It is therefore a core labor-law question that demands uniform resolution by the expert agency. If this Court were to enter an injunction reflecting its view that the Union has validly disclaimed, but the NLRB were to determine otherwise and issue an order compelling the Union to return to the collective bargaining table as the players' representative, all parties to this controversy would find themselves in an untenable position.

Under the NLRA, a union's disclaimer of interest in collective bargaining is effective only if it was "unequivocal" and "made in good faith." *Int'l Bhd. of Elec. Workers, AFL-CIO & Local 159 (Texlite, Inc.)*, 119 NLRB 1792, 1798-99 (1958), *enf'd* 266 F.2d 349 (5th Cir. 1959). Disclaimers are made in bad faith—and are therefore ineffectual and invalid—when they are done as a "tactical maneuver," *id.* at 1799, or when the disclaimer was "obviously employed only as a measure of momentary expedience, or strategy in bargaining," *Retail Assocs, Inc.*, 120 NLRB 388, 394 (1958).

With respect to good faith, the Board will undoubtedly recognize that the Union's purported disclaimer is not motivated by a desire to abandon unionism permanently. Nor does it reflect dissatisfaction with the leadership or direction of the NFLPA; to the contrary, the membership some time ago

authorized their leadership to purport to abandon collective bargaining if it deemed such a step advantageous. (Compl. ¶¶54-55.) That fact—as well as the fact that the membership continues to stand with its leaders—confirms their continuing confidence in their Union.

With respect to the disclaimer being "unequivocal," the Board will also understand that with the NFLPA, past is prologue. Its purported disclaimer today does not mean that it will not collectively bargain in the future. Indeed, when asked directly at a press conference, "if you … do decertify, do you see it as a being a lasting decertification or do you see yourselves re-forming in some way, shape or form," the Executive Director of the NFLPA, DeMaurice Smith, equivocated: "I don't have a crystal ball. And if I had one, it probably wouldn't work." (Ex. M at 7.) And immediately after the NFLPA purported to disclaim, Mr. Smith told the press, "we'll be back." (Ex. N at 5.)[5]

In short, the Board will likely conclude that the NFLPA has not engaged in the good faith, unequivocal renunciation that the NLRA requires,

---

[5] That the Union has purported to rebrand itself as a "trade association" is of no moment. A group is a "labor organization" under the NLRA if employee-members participate in it, and if it exists, at least in part, to "deal[] with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. § 152(5). As members of the NFLPA's executive committee have stated post disclaimer, the NFLPA intends to "continue to negotiate" with the NFL about terms and conditions of NFL player employment while this lawsuit proceeds. (Exs. H, I.)

and it likely will issue an order requiring the Union to resume collective
bargaining negotiations with the NFL member clubs.[6]

In addition, recognizing the need for stability in the collective
bargaining process, the Board has also held that neither labor nor
management may withdraw unilaterally from multiemployer bargaining once
negotiations begin absent "mutual consent" or "unusual circumstances."
*Charles D. Bonanno Linen Serv., Inc.*, 243 NLRB 1093, 1093 (1979), *enf'd* 630
F.2d 25 (1st Cir. 1980), *aff'd* 454 U.S. 404 (1982).

The Board must determine whether the NFLPA's tactical "disclaimer"
is sufficient to meet this standard.  *See, e.g., Detroit Newspaper Publ'rs Ass'n
v. NLRB*, 372 F.2d 569, 571 (6th Cir. 1967) ("[T]he Board could with propriety
inquire into the good faith of withdrawals and whether they are harmful to
either party, particularly where, as here, the unit has been in existence and
has operated satisfactorily for so many years."); *id.* at 572 ("[I]t must be
equally clear that a virtually unfettered [union] right of withdrawal ... might
also destroy the attractiveness of [multiemployer bargaining].  The Board

---

[6] For example, the Board has previously rejected informal membership
"votes" to terminate a union's labor organization status when the "votes"
were part of a bad-faith strategy to achieve a preferable collective bargaining
agreement.  *See News-Press Publ'g Co.*, 145 NLRB 803, 804-05 (1964).

might well find that the instability resulting from such conditions had undermined the multiemployer unit as an effective tool of labor relations.").

To determine whether plaintiffs have a likelihood of success on the merits, the Court would have to assess whether the NFLPA's disclaimer was made in good faith and intended to be unequivocal, or whether it instead was undertaken for tactical reasons, and is therefore invalid, as the evidence discussed above strongly suggests. The Court would also have to assess whether the NFLPA's tactical withdrawal from multiemployer bargaining was justified by "unusual circumstances." But these inquiries fall squarely within the specialized knowledge, expertise, and primary jurisdiction of the Board. *See Garmon*, 359 U.S. at 244-45; *Columbia Tribune*, 495 F.2d at 1389.

In these circumstances, the primary jurisdiction doctrine "transfers from court to agency the power to" resolve these issues. *W. Pac. R.R.*, 352 U.S. at 65. The Court must therefore stay this action pending resolution of the previously-initiated Board proceedings. *See Reiter v. Cooper*, 507 U.S. 258, 268 (1993). *Cf. Powell v. NFL*, 678 F. Supp. 777, 789 (D. Minn. 1988) (staying determination of applicability of antitrust laws pending NLRB determination of bad faith bargaining charge).

In short, this is a paradigmatic case for deferring to the Board's specialized expertise as required by the doctrine of primary jurisdiction.

Indeed, when a party "has already brought [its] complaint to the NLRB"—as the NFL has done here—the rationale underlying the primary jurisdiction doctrine "'has its greatest validity'" "'because the risk of interference with the Board's jurisdiction is ... obvious and substantial' ... ." *Cormier v. Simplex Techs., Inc.*, 1999 WL 628120, at *3 (D.N.H. Mar. 4, 1999) (quoting first *Platt v. Jack Cooper Transp. Co.*, 959 F.2d 91, 95 (8th Cir. 1992), and second *Local 926, Int'l Union of Operating Eng'rs v. Jones*, 460 U.S. 669, 683 (1983)).[7]

The situation here is therefore wholly unlike the contract-enforcement cases of *Connell* and *Kaiser*, which involved challenges to the legality of "hot cargo" provisions (which obligate an employer to cease doing business with, or to stop handling the goods of, another employer).  Such agreements are expressly deemed void *ab initio* under Section 8(e) of the NLRA (29 U.S.C. § 158(e)) and may therefore be prohibited by federal courts without the need

---

[7] Plaintiffs rely on Judge Doty's decision in *McNeil (sub nom. Powell) v. NFL*, 764 F. Supp. 1351 (D. Minn. 1991).  There, where the primary jurisdiction doctrine was not even addressed by the court, Judge Doty determined that the NFLPA's purported 1989 disclaimer had terminated the nonstatutory labor exemption. *Id.* at 1358-59.  Judge Doty recognized, however, that the merits of that determination presented a "controlling question of law on which there is substantial ground for difference of opinion." *Id.* at 1360.

Given the current pendency of NLRB proceedings addressing the validity of the NFLPA's second purported disclaimer—as well as the Eighth Circuit's holding in *Powell v. NFL* that "until final resolution of Board proceedings and appeals therefrom, the labor relationship continues and the [nonstatutory] labor exemption applies," 930 F.2d 1293, 1303-04 (8th Cir. 1989)—the *McNeil* decision on the nonstatutory labor exemption has no application here.

to defer to Board proceedings.  *See, e.g., Teamsters Local Union 682 v. KCI Constr. Co.*, 384 F.3d 532, 537, 540-41 (8th Cir. 2004).  Here, whether the plaintiff-employees have an antitrust cause of action against their employers cannot be determined without the Board's resolution of the fundamental, predicate labor law issues falling directly within its specialized expertise.

<p style="text-align:center">*        *        *        *</p>

The validity of the Union's purported disclaimer is not the only issue in this case that the NLRB must address.  The Supreme Court in *Brown* held that courts must also consider the "specialized judgment" of the Board when determining whether, and if so when, an agreement among members of a multiemployer bargaining unit may no longer be protected by the nonstatutory labor exemption and subject to antitrust scrutiny:

> [A]n agreement among employers *could* be sufficiently distant in time and in circumstances from the collective-bargaining process that a rule permitting antitrust intervention would not significantly interfere with that process. *See, e.g.,* [*Brown v. Pro Football, Inc.*], 50 F.3d [1041] at 1057 [(D.C. Cir. 1995)] (suggesting that the exemption lasts until collapse of the collective-bargaining relationship, as evidenced by decertification of the union); *El Cerrito Mill & Lumber Co.,* 316 NLRB [1005] at 1006-07 [(1995)] (suggesting that *"extremely long" impasse, accompanied by "instability" or "defunctness"* of multiemployer unit, might justify union withdrawal from group bargaining).  We need not decide in this case *whether, or where,* within these extreme outer boundaries to draw that line.  *Nor would it be appropriate for us to do so without the detailed views of the Board, to whose specialized judgment Congress intended to leave many of the inevitable questions concerning multiemployer bargaining bound to arise in the future.*

518 U.S. at 250 (emphasis added).

Thus, contrary to plaintiffs' assertion (Mem. 25), the Supreme Court has *not* held that the nonstatutory labor exemption "ceases to be available" the instant "a collective bargaining representative is no longer in existence." In fact, it has held to the contrary and made clear that a court should not make that determination absent the views of the NLRB.  (*Cf.* Compl. ¶ 80 (quoting the start of the passage from *Brown* reprinted above, but omitting the remainder beginning with "We need not decide …").

Accordingly, and as discussed more fully below, even if the Union's purported disclaimer is valid under the labor laws—an issue that the Board and the Board alone must decide *first*—the Court would then have to decide whether *Brown*'s "sufficiently distant in time and in circumstances" standard has been satisfied such that the exemption no longer applies.  And, as the Supreme Court held, this Court could not find the exemption inapplicable "without the detailed views of the Board."  518 U.S. at 250.

As the Board is now considering that very question—which would be moot if the Union's purported disclaimer is found by the Board to be invalid— the Court should defer ruling on plaintiffs' motion until such time as all proceedings before the Board have been completed.

III.   *Plaintiffs Cannot Meet Their Heavy Burden of Proving that Preliminary Injunctive Relief is Warranted.*

As noted above, there are two threshold, independent, jurisdictional reasons why this Court cannot grant the requested injunction.  But even if the Court were to apply the familiar four-factor test, it is clear that an injunction should not issue.  "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

"[W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc).  None of these factors favors plaintiffs.

A.   Plaintiffs cannot show a likelihood of success on the merits.

Likelihood of success on the merits is the "'most significant' *Dataphase* factor." *Anytime Fitness, Inc. v. Family Fitness of Royal, LLC*, 2010 WL 145259, at *3 (D. Minn. Jan. 8, 2010) (quoting *S & M Constructors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir. 1992)).  Absent likelihood of success,

"there is little justification for granting a preliminary injunction." *CDI Energy Servs., Inc. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009).

Plaintiffs cannot show a likelihood of success on the merits because, notwithstanding the NFLPA's purported disclaimer, the challenged lockout is protected from antitrust scrutiny by the nonstatutory labor exemption.

> 1.   The nonstatutory labor exemption protects
>       lockouts by multiemployer bargaining units.

Federal labor law favors and encourages collective bargaining. *See Brown*, 518 U.S. at 236; *Anderson v. Ford Motor Co.*, 803 F.2d 953, 955 (8th Cir. 1986). Under federal labor law, "[m]ultiemployer bargaining ... is a well-established, important, pervasive method of collective bargaining, offering advantages to both management and labor." *Brown*, 518 U.S. at 240.

Multiemployer bargaining *requires* employers to agree on collective bargaining objectives, strategy, planning, and implementation, including whether (and if so, how) to exercise rights under the federal labor laws, including whether to implement a lockout.

A lockout—"[a]n employer's withholding of work ... because of a labor dispute," Black's Law Dictionary 1024 (9th ed. 2009)—is a lawful, protected economic tool of good faith collective bargaining. *See Lodge 76, Int'l Ass'n of Machinists v. Wisc. Emp't Relations Comm'n*, 427 U.S. 132, 147 (1976)

("Resort to economic weapons should more peaceful measures not avail is the right of the employer as well as the employee."); *Powell v. NFL*, 930 F.2d 1293, 1302 (8th Cir. 1989) (a lockout is one of the "economic and legal … tools" that employers may use in a labor dispute); *NBA v. Williams*, 45 F.3d 684, 689 (2d Cir. 1995) (Congress approved of multiemployer lockouts).

Because federal labor policy encourages multiemployer bargaining, the nonstatutory labor exemption insulates from antitrust scrutiny certain decisions of multiemployer bargaining units that might otherwise be deemed anticompetitive or in violation of the antitrust laws. *See Brown*, 518 U.S. at 237 ("[T]he implicit [*i.e.*, nonstatutory labor] exemption recognizes that, to give effect to federal labor laws and policies and to allow meaningful collective bargaining to take place, some restraints on competition imposed through the bargaining process must be shielded from antitrust sanctions.").

The exemption is designed to keep "instability and uncertainty [from entering] into the collective-bargaining process," *id.* at 242, and reflects Congress's intent "to prevent judicial use of antitrust law to resolve labor disputes—a kind of dispute normally inappropriate for antitrust law resolution," *id.* at 236. Accordingly, "employees confronted with actions imposed lawfully through the collective bargaining process must respond *not with a lawsuit brought under the Sherman Act*, but rather with the weapons

- 30 -

provided by the federal labor laws." *Brown v. Pro Football, Inc.*, 50 F.3d

1041, 1045 (D.C. Cir. 1995) (emphasis added), *aff'd*, 518 U.S. 231 (1996).

> 2.     The exemption continues to apply until the challenged
>        conduct is sufficiently distant in time and in
>        <u>circumstances from the collective bargaining process.</u>

Plaintiffs contend that the Union's purported disclaimer—undertaken

in the waning hours of the 2006 CBA and literally *during* a multiemployer

collective bargaining session—*instantly* terminated the nonstatutory labor

exemption.  As a result, plaintiffs assert, the lockout is unprotected by the

exemption and plaintiffs are entitled to an injunction under the Sherman Act.

*Brown* forecloses this argument.

In *Brown*, the NFLMC and the NFLPA had bargained to impasse over

compensation for developmental squad players.  *See* 518 U.S. at 234-35.  The

NFL clubs then unilaterally implemented their last offer.  (The right to

implement at impasse its last good faith offer, like the right to lock out, is one

of the economic tools afforded an employer under the labor laws.  *See id.* at

238.)  In response, players funded by the NFLPA filed a class action antitrust

suit claiming that the clubs' agreement on the terms reflected in the offer

violated Section 1 of the Sherman Act.  *Id.* at 235.

The Court started with the premise that multiemployer bargaining

*requires* agreements that would otherwise contravene the antitrust laws:

"[I]t would be difficult, if not impossible, to require groups of employers and

employees to bargain together, but at the same time to forbid them to make among themselves or with each other *any* of the competition-restricting agreements potentially necessary to make the process work or its results mutually acceptable." *Id.* at 237.

The Court went on to hold that the nonstatutory labor exemption protected the conduct at issue, which "took place during and immediately after a collective-bargaining negotiation" and which "grew out of, and was directly related to, the lawful operation of the bargaining process." *Id.* at 250.

In so holding, the Court emphasized the untenable, Catch-22 situation that employers engaged in multiemployer collective bargaining (which the labor law favors) would confront if antitrust liability applied at impasse:

> If the antitrust laws apply, what are employers to do once impasse is reached?  If all impose terms similar to their last joint offer, they invite an antitrust action premised upon identical behavior ... as tending to show a common understanding or agreement.  If any, or all, of them individually impose terms that differ significantly from that offer, they invite an unfair labor practice charge.  *Indeed, how can employers safely discuss their offers together even before a bargaining impasse occurs?*  A preimpasse discussion about, say, the practical advantages or disadvantages of a particular proposal invites a later antitrust claim that they agreed to limit the kinds of action each would later take should an impasse occur.  The same is true of postimpasse discussions aimed at renewed negotiations with the union ... .  *All of this is to say that to permit antitrust liability here threatens to introduce instability and uncertainty into the collective-bargaining process, for antitrust law often forbids or discourages the kinds of joint discussions and behavior that the collective-bargaining process invites or requires.*

*Id.* at 241-42 (emphases added).

The same Catch-22 presented by an impasse—or an impending impasse—would confront the members of a multiemployer bargaining unit if a union representing their employees disclaimed interest—or threatened to disclaim interest—during or immediately in the wake of collective bargaining.[8]

Indeed, plaintiffs' complaint points to proposals made *during collective bargaining* as demonstrating an anticompetitive intent sufficient to justify an antitrust claim.  (*See, e.g.*, Compl. ¶¶3, 53.)  By seeking to subject to antitrust scrutiny proposals made in collective bargaining—as well as terms to which the parties had previously agreed in collective bargaining—plaintiffs aim to put the members of the NFL multiemployer bargaining unit in a posture where they risk antitrust liability for conduct undertaken, planned, or even discussed as part of the collective bargaining process.

The circumstances here therefore raise concerns of the very same kind identified by the Supreme Court in the context of impasse—concerns about instability and uncertainty arising from the antitrust risks that the members

---

[8]  Although *Brown* dealt with terms imposed at impasse rather than a lockout, the Court made clear that courts should look to the underlying purposes of the nonstatutory labor exemption in determining whether it applies.  *See* 518 U.S. at 243 (relying on "the exemption's rationale").

of the multiemployer bargaining unit would face by (1) maintaining the status quo *or* (2) individually implementing (or even proposing common) terms and conditions of employment, *or* (3), as demonstrated by plaintiffs' complaint, exercising their rights under the labor laws.  The common theme of all of these concerns is the extent to which potential antitrust scrutiny would frustrate federal labor law by inhibiting, deterring, and destabilizing collective bargaining *throughout the collective bargaining process,* both after *and in anticipation of* the triggering event, whether it be impasse or disclaimer.

As the Supreme Court recognized in *Brown*, Congress has determined that the labor laws trump the antitrust laws *for a reason*:  because industrial peace is best achieved by requiring parties to settle their differences at the bargaining table rather than in an antitrust courtroom.  *See* 518 U.S. at 237.  Thus, the Supreme Court has held that the purpose of the nonstatutory labor exemption is to prevent instability and uncertainty from corrupting the collective bargaining process—not only after negotiations have broken down, but before.  *See id.* at 242, 246.

To obviate the chilling effect that the threat of instantaneous antitrust liability would have on multiemployer collective bargaining, the Supreme Court held that the nonstatutory labor exemption continues to apply until there has been a "sufficient[] distan[ce] in time and in circumstances from the

collective-bargaining process that a rule permitting antitrust intervention would not significantly interfere with that process." *Id.* at 250.

The Court further held that it would be inappropriate for it—and implicitly, for any other antitrust court—to find the labor exemption inapplicable or to define the outer boundaries of what constitutes "sufficiently distant in time and in circumstances" "without the detailed views of the [National Labor Relations] Board." *Id.* Indeed, the Court expressly refused to decide that the exemption would expire immediately upon the "collapse of the collective-bargaining relationship" and/or upon the decertification of a union, recognizing that such a conclusion should not be reached without the "detailed views of the Board." *Id.*

In this respect, *Brown*'s holding reaffirms the correctness of the Eighth Circuit's earlier holding in *Powell* that "as long as there is a possibility that proceedings may be commenced before the Board, or until final resolution of Board proceedings and appeals therefrom, the labor relationship continues and the [nonstatutory] labor exemption applies." *Powell*, 930 F.2d at 1303-04. Both decisions, at bottom, are based on a fundamental recognition that the labor laws cannot function effectively unless collective bargaining is given significant room to operate, even after one side unilaterally asserts that the bargaining relationship is over.

3.   The exemption protects the challenged lockout
         from antitrust scrutiny.

There can be no reasonable dispute that this case is about lawful

conduct taking "place during and immediately after a collective-bargaining

negotiation." *Brown*, 518 U.S. at 250.  The Union's purported disclaimer

occurred *before* expiration of the CBA and while the parties were literally

still at the bargaining table negotiating terms and conditions of employment.

Nor can there be any question that the lockout "grew out of, and was directly

related to, the lawful operation of the bargaining process." *Id.*  And, given

the history of this Union and the evidence discussed above, plaintiffs cannot

make a clear showing that the collective bargaining relationship is, indeed,

actually over, let alone that it is not likely to be in full operation soon.

As noted, this Court should not accept plaintiffs' contentions until the

Board has decided the issues pending before it.  The NFL's unfair labor

practice charge calls upon the Board to determine whether the Union's

purported, strategic disclaimer and unilateral withdrawal from

multiemployer bargaining are valid under, or whether they violate, the

NLRA.  Until the NLRB answers that question, the labor exemption

continues to apply.  *See Brown*, 531 U.S. at 250; *Powell*, 930 F.2d at 1303-04.

Moreover, even if the Court did not let the Board's proceedings unfold

before considering the merits of plaintiffs' claims, there can be no serious

contention here that the collective bargaining process is "sufficiently distant in time and in circumstances" such that the labor exemption could not apply. As for "distant in time," the parties were at the bargaining table less than an hour before the lawsuit was filed. As for "distant in circumstances," both past conduct and recent evidence underscore that this lawsuit is a Union-sponsored tactic to secure favorable terms and conditions of employment for its members.

Plaintiffs' only response is the argument that the NFLPA's purported disclaimer acted as a switch that turned the labor exemption off. But the legitimacy of that disclaimer is the precise issue before the Board. Moreover, the timing of that flip of the switch underscores the need for the labor exemption to apply in this context. The Court should be especially wary of finding that this situation is "sufficiently distant in time and in circumstances" that the exemption no longer applies, given this Union's previous history of disclaimer followed by bargaining, and the multiple recent statements of its leadership confirming that its purported disclaimer was an interim step, undertaken for tactical reasons, in anticipation of reaching another collective bargaining agreement.

Indeed, plaintiffs' light switch theory is especially pernicious in the context of professional sports leagues where, because of the need for common rules establishing terms and conditions of player employment, multiemployer

bargaining is essential. *See Brown*, 518 U.S. at 248-49 ("[T]he clubs that make up a professional sports league are not completely independent economic competitors, as they depend upon a degree of cooperation for economic survival.").

Even the *threat* of antitrust exposure following a union's pre-expiration disclaimer puts the member clubs of a professional sports league into precisely the sort of untenable Catch-22 that the Court in *Brown* refused to countenance. This case proves the point: If the exemption does not apply, the NFL clubs will face potential antitrust claims regardless of whether they (a) maintain their lockout, which has resulted in the claim now before the Court, or (b) attempt to produce their joint product, which (as further explained at pages 45-47, *infra*) undoubtedly will lead—and, indeed, already has led—to additional antitrust claims because of the inherent need for certain common terms and conditions of player employment.

Plaintiffs' complaint seeks to bar the League from locking out the players, but it also seeks antitrust damages on the ground that terms and conditions of player employment—to which the plaintiffs' Union had previously agreed—are also violations of the Sherman Act. This is the epitome of a Catch-22: Under plaintiffs' theory, the NFL is subject to antitrust liability if it ceases or refuses to continue football operations, and it

is subject to antitrust liability if it does not.  This "heads I win, tails you lose" approach is not and cannot be the law.

Indeed, if the nonstatutory labor exemption does not apply, the NFL clubs could not work together *even to resolve the ongoing labor dispute* without risking antitrust liability.  Federal labor law and policy encourage members of a multiemployer bargaining unit to continue working together to resolve any labor dispute, both before and after collective bargaining agreements expire.  Application of the exemption in these circumstances furthers this purpose; abrogating the exemption at the tactical flip of a switch would frustrate it.

Because neither plaintiffs nor the Union can demonstrate—either at the NLRB or to this Court—that the Union's purported disclaimer has extinguished the nonstatutory labor exemption, the lockout should be protected from antitrust scrutiny.  *See Brown*, 518 U.S. at 235-37; *Powell*, 930 F.2d at 1304.

4.   Plaintiffs' "waiver" argument lacks any merit.

Plaintiffs argue that Article LVII, Section 3(b) of the CBA (and the SSA counterpart, Article XVIII, Section 5(b)) waives the NFL's ability to oppose their motion.  That Section reads:

> *[A]fter the expiration of the express term of this Agreement*, in the event that *at that time or any time thereafter* a majority of players indicate that they wish to end the collective bargaining status of the NFLPA on or after expiration of this Agreement, the NFL … waive[s] any rights [it] may have to assert any antitrust labor exemption defense based upon any claim that the termination by the NFLPA of its status as a collective bargaining representative is or would be a sham, pretext, ineffective, requires additional steps, or has not in fact occurred.

(emphases added) (Ex. O.)

By its own plain and unambiguous terms, the provision purports to apply only when the players' decision "to end the collective bargaining status of the NFLPA" is made "at … or any time []after" the "express term" of the CBA.[9] But here, it is undisputed that the Union's (purported) disclaimer occurred *before* the CBA expired; the premise of plaintiffs' claim is that the NFLPA's "collective bargaining status" had already ended at expiration. (Compl. ¶¶24, 54-61; Pls.' Mem. 9 ¶¶1-2.) Accordingly, the predicate for Section 3(b) is not met; the provision cannot apply.

Plaintiffs know this; their Union told its membership that it needed to disclaim interest *before* expiration of the CBA to avoid application of the

---

[9] Plaintiffs' effort to distort the plain meaning of Section 3(b) through the testimony of Messrs. Berthelsen and Upshaw is both futile and improper. The CBA and SSA expressly prohibit the parties "in any proceeding or otherwise" from "us[ing] or refer[ing] to *any* parol evidence with regard to the interpretation or meaning of" Section 3(b) and most other provisions of the Agreements. (CBA Art. LV, Sec. 19 (Ex. P); SSA Art. XXX, Sec. 7.)

companion Section 3(a)—an obvious *quid pro quo* to the "waiver" provision of Section 3(b)—which provides that "if the NFLPA is in existence as a union [*following* expiration of the CBA], the Parties agree that no ... player represented by the NFLPA shall be able to commence an action, or assert a claim under the antirust laws for" at least six months.

As the Union told its members, it was not willing to wait six months to initiate its sponsored lawsuit.[10]  Having made the tactical election to avoid the six-month waiting period imposed by Section 3(a), neither the Union nor the plaintiffs can attempt to invoke the companion waiver provision in Section 3(b).

Even if the predicate for Section 3(b) were met, the provision itself is void as against the established public policy, recognized by the Supreme Court's 1996 decision in *Brown*, that the labor laws, not the antitrust laws, apply to the collective bargaining process.  The waiver provision—which purports to condone deliberate misrepresentation by the NFLPA and to let an antitrust suit proceed even when the disclaimer is invalid—cannot be

---

[10]  The Union's *Guide to the Lockout,* in a section authored by its General Counsel, could not be more explicit:  "Q. Can we remain a union after expiration, see how collective bargaining goes, and then renounce our union status later if collective bargaining doesn't work?  A.  We could, but there are … important reasons why we should not.  First, the current CBA says that we cannot sue for six months if we remain as a union at any time after expiration."  (Ex. J at 45.)

enforced without contravening public policy.  The waiver provision is therefore void.  *See, e.g.*, *Resolution Trust Corp. v. Home Sav. of Am.*, 946 F.2d 93, 97 (8th Cir. 1991); Restatement (Second) of Contracts § 178(1) (1981); *id.* § 196 cmt. a, illus. 1.

In any event, Section 3(b) has no application to the NFL's unfair labor practice charge against the Union at the NLRB, which has to be resolved first.  (Any effort by the Union to limit the NFL's rights before the Board would be ineffective.  *See, e.g.*, *Conoco, Inc.,* 287 NLRB 548, 559 (1987) (waiver of right to seek redress with Board or courts is *per se* illegal and unenforceable as contrary to public policy).)

And even if the waiver did preclude the NFL from arguing to the Court the obvious—that the Union's disclaimer is a sham—it would not limit the NFL's ability to argue that the nonstatutory labor exemption continues to apply because the parties are not at a point "sufficiently distant in time and in circumstances" such that the exemption would no longer be applicable. *Brown*, 518 U.S. at 250.

> B.   Plaintiffs will not suffer irreparable harm in the absence of temporary injunctive relief.

Plaintiffs will not suffer irreparable harm if their motion is denied. That itself is "a sufficient ground upon which to deny a preliminary injunction."  *CDI Energy Servs.*, 567 F.3d at 402-03.

To the extent that the antitrust laws apply, plaintiffs may assert claims for *treble* damages that are more than adequate (trebly adequate) to remedy any possible harm. *See Rittmiller v. Blex Oil, Inc.*, 624 F.2d 857, 861 n.4 (8th Cir. 1980) ("The availability of treble damage relief is an important consideration ... weighing against granting an interlocutory injunction."); *John Peterson Motors, Inc. v. Gen. Motors Corp.*, 613 F. Supp. 887, 905 (D. Minn. 1985) ("Plaintiffs have their actions for damages so that their harm cannot be said to be irreparable. And antitrust claims hold out the possibility of treble damages."). Plaintiffs' treble damages claims are an adequate remedy at law; they cannot demonstrate irreparable harm. *See Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).

Stated differently, the proper inquiry here is whether, assuming plaintiffs' claims are meritorious, plaintiffs would be irreparably harmed by a period of (triply) paid leave—a period in which they will not face a risk of "career-ending injury" (Pls.' Mem. 11 ¶1) or any "wear and tear" (*e.g.*, Condon Decl. ¶12)? To ask that question is to answer it.

Plaintiffs' contention that the lockout will deprive them of "contracted for salaries ... or bonuses" (Pls.' Mem. 12 ¶2) does not alter the inquiry. Any delay in the payment of salary or bonuses is obviously compensable in monetary damages. "The temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." *Sampson v.*

*Murray*, 415 U.S. 61, 90 (1974).  Similarly, the fact that the jury found that some of the *McNeil* plaintiffs had failed to prove monetary damages (Pls.' Mem. 15 & n.3) does not demonstrate the absence of an adequate remedy at law; it is simply evidence of a failure of proof by those individual plaintiffs.

Finally, plaintiffs' assertion that they face immediate irreparable harm in not being able to practice with or work out with their teammates lacks merit when one considers that (i) it is the offseason; the start of training camp is months away (Ruocco Decl. ¶10); (ii) plaintiffs Mankins and Jackson intentionally skipped the entirety of their respective club offseason training programs last year (*id.* ¶12); (iii) many players choose to work out on their own in the offseason (*id.* ¶13); and (iv) many players, including many rookies, historically have held out from training camps and other organized team activities (*id.* ¶14).  Indeed, many players have already made arrangements to work out together under the Union's supervision.  (*Id.* ¶13 & Tab 2.)

Plaintiffs rely on cases concluding, based principally on theories of a harm to reputation, a loss of ability to compete for postseason honors, or damage to one's career vis-à-vis other players, that professional athletes would suffer "irreparable harm" without preliminary injunctive relief permitting them to play in games.  (*See* Pls.' Mem. 15-16 & n.4 (citing, *inter alia*, *NFLPA v. NFL ("Starcaps")*, 598 F. Supp. 2d 971, 982-83 (D. Minn. 2008) (involving suspensions of two players under the NFL's steroid policy);

*Jackson v. NFL*, 802 F. Supp. 226, 230-31 (D. Minn. 1992) (involving a challenge to "Plan B" free agency rules preventing some but not all players from signing with other clubs); *In re Haywood v. NBA*, 401 U.S. 1204 (1971) (Blackmun, J.) (in chambers) (staying injunction that would have prohibited player from participating in the playoffs).)  Such cases are inapposite here: no player's reputation suffers because of the lockout; no one player is disadvantaged vis-à-vis others, as the lockout applies equally to all.

    C.    <u>The balance of harms favors the NFL.</u>

    Granting plaintiffs' proposed injunction would cause considerably more harm to the NFL than denying it would cause plaintiffs.

    If this Court grants the requested injunction, the NFL member clubs undoubtedly would be subject to additional antitrust claims.  (*See* Ruocco Decl. ¶5.)  Plaintiffs' complaint itself purports to challenge on antitrust grounds terms and conditions of employment that are part of the *status quo ante* established by the prior CBA.  (Compl. ¶¶125-136.)

    An order barring the lockout would effectively require the clubs to produce their inherently joint and collective product, which in turn would inevitably require the clubs to reach agreements with each other concerning numerous terms and conditions of player employment.  *See Brown*, 518 U.S. at 248-49; *Am. Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2216 (2010) ("The fact that NFL teams share an interest in making the entire league successful and

profitable, and that they must cooperate in the production and scheduling of games, provides a perfectly sensible justification for making a host of collective decisions."); *Reynolds v. NFL*, 584 F.2d 280, 287 (8th Cir. 1978) ("Precise and detailed rules must of necessity govern how the sport is played …. While some freedom of movement after playing out a contract is in order, complete freedom of movement would result in the best franchises acquiring most of the top players.  Some leveling and balancing rules appear necessary to keep the various teams on a competitive basis, without which public interest in any sport quickly fades.").

Necessary decisions designed to promote competitive balance on the football field and enhance the quality of the League's entertainment product would expose the member clubs to treble-damage antitrust claims by players contending that the decisions unreasonably restrain competition in a purported market for player services; each suit would create a debilitating cloud of legal uncertainty over NFL clubs (to say nothing of the unrecoverable expense and burden of defending such suits).  (Ruocco Decl. ¶¶4-5.)

In addition, an injunction would lead to the irreparable harm of which the Eighth Circuit warned in *Reynolds*:  Ordering the NFL clubs to resume football operations would likely lead to the more favorably-situated teams signing the best players.  *See Reynolds*, 584 F.2d at 287; Ruocco Decl. ¶¶6-9. Indeed, plaintiffs' complaint expressly seeks that result by challenging any

"restrictions on player free agency." (Compl. ¶132.) But that would irreparably harm the NFL by destroying the competitive balance that is essential to keeping it's entertainment product attractive to fans. *See Powell*, 690 F. Supp. at 818 ("[T]he potential migration of many key players from less attractive clubs to more desirable ones could have a devastating, long-term impact on the competitive balance within the League.").

Although such an injunction "would only be 'preliminary' pending final resolution of this matter, its effects may be felt for years since many players who moved undoubtedly would sign long-term contracts with their new clubs." *Id.* at 816. It would be difficult, if not impossible, to unscramble the eggs and return those players to clubs who otherwise may have had contract arrangements with (or, at least, a greater ability to enter into contracts with) such players in the absence of an injunction. (*See* Ruocco Decl. ¶7.)

D.    The public interest will be furthered only if the Court denies plaintiffs' motion.

The dominant public interest in this case lies in "fair, unfettered collective bargaining"; in parties' acting consistently with "fair labor practices"; and "in protecting and promoting the bargaining process." *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 372 (8th Cir. 1991); *Osthus ex rel. NLRB v. Laborers Dist. Council of Minn. & N.D.*, 2010

WL 3927409, at *6 (D. Minn. Oct. 4, 2010); *Powell*, 690 F. Supp. at 818; *see also Brown*, 518 U.S. at 236; *Anderson*, 803 F.2d at 955.

Even if both sides faced irreparable harm during the pendency of an appeal, that would only underscore the importance of the strong public interest in encouraging parties in a labor dispute to resolve their differences via collective bargaining, free from the skewing effect of an injunctive order. *See In re Dist. No. 1*, 732 F.2d at 75. Strikes and lockouts ultimately lead to agreements precisely because both sides have something to lose. Enjoining one side in a labor dispute from using the economic tools available to it under the labor laws would contravene the policy underlying the Norris-LaGuardia Act, the primary jurisdiction of the NLRB, and federal labor law generally, by replacing bilateral negotiation with a unilateral ability to place a judicial injunctive thumb on the collective bargaining scale.

In aid of the public interest in collective bargaining, "the federal labor laws provide the opposing parties to a labor dispute with offsetting tools, both economic and legal, through which they may seek resolution of their dispute." *Powell,* 930 F.2d at 1302. A lockout—implemented as part of the collective bargaining process, *Brown*, 50 F.3d at 1053-54—is a tool consistent with the public interest. Antitrust litigation is not. Indeed, an injunction here "would wholly subvert the collective bargaining process and thereby offend a central purpose of the Norris-LaGuardia Act." *Powell*, 690 F. Supp. at 817.

- 48 -

"[W]hen federal labor policy collides with federal antitrust policy in a labor market organized around a collective bargaining relationship, antitrust policy must give way." *Brown*, 50 F.3d at 1056.  Accordingly, "employees confronted with actions imposed lawfully through the collective bargaining process must respond *not with a lawsuit brought under the Sherman Act*, but rather with the weapons provided by the federal labor laws." *Id.* at 1045 (emphasis added).

## CONCLUSION

For the foregoing reasons, this Court should deny plaintiffs' motion.

Respectfully submitted,

<div style="display:flex; justify-content: space-between;">

David Boies (*pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY  10504
(914) 749-8200
(914) 749-8300 (fax)

    s/Daniel J. Connolly
Daniel J. Connolly #197247
Aaron D. Van Oort #315539
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7806
(612) 766-1600 (fax)

</div>

William A. Isaacson (*pro hac vice*)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave., NW
Washington, DC  20015
(202) 237-2727
(202) 237-6131 (fax)

Gregg H. Levy (*pro hac vice*)
Benjamin C. Block (*pro hac vice*)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC  20004-2401
(202) 662-6000
(202) 662-6291 (fax)

*Counsel for the NFL and NFL Clubs*

March 21, 2011