# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Tom Brady, Drew Brees, Vincent
Jackson, Ben Leber, Logan Mankins,
Peyton Manning, Von Miller, Brian
Robison, Osi Umenyiora, Mike Vrabel,
Carl Eller, Priest Holmes, Obafemi
Ayanbadejo, Ryan Collins, and Antawan
Walker,

*individually and on behalf of all
others similarly situated*,

    Plaintiffs,

  v.

National Football League, et al.,

    Defendants.

Civil No. 11-639 (SRN/JJG)


**MEMORANDUM OPINION
AND ORDER**

---

Barbara P. Berens and Justi R. Miller, Berens & Miller, PA, 80 South Eighth St., Suite 3720, Minneapolis, MN 55402; Timothy R. Thornton, Briggs & Morgan, PA, 80 South Eighth St., Suite 2200, Minneapolis, MN 55402; Bruce S. Meyer and James W. Quinn, Weil, Gotshal & Manges, LLP, 767 Fifth Ave., New York, NY 10019; Christopher R. Clark, David G. Feher, David L. Greenspan, Jeffrey L. Kessler, Jennifer Stewart and Molly Donovan, Dewey & LeBoeuf, LLP, 1301 Avenue of the Americas, New York, NY 10019, for Plaintiffs Brady, Brees, Jackson, Leber, Mankins, Manning, Miller, Robison, Umenyiora and Vrabel.

Arthur N. Bailey, Jr., Hilary K. Scherrer, Jon T. King, Michael D. Hausfeld and Michael P. Lehmann, Hausfeld LLP, 44 Montgomery St., Suite 3400, San Francisco, CA 94104; Daniel S. Mason, Mark J. Feinberg and Michael E. Jacobs, Zelle Hofmann Voelbel & Mason LLP, 500 Washington Ave. South, Suite 4000, Minneapolis, MN 55415; and Samuel D. Heins and Vincent J. Esades, Heins Mills & Olson PLC, 310 Clifton Ave., Minneapolis, MN 55403, for Plaintiffs Eller, Holmes, Ayanbadejo, Collins and Walker.

Daniel J. Connolly and Aaron D. Van Oort, Faegre & Benson, LLP, 90 South Seventh St., Suite 2200, Minneapolis, MN 55402; Benjamin C. Block, Gregg H. Levy and James M. Garland, Covington & Burling, LLP, 1201 Pennsylvania Ave. Northwest, Washington DC 20004; David Boies and William A. Isaacson, Boies, Schiller & Flexner, LLP, 333 Main St., Armonk, NY 10504, for Defendants.

SUSAN RICHARD NELSON, United States District Judge

This matter is before this Court in these consolidated actions on the motions for a preliminary injunction sought by Plaintiff Tom Brady, et al. (the "Brady Plaintiffs") as well as by Plaintiff Carl Eller, et al. (the "Eller Plaintiffs") (Doc. Nos. 2 & 58).[1]  For the reasons stated below, this Court grants the Brady Plaintiffs' motion.  This ruling renders moot the Eller Plaintiffs' motion, which seeks identical relief, that is, an injunction lifting the "lockout."  See infra notes 52 & 57.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

The Brady Plaintiffs are nine professional football players and one prospective professional football player who have been or seek to be employed by Defendants, the National Football League ("NFL") and the 32 separately-owned NFL teams (collectively, "the NFL" or "the League").  The Brady Plaintiffs filed this lawsuit on behalf of themselves and similarly situated players, alleging antitrust violations and breach of contract based on Defendants' actions, inter alia,  in imposing a "lockout" or "group boycott" of the Players.  (Doc. No. 1 (Complaint) ¶¶ 116-60.)  Plaintiffs seek a

---

[1]      After the Brady Plaintiffs filed this action, No. 11-CV–639, Carl Eller and other retired professional football players filed a similar action also seeking a preliminary injunction.  That case was originally docketed as No. 11-CV-648.  This Court consolidated the two actions.  (Doc. No. 55.)  As a result, all of the materials originally filed in No. 11-CV-648 are now part of the docket in this action (as Doc. Nos. 57-87) and will be cited by this Court accordingly.  In addition, when citing the various Memoranda, which often include various tables of contents and other prefatory material subject to their own pagination, this Court will cite both the page number of the document as referenced in CM/ECF, as well as the original page number of the memorandum.

declaratory judgment, injunctive relief, and damages.  (Id. at 48-50 ("Prayer for Relief").)

The dispute between the NFL and the Players has a long and complex history.

Powell v. NFL, 930 F.2d 1293, 1303 (8th Cir. 1989).  The present case dates in some

respects back to the dispute resolved in Mackey v. National Football League, 543 F.2d

606 (8th Cir. 1976).  In Mackey, several players challenged the so-called "Rozelle Rule"

as a violation of Section 1 of the Sherman Act.  543 F.2d at 609.  In 1963, the League

unilaterally adopted the Rozelle Rule, which governed free agency, largely by restricting

it.  Id. at 610-11.  The League defended the Rule as protected from antitrust scrutiny

under the nonstatutory labor exemption, which insulates employers and management from

antitrust claims where an employer is participating in collective bargaining with a union

that represents its employees.  Id. at 611-12.

After a lengthy bench trial, the district court ruled that the Rozelle Rule was both a

per se violation of Section 1 as well as an invalid restraint of trade under the Rule of

Reason.  Mackey v. NFL, 407 F. Supp. 1000 (D. Minn. 1975).[2]  The Eighth Circuit

affirmed based on the Rule of Reason.  543 F.2d at 620-21.  In assessing the nonstatutory

labor exemption, the Eighth Circuit found that the proper accommodation between the

competing interests of the labor laws (which seek to facilitate collective action by

employees) and the antitrust statutes (which seek to promote competition and limit

---

[2]       Some restraints of trade, such as horizontal price-fixing, are so obviously
impermissible, that they are deemed "per se" violations of the Sherman Act.  Id. at 618.
The rest are analyzed under the "Rule of Reason," by which a court weighs a restraint's
anti-competitive impact against whatever legitimate business purposes might otherwise
justify it.  Id. at 620.

collective action) required, in order for the exemption to apply, (1) that the restraint

"primarily affects only the parties to the collective bargaining relationship," (2) that the

agreement subject to the protection of the exemption "concerns a mandatory subject of

collective bargaining," and (3) that the agreement "is the product of bona fide arm's-

length bargaining." Id. at 614.  Although the particular agreement at issue there–the

Rozelle Rule–satisfied the first two prongs of the test, the court found it was not the

product of bona fide arm's-length bargaining.  Id. at 615-16.  The League later settled the

class action for $13 million in damages.

 "The players' initial antitrust victory was short lived, for following the ruling in

Mackey the owners used their leverage in collective bargaining to reestablish the status

quo, exchanging the Rozelle Rule for similar collectively bargained provisions that were

impervious to antitrust attack."  White v. NFL, 585 F.3d 1129, 1134 (8th Cir. 2009).  The

next major battle occurred in the various Powell / McNeil cases.  In 1977, the League and

the Players entered into a collective bargaining agreement governing free agency.  The

terms were modified in a successor agreement entered into in 1982.  That agreement

expired in August 1987.  In September 1987, after negotiations for another agreement

proved unsuccessful, the Players initiated a strike over veteran free agency and other

issues.

 After the strike failed to produce a new agreement, the Players filed an action in

October 1987, contending that the League's adherence to the expired 1982 agreement

violated the antitrust laws.  In January 1988, the district court held that after the

expiration of a bargaining agreement, the labor exemption from the antitrust laws

terminates with respect to a mandatory subject of bargaining when employers and a union

reach a bargaining impasse as to the contested issue.  Powell v. Nat'l Football League,

678 F. Supp. 777, 788 (D. Minn. 1988).

On November 1, 1989, the Eighth Circuit rejected the district court's 1988 ruling

that impasse lifted the protection of the exemption from the antitrust laws, noting that in

certain circumstances "the nonstatutory labor exemption may be invoked even after a

collective bargaining agreement has expired."  Powell, 930 F.2d at 1301.  The court

concluded that the parties had "not yet reached the point in negotiations where it would

be appropriate to permit an action under the Sherman Act," explaining that "even after

impasse" both a union and management retain certain rights and remain under certain

legal obligations.  Id. at 1302.  The court held that, on the facts presented there, antitrust

claims were not appropriate in light of the general labor policy that favors "negotiated

settlements rather than intervention by the courts."  Id. at 1303.

Moreover, the court declined to "pick a termination point for the labor exemption."

Id.  But, the court noted that "[i]mportantly, this does not entail that once a union and

management enter into collective bargaining, management is forever exempt from the

antitrust laws."  Id.  Thus the Eighth Circuit expressly declined to "hold that restraints on

player services can never offend the Sherman Act."  Id.  The court then also noted that

"[t]he League concedes that the Sherman Act could be found applicable, depending on

the circumstances," in certain situations including (as most relevant here) "if the affected

employees ceased to be represented by a certified union." Id. at 1303 n.12.[3]

In the interim, the district court, having concluded that the impasse triggered the application of the antitrust laws, proceeded to hold, in July 1988, that the "presence of a bargaining impasse" nevertheless does not signify "the end of a 'labor dispute'" so as to preclude the application of the Norris-LaGuardia Act's prohibition against injunctions in cases "'involving or growing out of labor disputes.'"   690 F. Supp. 812, 814-15 (D. Minn. 1988) ("Indeed, a bargaining impasse is by definition a 'labor dispute.'").   The court noted that "where the bargaining relationship and the collective bargaining process remains intact, a controversy regarding terms or conditions of employment constitutes a labor dispute." Id. at 815.[4]

In the face of the Eighth Circuit's November 1989 ruling that a negotiating impasse did not permit the Players to pursue antitrust claims–and recognizing that the court did not identify any particular point when they could seek such relief–the Players faced a difficult choice between (1) continuing to engage in a collective bargaining

---

[3]       Judge Heaney dissented, contending, among other things, that although the majority purported to reject an indefinite exemption from the antitrust laws, the "practical effect" of its decision "is just that–because the labor exemption will continue until the bargaining relationship is terminated either by a NLRB decertification proceeding or by abandonment of bargaining rights by the union." Powell, 930 F.2d 1293, 1303, 1305 (8th Cir. 1993).   As neither side would likely file a decertification proceeding, in Judge Heaney's view, "[i]t follows that the end result of the majority opinion is that once a union agrees to a package of player restraints, it will be bound to that package forever unless the union forfeits its bargaining rights." Id. at 1306.

[4]       Unlike the district court's earlier ruling that impasse triggered the application of the Sherman Act, which was reversed by the Eighth Circuit, this second ruling regarding the Norris-LaGuardia Act was not reviewed on appeal.

process that had failed to accord them any true negotiating power, see Brown v. NFL, 50

F.3d 1041, 1057 (D.C. Cir. 1995) ("We recognize that the history of bargaining between

the NFL and the NFLPA, which includes a failed strike by the players during the 1987

season, has prompted some commentators to conclude that '[t]he union cannot effectively

strike.'"), and (2) jettisoning the entire collective bargaining apparatus–and the rights and

benefits it provided to them–in order to assert claims under the Sherman Act against the

League.  The Players elected to take the risk of the latter option and disclaimed the Union.

In 1990, eight individual players alleged that "Plan B"–a new proposed system of

player restraints–constituted a violation of Section 1.  The League again asserted the

nonstatutory labor exemption.  In May 1991, the district court granted the plaintiffs'

motion for summary judgment, concluding that the exemption terminated where no

"ongoing collective bargaining relationship" continued to exist because the union elected

to dissolve itself.  McNeil v. Nat'l Football League 764 F. Supp. 1351, 1358 (D. Minn.

1991).[5]

The court explained that the Union's executive committee decided, in light of the

Eighth Circuit's ruling–and in particular the Eighth Circuit's recognition of the League's

concession "that the nonstatutory labor exemption would necessarily end 'if the affected

---

[5]     The reported decision is captioned in terms of both Powell v. NFL and
McNeil v. NFL, but the court denied the NFL's motion to consolidate the two cases
because, among other reasons, the McNeil case was brought by individual players in 1990
in the wake of the Eighth Circuit's decision in Powell and after "the players had voted to
end their union status and the NFLPA had renounced its collective bargaining rights,"
whereas the Powell case was a class action filed in 1987 that challenged issues "entirely
absent from McNeil."  764 F. Supp. at 1359.

employees ceased to be represented by a certified union'"–"to abandon all collective

bargaining rights in an effort to end the labor exemption defense to the NFL defendants'

system of player restraints." Id. at 1354, 1356.  The court observed that the player

representatives of each team unanimously voted to end the Union's "status as the players'

collective bargaining representative and to restructure the organization as a voluntary

professional association." Id. at 1354.  The reconstituted association filed a labor

organization termination notice with the labor department and procured from the IRS a

reclassification of its tax-exempt status from that of a labor organization to that of a

business league.  Perhaps most importantly, the association promptly ceased all collective

bargaining on behalf of any of the Players.  Id.  It also ceased other functions it had

previously performed as a union.  Id.

 The League nonetheless claimed that the labor exemption continued in effect and

further contended that the Union "must first obtain a determination from the NLRB 'that

its certification is no longer operative.'"  Id. at 1356.  The district court rejected this

position, however, stating that "[t]he [League's] position regarding decertification . . .

finds no support in the labor law." Id. at 1356-57.

 The court then explained that although a union may obtain certification from the

NLRB, certification is not necessary to participate in a collective bargaining relationship

under the labor laws.  The only requirement is that a "majority of the employees in a

bargaining unit supports a particular union as their bargaining representative." Id. at

1357.  Certification, however, provides certain additional "'special privileges which are

not accorded unions recognized voluntarily or under a bargaining order.'" Id. (quoting

Gissel Packaging Co., 395 U.S. 575, 598-99 (1969)).  Moreover, employees have the

same right to withdraw from a bargaining relationship as do employers (although subject

to different conditions and standards).  Id. at 1357-58 (citing Section 7 of the NLRA).

The court further explained that "[j]ust as certification is not required to create a

collective bargaining relationship, a decertification proceeding is not required to end it."

Id. at 1358.  Decertification election proceedings are appropriate where "an employer or a

competing union seeks to contest a union's majority status" over the union's objection.

Id.  But where, as the court in McNeil faced, "a majority of players have voted to end

collective bargaining" and the Union "concedes it has lost its majority status," such that it

"may no longer bargain on the players' behalf," "there is no need for the NLRB to

decertify the NFLPA."  Id.

Finally, the court recognized that "a union may end its duty to bargain by

disclaiming interest in representing the employees as long as it does so in good faith."  Id.

at 1357 n.6.  That good faith requirement is met where "a majority of the players clearly

have indicated their wish not to be represented by any entity, including the NFLPA,

during collective bargaining."  Id.  The district court thus concluded that because (1) the

Union "no longer engages in collective bargaining and has also refused every overture by

the NFL defendants to bargain since November of 1989," and (2) the Union "has

abandoned its role in all grievance arbitrations and has ceased to regulate agents," no

"ongoing collective bargaining relationship" remains.  Id. at 1358-59.  The court further

observed that, with the dissolution of their Union, the players have "paid a price for the

loss of their collective bargaining representative because the NFL defendants have

unilaterally changed insurance benefits and lengthened the season without notifying the

NFLPA." Id. at 1359. Because the collective bargaining relationship had ended, the

plaintiffs also lost, for example, their labor law rights to institute "an NLRB proceeding

for failure to bargain in good faith" as well as their right to strike. Id.

    The McNeil plaintiffs then moved for partial summary judgment on their claim for

an injunction under Section 16 of the Clayton Act, seeking to permanently bar the NFL

from implementing "Plan B." 790 F. Supp. 871, 876 (D. Minn. 1992). The court denied

that motion as premature, however, as it was not then clear that the League would

institute that plan. Id. at 877. Because the court also denied the League's summary

judgment motion on that claim, id., the case proceeded to trial. In September 1992, the

jury in the McNeil action found that the Plan B restraints violated Section 1 of the

Sherman Act and inflicted economic injury on the plaintiffs. McNeil v. Nat'l Football

League, 1992 WL 315292, *1 (D. Minn. Sept. 10, 1992) (publishing the special verdict

form).

    Shortly after that September 1992 verdict, a group of players seeking to become

free agents brought suit complaining that the same restraints injured them. Jackson v.

NFL, 802 F. Supp. 226, 228 (D. Minn. 1992). Based on the McNeil verdict, the court

granted their motion for a temporary restraining order, finding that they would suffer

irreparable injury each week they remained restricted under the NFL-imposed system of

player restraints.  Id. at 230-31.

The result of these actions quickly led to the White v. NFL litigation.  In 1992,

several players brought an antitrust class action seeking an injunction requiring total or

modified free agency.  White v. Nat'l Football League, 822 F. Supp. 1389 (D. Minn.

1993).  The court then certified a settlement class for damages and injunctive relief.

Finally, the League and the Players entered into the White Stipulation and

Settlement Agreement ("SSA"), which the court approved on April 30, 1993.  They also

entered into a Collective Bargaining Agreement ("CBA"), at the insistence of the NFL,

that mirrors the SSA.  The SSA "allowed for recertification of the [NFLPA] and the

resumption of the collective bargaining relationship between the players and owners."  Id.

at 1134.

Since 1993, the Players and the League have operated under the SSA.  Among the

negotiated terms of the SSA, the Players, who had de-certified their union in order to

bring antitrust claims, acceded to the NFL's demand that they re-certify their union within

30 days.  As an apparent form of quid pro quo for that accession, the NFL agreed to

waive any right in the future to assert the non-statutory labor exemption, after the

expiration of the CBA, on the ground that the Players' disclaimer was a sham or

otherwise ineffective to end the labor exemption.  (See Doc. No. 43-1 (Declaration of

Barbara P. Berens, Ex. A (Amended SSA)) Art. XVIII § 5(b).)  In fact, Eugene Upshaw,

who had served as the Executive Director of the NFLPA since 1983, has stated that the

"only reason" he "agreed to recommend that the NFLPA be converted from a trade

11

association back into a union" was "because the <u>owners</u> demanded that as a condition for the Settlement Agreement," but only in exchange for the owners' agreement that they would not challenge any subsequent election to again decertify the NFLPA as their collective bargaining representative.  (Doc. No. 7-1 (Declaration of Richard A. Berthelsen), ¶ 8 (emphasis in original).)

Consequently, the Players reconstituted the National Football League Players' Association ("NFLPA") as their exclusive bargaining authority, and, together with the NFL, entered into a Collective Bargaining Agreement ("CBA") that mirrored the SSA. The parties amended and extended the CBA in 1996 and 1998 and, in 2006, renegotiated the CBA for the period from 2006-2012 (that is, through the 2012 season, which would terminate at the end of February 2013).  See <u>White v. NFL</u>, CV 4-92-906 (DSD), 2011 WL 706319, *1 (D. Minn. Mar. 1, 2011).

In the meantime, the "impasse" issue addressed in <u>Powell</u> eventually reached the Supreme Court, on review of a separate action in <u>Brown v. Pro Football, Inc.</u>, 518 U.S. 231 (1996).  In <u>Brown</u>, players on "developmental squads" alleged that the NFL's unilateral imposition in June 1989 (when the parties reached an impasse in negotiations to replace the collective bargaining agreement that had expired in 1987) of a fixed salary for such players violated the antitrust laws.  <u>Id.</u> at 234-35.  The Supreme Court ruled that an impasse in the course of labor negotiations did not operate to lift the protection of the non-statutory antitrust exemption.  <u>Id.</u> at 250.[6]

---

[6]      Finally, the history of litigation between the NFL and the Players

(continued...)

The most recent SSA and CBA provided players with approximately 50% of all NFL revenues with a salary cap set at 57.5% of "Total Revenues," as defined in the CBA, after the deduction of approximately $1 billion in expenses.  (Doc. No. 1 (Complaint) ¶ 47.)  In May 2008, however, the NFL opted out of the last two years of the operative SSA and CBA for various reasons, including a desire to seek a greater share of revenues, and to impose new restraints, such as a rookie wage scale.  (Id. ¶ 49.)  Since that time, the NFLPA and the NFL have attempted to negotiate a new CBA, but their efforts have proven to be unsuccessful.  During this process, the NFL warned the Players that they might use a "lockout" as a means to achieve an agreement more favorable to their interests.  White, 2011 WL 706319, at *1.  A lockout occurs when an employer lays off or 'locks out' its unionized employees during a labor dispute to bring economic pressure in support of the employer's bargaining position.  See American Ship Bldg. Co. v. N.L.RB., 380 U.S. 300, 301-302 (1965) (permitting management lockouts as a collective bargaining negotiating tool, as a counterpart to a union's right to strike).

The most recent SSA and CBA was due to expire at 11:59 p.m. on March 11, 2011.  (Compl. ¶¶ 50-51.)  As of that date, the Players had determined that "it would not be in their interest to remain unionized if the existence of such a union would serve to

---

[6](...continued)
concludes, as relevant here, with a case somewhat tangential to the present dispute between these parties.  The Supreme Court recently ruled, for purposes of the prohibition under Section 1 of the Sherman Act against combinations or conspiracies in restraint of trade, that the NFL, that is, the thirty-two individual teams, cannot evade Section 1 simply by forming a single corporate entity to develop, license and market their intellectual property (apparel with individual team logos, etc.).  American Needle, Inc. v. Nat'l Football League, ___ U.S. ___, 130 S. Ct. 2201 (2010).

allow the NFL to impose anticompetitive restrictions with impunity." (Id. ¶ 54.) A
substantial majority of the Players voted to end the collective bargaining status of their
Union, and the player representatives of the Union then voted to restructure the
organization as a professional association rather than as a union. (Id. ¶¶ 55-56.)

Accordingly, at approximately 4:00 p.m. on that day, the NFLPA informed the
NFL that it disclaimed any interest in representing the Players in further negotiations. (Id.
¶ 57; Doc. No. 91, Ex. B.)[7] In addition, as of that time, the NFLPA amended its bylaws
to prohibit it or its members from engaging in collective bargaining with the NFL, the
individual teams, or their agents. (Doc. No. 1, ¶ 58.) The NFLPA also filed notice with
the Department of Labor to terminate its status as a labor organization. (Id. ¶ 59; Doc.
No. 91, Ex. E.) Similarly, it filed an application with the IRS to be reclassified for tax
purposes as a professional association rather than a labor organization. (Doc. No. 1, ¶
60.) And on March 11, it also informed the NFL that it no longer would represent players
in grievances under the soon-to-expire CBA, so that the players would have to pursue or
defend on an individual basis any grievance with the NFL or the individual teams. (Id. ¶
61; Doc. No. 91, Ex. C.)

The Brady Plaintiffs filed the present Complaint that same day. It alleges several
antitrust claims under Section 1 of the Sherman Act as well as breach of contract and
related tort claims. (Doc. No. 1.) They allege that the NFL and its thirty-two separately-

---

[7]     The NFL then amended an unfair labor charge that it had filed in February
2011 (alleging that the NFLPA was not bargaining in good faith) to add the charge that
the NFLPA's disclaimer was invalid.

owned and independently-operated teams have jointly agreed and conspired–"through a patently unlawful group boycott and price-fixing arrangement" or "a unilaterally-imposed set of anticompetitive restrictions on player movement, free agency, and competitive market freedom"–to coerce the Players "to agree to a new anticompetitive system of player restraints" that will economically harm the Plaintiffs.  (Id. ¶¶ 2-3.)  One of the alleged anticompetitive agreements is the "so-called 'lockout' aimed at shutting down the entire free agent marketplace," "as well as a boycott of" rookies and players currently under contract."  (Id. ¶ 3.)  Thus, they moved for a preliminary injunction the same day, seeking to enjoin the NFL from perpetuating the "lockout" or group boycott.  (Doc. No. 2.)  The Eller Plaintiffs filed a similar action on March 28, 2011.  (Doc. No. 57.)  They too promptly moved for essentially the same preliminary injunctive relief.  (Doc. No. 58.)

After the CBA expired at the end of that day, the League instituted its "lockout" effective March 12, 2011.

The Brady Plaintiffs present affidavit evidence to this Court regarding their irreparable harm.  Richard Berthelsen, the NFLPA's General Counsel, contends that, due to the relatively short careers of most NFL players, damages could not fully compensate the Players.  (Doc. No. 7-1 (Berthelsen Decl.) ¶ 29.)  He argues further that the players' unique abilities and circumstances compound the difficulty in determining the salary and benefits that each player might have earned in a competitive market.  (Id.)  Numerous affidavits underscore that the careers of NFL players are of short duration, typically less than four years.  (Doc. No. 5 (Decl. of Frank Bauer) ¶ 11; Doc. No. 6 (Decl. of Anthony

15

Agnone) ¶ 9; Doc. No. 7 (Berthelsen Decl.) ¶ 30; Doc. No. 9 (Decl. of Tom Condon) ¶

12; Doc. No. 10 (Decl. of Neil Cornrich) ¶ 7; Doc. No. 11 (Decl. of William Vann

McElroy) ¶ 13; Doc. No. 12 (Decl. of Neil Schwartz) ¶ 14.)

 These affidavits note that the short careers of NFL players are due to both the ever-

present risk of career-ending injury and the constant physical wear and tear on players'

bodies – risks faced by every NFL player.  (Id.)  The Brady Plaintiffs also maintain that

they must constantly demonstrate their skill and value on the practice and playing fields.

(Bauer Decl. ¶ 12; Agnone Decl. ¶ 10; Berthelsen Decl. ¶ 31; Condon Decl. ¶ 13;

Cornrich Decl. ¶ 8; McElroy Decl. ¶ 14; Schwartz Decl. ¶ 15.)  Because of this constant

pressure to prove their physical and economic worth, the Brady Plaintiffs submit that the

loss of an entire year in a short professional athletic career cannot be recaptured and,

therefore, cannot be adequately compensated by damages.  (Bauer Decl. ¶ 12; Agnone

Decl. ¶ 10; Berthelsen Decl. ¶¶ 31, 35; Condon Decl. ¶ 13; Cornrich Decl. ¶ 8; McElroy

Decl. ¶ 14; Schwartz Decl. ¶ 15; Doc. No. 13 (Decl. of Donald Yee) ¶ 8.)  Moreover, they

argue, time spent off the playing and practice fields diminishes players' skills.  (Bauer

Decl. ¶ 12; Agnone Decl. ¶ 10; Berthelsen Decl. ¶ 31; Condon Decl. ¶ 13; Cornrich Decl.

¶ 8; Schwartz Decl. ¶ 15; Yee Decl. ¶ 8.)   As a result of sitting out a season, they argue,

this diminishment in skills could shorten or end the careers of some players.  (Agnone

Decl. ¶ 10; Condon Decl. ¶ 13; Cornrich Decl. ¶ 8; McElroy Decl. ¶ 14; Schwartz Decl. ¶

15.)

 As a result, the Players–having made the decision to dissolve the NFLPA as their

16

collective bargaining agent–allege that they immediately began to suffer the
consequences of the NFL's lockout.  Significantly, in previous battles in this long-running
dispute between the Players and the League, this Court has recognized that the threat of
harm shown by Plaintiffs here, including lost playing time, constitutes irreparable harm.
Nat'l Football League Players Ass'n v. Nat'l Football League, 598 F. Supp.2d 971, 982
(D. Minn. 2008); Jackson v. Nat'l Football League, 802 F. Supp. 226, 230-31 (D. Minn.
1992); see also Powell v. Nat'l Football League, 690 F. Supp. 812, 818 (D. Minn. 1988)
(denying injunctive relief for unrestricted free agency rules, but finding that at least some
of the players would likely suffer irreparable injury as a result of the NFL's restriction).
"The existence of irreparable injury is underscored by the undisputed brevity and
precariousness of the players' careers in professional sports, particularly in the NFL."
Jackson, 802 F. Supp. at 231 (citing Linseman v. World Hockey Ass'n, 439 F. Supp.
1315, 1319 (D. Conn. 1977) ("[T]he career of a professional athlete is more limited than
that of persons engaged in almost any other occupation. Consequently the loss of even
one year of playing time is very detrimental.").

　　　　After consolidating the two actions (Doc. No. 55), this Court heard oral argument
on both motions.

## II.    DISCUSSION

　　　　Plaintiffs seek a preliminary injunction under Rule 65 against the "lockout" that
Plaintiffs contend is an illegal "group boycott and price-fixing agreement" by the NFL
and its owners.  (Doc. No. 4, at 9 (Mem. at 1).)  In response, the NFL claims this Court

may not enjoin their "exercise of their labor law *right* to lock out their player-employees" as the lockout "is unquestionably lawful and permitted by federal labor law." (Doc. No. 34, at 9 (Mem. at 1) (emphasis in original).)

Before this Court may address whether a preliminary injunction is warranted, however, it must first address the NFL's argument that the Norris-LaGuardia Act precludes any injunctive relief here, as well as its argument that this Court should defer this matter, or at least a portion of it, to the National Labor Relations Board under the doctrine of primary jurisdiction–issues that the NFL contends are jurisdictional. (Id. at 9-10, 36 (Mem. at 1-2, 28) (characterizing these two issues as "jurisdictional").)

## A.   The Threshold "Jurisdictional" Issues

Both of the NFL's jurisdictional arguments appear to rest on the premise that this dispute is governed by labor law–chiefly the National Labor Relations Act of 1935 ("NLRA"), 49 Stat. 449, and the Norris-LaGuardia Act of 1932, 47 Stat. 90.[8]  This premise, in turn, assumes that the Players are still represented by their former Union. (Doc. No. 34, at 9-10, 36 (Mem. at 1-2, 28) (contending that the Players' Union, as a "party to a collective bargaining relationship," "cannot, by a tactical declaration akin to the flip of a switch," unilaterally and "instantaneously oust federal labor law" and thereby "transform a multiemployer bargaining unit's lawful use of economic tools afforded it under the labor laws into an antitrust violation").)

_____

[8]      The NLRA (also known as the Wagner Act), is codified as subchapter II of Chapter 7 of Title 29, that is, 29 U.S.C. §§ 151-69.  (The rest of Chapter 7, exclusive of subchapter II, codifies the Labor Management Relations Act, 1947.)  The Norris-LaGuardia Act is codified as Chapter 6 of Title 29, that is, 29 U.S.C. §§ 101-13.

It is necessary then to determine, as an initial matter, whether this Court has jurisdiction to rule whether the Players' disclaimer was effective or not, or whether this Court must refer that issue to the National Labor Relations Board ("NLRB"). The Court thus turns to the critical question of what general body of law governs this dispute in its present factual context. This antecedent issue is best approached by first addressing the League's contention that this dispute, or at least a portion of it, must be referred to the NLRB under the doctrine of "primary jurisdiction" for resolution of the question of whether the Union's disclaimer was valid and effective.[9]

### 1.      Exercising Its Discretion, This Court Declines to Refer This Matter To The NLRB

The NFL argues that this Court "cannot consider" the issue of "whether the nonstatutory labor exemption protects the NFL's conduct from antitrust challenge" "without first determining (1) whether the NFLPA's purported disclaimer is valid and effective and, if so, (2) whether such disclaimer immediately ended the exemption's applicability." (Doc. No. 34, at 25 (Mem. at 17).) The League contends that the validity of the disclaimer, however, "is unquestionably within the NLRB's primary jurisdiction."

---

[9]      The Players contend that the NFL has waived its right to contest the Union's disclaimer. (Doc. No. 41, at 13-14 (Mem. at 8-9).) As noted above, this is not the first time that the Players' Union has disclaimed its status and role as their negotiating agent in collective bargaining. When the parties resolved their earlier dispute in 1993, the SSA (and the resulting CBA) into which they entered required the Players to reconstitute the NFLPA as a union, and stated that the NFL would not challenge any subsequent election to once again "de-unionize." The NFL now contests the waiver, arguing that it is inapplicable, but in any event, despite its earlier agreement, against public policy. This court need not reach the issue of waiver.

(Id.)[10]  Thus the League expressly argues that "the Court must stay this case pending the

outcome of the Board proceedings."  (Id. at 10 (Mem. at 2).)[11]

### (a)    The Doctrine of "Primary Jurisdiction"

Under the doctrine of primary jurisdiction, a court having jurisdiction to hear an

action that involves a particular issue on which an agency has particular expertise may

"refer" that issue to the agency for its views or resolution.  Reiter v. Cooper, 507 U.S.

258, 268 (1993) (explaining that doctrine applies where the "claims are properly

cognizable in court" and that "[r]eferral of the issue to the administrative agency does not

deprive the court of jurisdiction").  Thus the issue is solely whether this Court should stay

this action to await the ruling of the NLRB on the NFL's outstanding unfair labor practice

charge that accuses the Players of a "sham," and therefore ineffective, disclaimer.

---

[10]      This Court does not understand the NFL to suggest that this Court should
refer (or must defer) to the Board to decide the ultimate issue of whether the nonstatutory
labor exemption continues to apply here, because the Supreme Court has ruled that the
issue of any implied antitrust exemption is generally one for the courts and that even in
the exceptional case where referral to the relevant agency might be warranted, "[t]he
decision in the end . . . is for the courts."  Gordon v. New York Stock Exchange, 422 U.S.
659, 686 (1975).

[11]      Application of the doctrine of primary jurisdiction usually requires that the
court stay, rather than dismiss, the judicial proceedings pending an agency's resolution of
an issue within its particular specialized expertise.  Thus this issue, unlike that regarding
the Norris-LaGuardia Act, is not truly "jurisdictional," as it does not raise any true bar to
a federal court's authority to hear a particular dispute as would a lack of subject-matter
jurisdiction, which of course would require dismissal of the entire action.  "Despite the
name, the doctrine of primary jurisdiction does not involve jurisdictional questions.  It is a
common law doctrine used to coordinate administrative and judicial decisionmaking."
Red Lake Band of Chippewa Indians v. Barlow, 846 F.2d 474, 476 (8th Cir. 1988).
Because the doctrine generally requires abstention pending agency resolution of the issue
entrusted to it, "[c]ourt jurisdiction is not thereby ousted, but only postponed."  United
States v. Philadelphia Nat'l Bank, 374 U.S. 321, 353 (1963).

**(b)      There Is No Issue Within The NLRB's Exclusive Statutory Jurisdiction**

At the outset, this Court must clarify the distinction between the doctrine of primary jurisdiction and the question of an agency's statutory jurisdiction.  When Congress creates an agency, it often accords to it the authority to adjudicate disputes within its particular realm of expertise.  2 Richard J. Pierce Jr., <u>Administrative Law Treatise</u> § 14.2, at 1185 (5th ed. 2010) ("An agency has the power to resolve a dispute or an issue only if Congress has conferred on the agency statutory jurisdiction to do so.").  That "statutory jurisdiction" is often exclusive of that of the federal (and state) courts.[12]

Due to the related nature of the two doctrines, sometimes even the "courts confuse primary jurisdiction with exclusive statutory jurisdiction."  2 Pierce, <u>supra</u>, § 14.2, at 1191.[13]  The issue of primary jurisdiction must be kept separate from issues of an

---

[12]      Agency jurisdiction may also be concurrent with that of the courts.  2 Pierce, <u>supra</u>, § 14.2, at 1190 ("Sometimes Congress confers concurrent jurisdiction on both an agency and the courts to resolve a class of disputes.").

[13]      For example, in <u>United States v. Western Pacific Railroad Co.</u>, the Supreme Court stated that the issues were "within the *exclusive primary jurisdiction*" of the Interstate Commerce Commission.  352 U.S. 59, 63 (1956) (emphasis added).  And here, the NFL relies on the First Circuit's decision in <u>Newspaper Guild of Salem, Local 105 v. Ottaway Newspapers, Inc.</u>, 79 F.3d 1273 (1st Cir. 1996), to support its argument that a preliminary injunction should not issue where the agency has not yet articulated its view. (Doc. No. 34, at 26-27 (Mem. at 18-19).)  In <u>Newspaper Guild of Salem</u>, the court, confusing statutory jurisdiction with primary jurisdiction, stated that "[i]t is well settled that the NLRB enjoys primary jurisdiction over disputes involving unfair labor practices or representational issues."  79 F.3d at 1283.  Here, however, the NFL's unfair labor practice charge is properly pending before the Board and the present judicial action involves no such charges or representational issues, which are questions within the NLRB's exclusive statutory jurisdiction.  Similarly, in <u>Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade</u>, also relied upon by the NFL, the Supreme Court addressed two

(continued...)

agency's exclusive statutory jurisdiction.  Id., § 14.1, at 1162 ("The question of whether an issue is within the agency's primary jurisdiction is different from the question of whether the agency actually has exclusive statutory jurisdiction to resolve an issue.").[14]

With respect to the present dispute, the National Labor Relations Act declared it to be the policy of the United States to encourage "the practice and procedure of collective bargaining" and to protect "the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection."  29 U.S.C. § 151 ("Findings and declaration of policy.").  The key provisions

---

[13](...continued)
issues regarding judicial review of agency decisions.  412 U.S. 800, 802 (1973). Regarding the second issue, "what sort of error must" the reviewing court "find in the proceedings of the" Interstate Commerce Commission "in order to enjoin a proposed rate increase after a final order by" that agency, the Court cautioned the reviewing court that because an injunction against agency action entails an assessment of the merits, the reviewing court should avoid indicating its view of "national transportation policy, prior to an expression by the Commission of its view."  Id. at 821.  Here, of course, this Court is not reviewing any agency determination, much less enjoining that decision, and the NLRB already has clearly and consistently stated its standard for assessing union disclaimers.

[14]     Because the NFL requests a stay pending the outcome of the Board proceedings, this Court does not understand the NFL to be contending that this entire action falls within the agency's "exclusive statutory jurisdiction" over certain issues and disputes, that is, that the Board could somehow consider and rule upon the antitrust and other underlying claims of the Plaintiffs.  Rather, where primary jurisdiction is invoked, initial decision-making responsibility is allocated between agencies and courts where jurisdiction to resolve disputes and issues overlaps.  2 Richard J. Pierce, Jr., Administrative Law Treatise § 14.1, at 1161 (5th ed. 2010).  And even where a case presents issues within the Board's statutory jurisdiction, "federal courts on occasion have decided [NLRA] questions that emerged as collateral issues in suits brought under other federal statutes."  2 John E. Higgins, Jr., The Developing Labor Law 2221 (5th ed. 2006).

for present purposes are:  (1) Section 7, which provides for the rights of employees to organize as a union and then collectively bargain with their employers, 29 U.S.C. § 157; (2) Section 8, which delineates unfair labor practices (ULPs), 29 U.S.C. § 158, both those by the employer, id. § 158(a), and those by "labor organizations," id. § 158(b); and (3) Section 9, which provides procedures regarding elections of representatives for purposes of collective bargaining and the powers of such representatives, id. § 159.  See generally 1 Higgins, supra, at 473 ("Section 9 vests in the Board 'the broad duty of providing election procedures and safeguards.").

For present purposes, Section 7 merits additional attention as it provides not only that employees shall have rights to organize and bargain collectively, but that they "shall also have the right *to refrain from any or all of such activities* except to the extent that such right may be affected by an agreement requiring membership in a labor organization as to a condition of employment as authorized in section 158(a)(3) of this title."  29 U.S.C. § 157 (emphasis added).

The Wagner Act also created the NLRB ("the Board") and the position of the General Counsel of the Board.  29 U.S.C. § 153.  As the NFL correctly observes, "'[t]he labor laws give the Board, not antitrust courts, primary responsibility for policing the collective-bargaining process.'"  (Doc. No. 34, at 25 (Mem. at 17) (quoting Brown v. Pro Football, Inc., 518 U.S. 231, 242 (1996)).)  "The Board has two principal functions under the National Labor Relations Act . . . :  (1) [t]he prevention of statutorily defined unfair labor practices . . ., and (2) the conduct of secret ballot elections among employees in

appropriate collective-bargaining units to determine whether or not they desire to be represented by a labor union." See 32 Fed. Reg. 9588, Sec. 201 (July 1, 1967). See generally 2 Higgins, supra, at 2658 ("The Board's principal function is adjudicatory in nature.  It determines all unfair labor practice cases brought before it by the general counsel.  It also has complete authority over representation matters.").

The Board's central function is to resolve claims of ULPs under Section 8.  29 U.S.C. § 160(a) ("The Board is empowered . . . to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce.").  Under Section 7, the Board also polices situations where employees exercise their rights to form a union and then to engage in collective bargaining.  29 U.S.C. § 157.  Finally, under Section 9, the Board addresses questions of the appropriate union representative and defines the appropriate bargaining unit.  29 U.S.C. § 159.

The General Counsel of the NLRB "shall have final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under section 160 of this title, and in respect of the prosecution of such complaints before the Board, and shall have such other duties as the Board may prescribe or as may be provided by law." Id. § 153(d); see also, 32 Fed. Reg. 9588, Sec. 202 (July 1, 1967).

In support of its argument that the NLRB must decide whether the Union's disclaimer was valid and effective, however, the NFL cites Minn-Dak Farmers Cooperative, Employees Organization v. Minn-Dak Farmers Cooperative, 3 F.3d 1199 (8th Cir. 1993), incorrectly conflating the doctrine of primary jurisdiction and exclusive

24

statutory jurisdiction.[15]   In <u>Minn-Dak</u>, a union brought an action in federal district court

against an employer for a declaration that the employer was required to recognize an

affiliation vote.  The court recognized that the "Board has exclusive jurisdiction to decide

questions concerning representation" under Section 9, 29 U.S.C. § 159, concluding that

"[t]his case presents a *pure question of representation*, and is within the exclusive

jurisdiction of the NLRB."  <u>Id.</u> at 1201 (emphasis added).[16]   Moreover, Section 9 provides

---

[15]     The NFL also claims that the Supreme Court's decision in <u>Brown v. Pro
Football, Inc.</u> requires "this Court to stay plaintiffs' suit pending the outcome of" the
Board proceedings the NFL initiated claiming an unfair labor practice by the Union.
(Doc. No. 34, at 25 (Mem. at 17).)  But the decision in <u>Brown</u> does not concern primary
jurisdiction.  Rather, the Supreme Court addressed the process of collective bargaining
between the Union and the League and particularly what legal effect, if any, occurs upon
an impasse during such negotiations.  518 U.S. 231, 235-50 (1996).  Here, the collective
bargaining process has ended, and the NFLPA disclaimed its role as the Players'
negotiating agent in that process.  <u>See infra</u> Section II.A.1(d).

[16]     The NFL's reliance on other Eighth Circuit cases to support its request for
a stay is similarly misplaced.  In <u>Construction, Building Material, Etc. Workers, Local
682 v. Bussen Quarries, Inc.</u>, the court faced the question of whether to *dismiss* an action
presenting issues within the Board's exclusive statutory jurisdiction.  849 F.2d 1123,
1125 (8th Cir. 1988) (2-1) (affirming dismissal for "lack of subject matter jurisdiction"
where plaintiff "essentially asks this court to review a representational matter" and
Section 9 "rests jurisdiction in the NLRB to determine questions of representation").
Likewise, in <u>Morello v. Federal Barge Lines, Inc.</u>, the court held that the district court
should have *dismissed* the case for lack of subject matter jurisdiction where the union
sought an injunction ordering the employers to negotiate the issue of the status of
supervisory employees, because such an issue presents a question of representation, for
which jurisdiction is vested solely with the NLRB under Section 9.  746 F.2d 1347, 1349-
51 (8th Cir. 1984).  Finally, the NFL's reliance on <u>National Labor Relations Board v.
Columbia Tribune Publishing Co.</u>, is unpersuasive as it was a judicial enforcement
action–that is, an appeal directly from the NLRB's decision exercising its exclusive
statutory jurisdiction over Section 8 disputes regarding unfair labor practices.  495 F.2d
1384, 1385 (8th Cir. 1974).  Where the NLRB decides what is in fact a genuine unfair
labor dispute, an issue within its exclusive statutory jurisdiction, it may enforce its order
in the appropriate court of appeal.  29 U.S.C. § 160(e).  <u>E.g.</u> <u>Hoffman Plastics</u>

(continued...)

the procedures by which employees exercise their Section 7 right to bargain collectively through representatives of their own choosing," that is, by conducting a representation election.  1 Higgins, supra, at 472-73.  It does not govern the dissolution of a union by disclaimer.

This federal antitrust and state-law contract case, however, cannot be deemed either a Section 9 representation action (much less a "pure" one), a Section 8 unfair labor practice action, or a Section 7 action.[17]  Rather, the NFL has disputed the Union's disclaimer–which concerns a union's decision to dissolve itself as a labor organization, instead of recognition of a vote to create or join a union–as a defense to the individual Players' antitrust (and related contract and tort) claims.  Accordingly, it is difficult to accept the NFL's argument that, in this antitrust action, the question of whether the Union's disclaimer is invalid is a "threshold predicate," rather than a collateral issue, where the Supreme Court has concluded that "the federal courts may decide labor law questions that emerge as *collateral* issues in suits brought under independent federal remedies, *including the antitrust laws*."  Connell Constr. Co. v. Plumbers and Steamfitters Local Union No. 100, 421 U.S. 616, 626 (1975) (emphases added).  In short, this antitrust

---

[16](...continued)
Compounds, Inc. v. NLRB, 535 U.S. 137 (2002).  See generally 2 Higgins, supra, ch. 33.
Columbia Tribune Publishing was not an action originally filed in district court in which a party claimed that a particular issue should be referred to the NLRB.  There is no dispute here that the Board has such exclusive jurisdiction over Section 8 actions.  This antitrust action, though, is not a Section 8 unfair labor practice case.

[17]     Section 9 provides the "administrative machinery" to resolve questions concerning representation and authorizes the Board to certify employee units appropriate for collective bargaining.  See generally 1 Higgins, supra, chs. 10 & 11.

action is not within the Board's exclusive statutory jurisdiction.

### (c)   This Federal Antitrust Action Is Not Governed By The <u>Garmon</u> Preemption Doctrine

Nor is this antitrust action subject to the <u>Garmon</u> preemption doctrine, which is based on an agency's exclusive statutory jurisdiction.  The NFL, relying substantially on the Supreme Court's decision in <u>San Diego Bldg. Trades Council v. Garmon</u>, contends that "federal courts generally do not have jurisdiction over activity that is 'arguably subject to' Sections 7 and 8 of the NLRA, . . . and that they '*must defer* to the exclusive competence of the' NLRB."  (Doc. No. 34, at 26 (Mem. at 18) (quoting <u>San Diego Building Trades Council v. Garmon</u>, 359 U.S. 236, 245 (1959) (emphasis added)).)  But in <u>Garmon</u>, the Supreme Court addressed, on review from the judgment of the California state supreme court, whether a state court could enjoin a union for picketing and award damages for losses sustained.  Thus, the issue was federal preemption of state trespass law.  <u>Id.</u> at 246 ("[T]he State's jurisdiction is displaced.").

As the Supreme Court explained in <u>Garmon</u>, the enactment of federal labor law "inevitably gave rise to difficult problems of federal-state relations," due in part to the fact that the general statutory language left it to the courts to fill in the details by adjudicating individual cases.  359 U.S. at 239-40.  Accordingly, the Eighth Circuit has recognized that the <u>Garmon</u> doctrine "is properly classified as one of preemption, rather than primary jurisdiction."  <u>Augspurger v. Brotherhood of Locomotive Engineers</u>, 510 F.2d 853, 857-58 nn.5&7 (8th Cir. 1975) (further noting that where the NLRB exercises its jurisdiction under <u>Garmon</u>, "the jurisdiction of the judiciary is not simply postponed,

27

but is ousted," whereas under primary jurisdiction, a court's "jurisdiction is not thereby

ousted, but only postponed").  There is no comparable question of preemption here, as the

present federal antitrust action was properly filed in federal court.  28 U.S.C. §§ 1331,

1337.[18]

     Moreover, the issue in <u>Garmon</u> did not concern the genuine doctrine of "primary

jurisdiction" at issue here–whether a court otherwise possessing subject matter

jurisdiction should "refer" a particular issue to an agency having expertise in that specific

area of law.  As the Supreme Court itself later explained, in <u>Garmon</u>,

> the term 'primary jurisdiction' is used to refer to the various considerations
> articulated in *Garmon* . . . that militate in favor of pre-empting state-court
> jurisdiction over activity which is subject to the unfair labor practice
> jurisdiction of the federal Board.  This use of the term *should not be*
> *confused with the doctrine of primary jurisdiction* [that] has been described
> by Professor Davis [in his <u>Administrative Law Treatise</u>, now authored by
> Richard J. Pierce, Jr.].

<u>Sears, Roebuck and Co. v. San Diego County District Council of Carpenters</u>, 436 U.S.

180, 199 n.29 (1978) (emphasis added).

     Rather, the issue in <u>Garmon</u> concerned the NLRB's statutory jurisdiction:

> Congress did not merely lay down a substantial rule of law to be enforced by any
> tribunal competent to apply law generally to the parties.  *It went on to confide*
> *primary interpretation and application of its rules to a specific and specially*
> *constituted tribunal* and prescribed a particular procedure for investigation,
> complaint and notice, and hearing and decision, including judicial relief pending a
> final administrative order.  Congress evidently considered that centralized

---

[18]    Although the Complaints also assert state-law claims for breach of contract
(and related tort claims) (<u>e.g.</u> Doc. No. 1, ¶¶ 137-55), this Court has supplemental
jurisdiction over such claims.  28 U.S.C. § 1367.  And this Court does not understand the
NFL's "primary jurisdiction" argument to contend that these state-law claims are
somehow preempted.

administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes towards labor controversies. . . .  A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law.

359 U.S. at 242 (quoting Garner v. Teamsters, 346 U.S. 485, 490-91 (1953)).

The language on which the NFL relies here to contend that the NLRB's purported "primary jurisdiction" is broad and mandatory derives, however, from the Supreme Court's preemption ruling:  "When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by [Section] 7 . . . or constitute an unfair labor practice under [Section] 8, due regard for the federal enactment requires that state jurisdiction must yield."  Id. at 244.[19]  The Supreme Court thus simply ruled, with respect to the NLRB's *statutory jurisdiction*, that doubts should be resolved in favor the NLRB:

At times it has not been clear whether the particular activity regulated by the States was governed by [Section] 7 or [Section] 8 or was, perhaps outside both these sections.  But courts are not primary tribunals to adjudicate such issues.  It is essential to the administration of the Act that these determinations be left in the first instance to the [NLRB].

Id. at 244-45.[20]  Moreover, the Supreme Court's broad preemption standard–requiring

_____

[19]     Later, in responding to the Eller Plaintiffs' motion, the NFL appears to recognize that Garmon concerned the NLRB's exclusive statutory jurisdiction, not the doctrine of primary jurisdiction.  (Doc. No. 75, at 14 (Mem. at 9) (citing Garmon for the proposition that the issue "falls within the *exclusive* jurisdiction of the NLRB" (emphasis in original).)  But even so, the NFL does so only to claim that the disclaimer presents an unfair labor practice governed by Section 8.  (Id. (characterizing disclaimer as "gamesmanship" that violates the Union's obligation to bargain in good faith).)

[20]     The Supreme Court then explained that it was facing just such a case of the preliminary issue of the Board's jurisdiction.  Id. at 245 ("The case before us is such a

(continued...)

deference "to the exclusive competence of the [Board] if the danger of state interference with national policy is to be averted" where "an activity is *arguably* subject to [Section] 7 or [Section] 8 of the Act"–is not implicated here where there is no issue of state law or state court interference with national labor policy.  359 U.S. at 245.  As the Supreme Court itself has observed, the preemption question at issue in <u>Garmon</u> differs from the true "primary jurisdiction" issue:

> While the considerations underlying *Garmon* are similar to those underlying the primary-jurisdiction doctrine, the consequences of the two doctrines are therefore different.  Where applicable, the *Garmon* doctrine completely pre-empts state-court jurisdiction unless the Board determines that the disputed conduct is neither protected nor prohibited by the federal Act.

<u>Sears, Roebuck & Co.</u>, 436 U.S. at 199 n.29 (whereas under primary jurisdiction a court simply refers an issue to an agency for its initial decision).[21]

---

[20](...continued)

case.").  But the Supreme Court stated it was not for it "to decide whether the [Board] would have, or should, have, decided these questions in the same manner."  Id.  And even in the context of an agency's statutory jurisdiction, courts may sometimes decide the issue themselves.  2 Richard J. Pierce Jr., <u>Administrative Law Treatise</u> § 14.2, at 1189 (5th ed. 2010) ("Of course, it would not be appropriate for courts to refer every question concerning the scope of an agency's statutory jurisdiction to the agency for initial resolution.  If the court concludes that the question can be resolved with confidence based solely on judicial analysis of the language and purpose of the statute, the court should resolve the question itself.").

[21]      And even in <u>Garmon</u> itself, where the issue of federal preemption usually dictates greater deference to the federal agency's authority than that appropriate under "primary jurisdiction," the Supreme Court "indicated that if the state court can ascertain the actual legal significance of particular conduct under federal law by reference to 'compelling precedent applied to essentially undisputed facts,' the court may properly do so and proceed to adjudicate the state cause of action."  <u>Sears, Roebuck & Co.</u>, 436 U.S. at 188 n.13 (quoting <u>Garmon</u>, 359 U.S. at 246)).

Furthermore, as the Supreme Court's decisions after <u>Garmon</u> demonstrate, "the Court has refused to apply the *Garmon* guidelines in a literal, mechanical fashion." <u>Sears, Roebuck & Co.</u>, 436 U.S. at 188; 2 Pierce, <u>supra</u>, § 14.4, at 1203 ("Given the difficulty and frustration the Court has experienced in its attempts to rely on the primary jurisdiction doctrine in the labor relations / federalism context, it is easy to understand why the Court has become less willing to use the doctrine and more willing to resolve close questions itself without the benefit of an initial agency resolution."); <u>see id.</u>, § 14.4, at 1201 ("The <u>Garmon</u> doctrine has become riddled with exceptions.").

For example, courts may hear actions where the claims "create no realistic risk of interference with the Labor Board's primary jurisdiction to enforce the statutory prohibition against unfair labor practices." <u>Sears, Roebuck & Co.</u>, 436 U.S. at 198. Similarly, in <u>Kaiser Steel Corp. v. Mullins</u>, the Supreme Court stated that "a federal court has a duty to determine whether a contract violates federal law before enforcing it." 455 U.S. 72, 83 (1982) (rejecting argument that "the question of the legality of [a contract clause] under §8(e) of the NLRA was within the exclusive jurisdiction of the [NLRB]"). <u>Accord</u> <u>Pipe Fitters Health and Welfare Trust v. Waldo</u>, 872 F.2d 815, 817 (8th Cir. 1989) (rejecting plaintiff's argument that the district court had "no jurisdiction to consider" an unfair-labor-practice defense because <u>Kaiser Steel</u> "gives it the authority to find collective bargaining agreements unenforceable if they violate federal labor law").

In sum, the present issue of "primary jurisdiction" is not truly "jurisdictional" as it does not concern the agency's exclusive statutory jurisdiction, much less whether a state

court's jurisdiction is thereby preempted.  Even assuming that the question of the Union's

disclaimer is an issue of labor law, this Court need not refer it to the NLRB because it

arises as a question embedded in the larger framework of this antitrust suit.

> **(d)**     **The Minimal, If Any, Benefit That Might Be Derived From Seeking The NLRB's Expertise Here Is Clearly Outweighed By The Delay Involved, Particularly Where The Players Are Incurring Ongoing Irreparable Harm**

Once the issue is properly framed in terms of "primary jurisdiction," rather than

exclusive statutory jurisdiction or the Garmon preemption doctrine, the question here is

relatively straightforward.  But the fact that this Court's jurisdiction is not divested in

favor of the "exclusive competence" of the NLRB does not resolve the issue of whether

this Court should, in its discretion, nevertheless refer the disclaimer issue to the Board.

See Sheet Metal Workers Int'l Ass'n v. Murphy Constr. Co., 191 F.3d 909, 910 (8th Cir.

1999) (applying abuse of discretion standard regarding primary jurisdiction).[22]

---

[22]     The Eighth Circuit has since stated that its "review [of] the issue of primary jurisdiction" is governed by the de novo standard.  United States v. Rice, 605 F.3d 473, 475 (8th Cir. 2010).  In Rice, the court cited United States v. Henderson, which stated that the court "appears" to apply that standard.  416 F.3d 686, 691 (8th Cir. 2005).  Henderson, in turn, cites Access Telecommunications v. Southwestern Bell Tel. Co., which expressly stated that it was applying that standard only because "both parties argue based on the assumption that we review de novo the issue of whether the doctrine of primary jurisdiction was properly applied by the District Court."  137 F.3d 605, 608 (8th Cir. 1998).  In fact, the court noted that it was *not* "deciding the standard-of-review question, which is best left to be resolved in a case in which it is contested."  Id.  Finally, the court noted that both parties had cited the same case from the Second Circuit, namely Nat'l Communications Ass'n v. AT&T, 46 F.3d 20 (2d Cir. 1995).  Id. at 608 n.2.  Of the eight circuits that had addressed the question as of 2007, the Second Circuit "is apparently the most committed to de novo review."  Aaron J. Lockwood, "The Primary Jurisdiction Doctrine:  Competing Standards of Appellate Review," 64 Wash. & Lee L. Rev. 707, 722 (Spring 2007).  Only three circuits seem to apply the de novo standard, and "it appears

(continued...)

32

As explained above, the doctrine of primary jurisdiction applies where a court has jurisdiction of the action but faces an issue where an agency's expertise on that issue, not within a court's general competence, might warrant the court staying the action while it refers the issue to that agency.  But the Supreme Court also has explained that "[n]o fixed formula exists for applying the doctrine of primary jurisdiction.  In every case the question is whether the reasons for existence of the doctrine are present and whether the purposes its serves will be aided by its application in the particular litigation."  United States v. Western Pacific Railroad Co., 352 U.S. 59, 64 (1956).  Accord Alpharma, Inc. v. Pennfield Oil Co., 411 F.3d 934, 938 (8th Cir. 2005) ("The contours of primary jurisdiction are not fixed by a precise formula.").

Courts "refer" an issue to an agency under the doctrine of primary jurisdiction for two primary reasons:  (1) to ensure uniformity of results, and (2) where resolution of the issues requires "the expert and specialized knowledge of the agencies involved."  Western Pacific, 352 U.S. at 64.  Accord Alpharma, Inc., 411 F.3d at 938.  The Eighth Circuit has repeatedly cautioned that the doctrine is to be invoked sparingly, however, as staying the case while the agency addresses or resolves the particular issue within its expertise usually entails substantial delay.  E.g., Alpharma, Inc., 411 F.3d at 938 ("The doctrine is

---

[22](...continued)
that none has adequately justified its choice," although the Ninth as well as the Eighth Circuits have "specifically avoided addressing the standard of review issue."  Id. at 723.  The First, Sixth, Seventh, and Eleventh Circuits "are unclear as to the standard they apply."  Id. at 722.  The Third, Fourth, Fifth, Tenth, and D.C. Circuits review for an abuse of discretion."  Id. at 721-22.  The author concludes that the issue "should be reviewed only for an abuse of discretion."  Id. at 709, 749-50.

to be 'invoked sparingly, as it often results in added expense and delay.'"). Such

concerns are particularly important insofar as most agencies lack any statutory

"mechanism whereby a court can on its own authority demand or request a determination

from the agency." Reiter v. Cooper, 507 U.S. 258, 268 n.3 (1993) (explaining that

"[r]eferral is sometimes [used] loosely" to describe the "process whereby a court" seeks

administrative agency input, because one of the parties must file an administrative

charge). Although the NFL has filed a charge here, the NLRB has yet to issue any

complaint and, in this Court's considered judgment, it is likely that the Board will dismiss

the charge.

Here, as in Alpharma, this Court finds that "this is not the rare case requiring

'expert consideration and uniformity of resolution.'" 411 F.3d at 938. This Court is

unable to discern much, if any, basis for referring the disclaimer issue to the NLRB. The

issue of the Players' disclaimer of the Union as their collective bargaining agent does not

require or otherwise merit the Board's specialized expertise. The Board has articulated

the standard under which disclaimers must be evaluated in a clear and consistent fashion,

and application of that established standard requires no particular specialized expertise.

Cf. Alpharma, Inc., 411 F.3d at 938 (refusing to refer issue to agency as issue turns on

matters "well within the 'conventional experience of judges'").

The NLRB has addressed the issue of union disclaimers in numerous opinions over

the last six decades. As the NFL correctly notes, "a union's disclaimer of interest in

collective bargaining is effective only if it was 'unequivocal' and 'made in good faith.'"

(Doc. No. 34, at 29 (Mem. at 21) (quoting In re Int'l Bd. Of Elec. Workers, AFL-CIO, Local 59, 119 N.L.R.B. 1792 (Feb. 28, 1958)).)[23]   The NFL suggests that the Union's disclaimer here, though, was made in bad faith because it was a "'tactical maneuver'" or otherwise employed "'only as a measure of momentary expedience, or strategy in bargaining.'" (Id. (quoting In re: Retail Assocs., Inc., 120 N.L.R.B. 388, 394 (1958).) The League also characterizes the disclaimer as a "sham." (Doc. No. 75, at 14 (Mem. at 9) (quoting Capitol Market No. 1, 145 N.L.R.B. 1430 1431 (1964)).)  The NFL predicts that "the Board will undoubtedly recognize that the Union's purported disclaimer is not motivated by a desire to abandon unionism permanently." (Doc. No. 34, at 29 (Mem. at 21).)  But there is no legal support for any requirement that a disclaimer be permanent. Employees have the right not only to organize as a union but also to refrain from such representation and, as relevant here, to "de-unionize." 29 U.S.C. § 157.

Nor is there any evidence of conduct by the Players which is inconsistent with an unequivocal disclaimer.  In Local 59, the NLRB explained that a "bare disclaimer" is one that is inconsistent with its ongoing conduct as a union.  119 N.L.R.B. at 1798-99 (noting,

---

[23]      The reason that the NLRB has issued decisions involving disclaimers is that the issue properly comes before the NLRB in various contexts within its statutory jurisdiction to resolve unfair labor disputes and to decide representation disputes.  E.g., In re Pittsburgh Steelers, Case 6-CA-23143, 1991 WL 144468 (June 26, 1991) (addressing disclaimer issue in context of a Section 8(a) unfair labor practice charge).  Here, the issue does not arise as part of any action within the NLRB's exclusive statutory jurisdiction, but rather only as a defense in an antitrust and breach of contract action properly filed in this Court.  And, of course, Judge Doty of this district assessed and ruled upon an essentially identical disclaimer in a prior dispute between these parties.  McNeil v. NFL, 764 F. Supp. 1351, 1356 (D. Minn. 1991).  See supra Section I (addressing history of NFL-Player disputes in greater detail).

among other things, that members of Local 59 "have continued to be members of" the

union, and that the union's representative still functioned as the employees'

representative).  Similarly, in Capitol Market No. 1, the union "continued the picketing

without interruption" after notifying the employer of its purported disclaimer.  145

N.L.R.B. 1430, 1431 (1964).[24]  The NLRB explained that a "good faith" disclaimer is the

opposite of continuing to engage in union activities such as picketing.  Id. at 1432.  In

short, a "good faith" disclaimer is one that is not inconsistent with the union's ongoing

actions as its members' bargaining agent.  Queen's Table, Inc., 152 N.L.R.B. 1401 (1965)

(concluding that disclaimer was not in good faith based on finding "that the Union's

entire course of conduct is inconsistent with its disclaimer"); Grand Central Liquors, 155

N.L.R.B. 295 (1965) (same).  Likewise, a "bare disclaimer" is one not supported by the

union's continuing conduct.

---

[24]      The NFL also relies on several decisions that do not concern a union's
disclaimer of its status as such, but rather address withdrawals from multi-employer
bargaining.  (Doc. No. 34, at 31 (Mem. at 23).)  In Detroit Newspaper Publishers
Association v. NLRB, 372 F.2d 569 (6th Cir. 1967), the sole issue was not a union's
disclaimer of any further representation of its members, but rather whether "two labor
unions had the right to withdraw unilaterally from [a] multi-employer bargaining unit."
372 F.2d at 570.  In other words, the unions were not seeking to dissolve or de-unionize
(so as to allow their employees to negotiate individually); rather, the unions wanted "to
bargain on a separate and individual basis with each publisher."  Id.  Thus, the issue was
one under Section 9(b) of the Board's authority and "discretion to determine the
appropriate bargaining unit."  Id. at 571.  In Retail Associates, the Board addressed a
similar issue, that is, whether the union could withdraw from multi-employer bargaining.
The union notified the employer association "that it no longer wished to bargain with the
Association as representative of the department stores in an association-wide unit, but at
the same time indicated a willingness and desire to negotiate with the management of
each of the stores on an individual basis."  120 N.L.R.B. 388, 391 (1958).  Similarly,
Charles D. Bonanno Linen Service v. NLRB concerned whether an employer may
withdraw from a multi-employer bargaining unit.  454 U.S. 404, 405 (1982).

Most importantly, in 1991, the NLRB's General Counsel issued an opinion in a factual context remarkably similar to that at issue here.  In the wake of the Eighth Circuit's November 1989 decision in Powell v. National Football League, which concluded that the non-statutory labor exemption protected the League's free agency restrictions from any antitrust claims by the Union, "the NFLPA Executive Committee decided to abandon all collective bargaining rights in order to allow player antitrust challenges to" those restrictions "to go forward free of the labor exemption defense."  In re Pittsburgh Steelers, Case 6-CA-23143, 1991 WL 144468, *1 (June 26, 1991).[25]

The General Counsel in the Pittsburgh Steelers matter addressed whether the NFL violated Section 8(a), which prohibits unfair labor practices by employers, by continuing to recognize the NFLPA as the players representative "following the NFLPA's disclaimer and reorganization, where another union is now trying to organize the players."  Id.[26]  The NFL had "refused to accept the disclaimer and reorganization," and the rival purported

---

[25]     The General Counsel provided his opinion in response to the request for "advice" from the Regional Director of Region 6.  The General Counsel issued an "Advice Memorandum" of the NLRB's General Counsel.  The General Counsel responds to a request for advice from any of the Regional Directors by issuing his "'final determination'" via an Advice Memorandum.  National Labor Relations Board v. Sears, Roebuck & Co., 421 U.S. 132, 142 (1975).

[26]     There, as here, "[t]he NFLPA also amended its bylaws to eliminate all references to collective bargaining and has sought to restructure itself as a voluntary professional 'trade association.'  Pursuant to this goal, the NFLPA filed a labor organization 'termination notice' with the Department of Labor, and has also filed forms with the Internal Revenue Service to be reclassified for tax purposes as a 'business league' rather than a labor organization.  The NFLPA informed management that it would no longer represent players who had filed grievances under the expired contract."  Id. at *1.  This is essentially identical to the Union's recent disclaimer here.  (Doc. No. 1 (Complaint) ¶¶ 57-61; Doc. No. 91, Exs. B, C & E.)

union, the United Players of the NFL (UPNFL), filed a charge that the NFL's statements "created the impression that the NFLPA was still the players' bargaining representative," thereby interfering in the new union's organizing campaign.

Identifying as a "threshold question" the issue of "whether the NFLPA remains the players' collective-bargaining representative," the General Counsel noted that the NFL contended that "the NFLPA's disclaimer and reorganization is a sham and that management has acted properly in continuing to recognize the NFLPA as the incumbent union." Id. at *2. The General Counsel, however, concluded "that the disclaimer was valid," and that "the NFLPA has not merely disclaimed representative status," but also "restructured itself so that it no longer functions as a collective-bargaining agent." Id. Accordingly, the General Counsel concluded that "the NFLPA is not a labor organization as defined in Section 2(5) of the Act," and thus "there can be no Section 8(a)(2) violation since it cannot be said that the NFL has been attempting to deal with a 'labor organization.'" Id. In the absence of a "labor organization," the General Counsel stated that "[w]e conclude that the [Section 8(a)(2)] charge should be dismissed." Id. "In summary, we conclude that the Section 8(a)(2) allegation is without merit because the NFLPA has effectively disclaimed its representational rights and has converted itself from a Section 2(5) labor organization to a trade association." Id. at *4; see In re Cleveland Decals, Inc., 99 N.L.R.B. 745 (1952) (dismissing petition for decertification because "the Union's unequivocal disclaimer of interest in the Employer's employees cancels whatever vitality its certificate as bargaining representative might otherwise

38

possess"); In re Federal Shipbuilding and Drydock Co., 77 N.L.R.B. 463 (1948)

(dismissing petition for decertification and setting aside a previously issued "Direction of

Election" after union disclaimed its status as exclusive bargaining representative of the

employees because "to direct an election despite the Union's disclaimer, would not only

be a waste of Federal funds, but would also almost certainly mean" the Employer could

"refuse to engage in collective bargaining with [any union]").

Summarizing the Board's opinions on union disclaimers, the General Counsel

provided a succinct standard.[27]  "In order for a union's disclaimer in representing a

particular unit to be valid, it must be unequivocal, made in good faith, and

unaccompanied by inconsistent conduct."  In re Pittsburgh Steelers, 1991 WL 144468 at

*4 n.8.  "Moreover, when a union has made a valid disclaimer, no question concerning

representation exists and a decertification election will not be held because it would be an

unnecessary waste of time and resources."  Id.

Here, the League contends that the Players' "purported" disclaimer of their

collective bargaining agent is a mere tactic that undermines the validity of the disclaimer.

(Doc. No. 34, at 29-32 (Mem. at 21-24); Doc. No. 75, at 13-14 (Mem. at 8-9).)  The

Players deny this, asserting that "[b]y disclaiming their union, the Players have given up

the right to strike, to collectively bargain, to have union representation in grievances, to

have union representation in benefits determinations, and to have union regulation of

---

[27]      When providing an Advice memorandum to one of the NLRB Regional
Directors, the General Counsel's legal position is derived from "prior Board and court
decisions and 'prior advice determinations in similar or related cases.'"   National Labor
Relations Board v. Sears, Roebuck & Co., 421 U.S. at 141.

agents." (Doc. No. 41, at 6 (Mem. at 1.).)  Moreover, the Players note that the disclaimer does not stand alone.  The Union also (1) amended its bylaws to prohibit it or its members from engaging in collective bargaining with the NFL, the individual teams, or their agents, (2) filed notice with the Department of Labor to terminate its status as a labor organization, (3) filed an application with the IRS to be reclassified for tax purposes as a professional association rather than a labor organization, and (4) informed the NFL that it no longer would represent players in grievances under the soon-to-expire CBA, such that the players would have to pursue or defend on an individual basis any grievance with the NFL or the individual teams.  This Court finds that the disclaimer is not a mere tactic because it results in serious consequences for the Players.

Moreover, this Court need not resolve the debate about whether their motive was influenced by the expectation of this litigation, because the NLRB's General Counsel has addressed this question too.  "[T]he fact that the disclaimer was motivated by 'litigation strategy,' i.e., to deprive the NFL of a defense to players' antitrust suits and to free the players to engage in individual bargaining for free agency, is *irrelevant* so long as the disclaimer is otherwise unequivocal and adhered to."  In re Pittsburgh Steelers, 1991 WL 144468, at *2 n.8 (emphasis added).[28]  This Court notes that the actions of both sides are no doubt, in part, a litigation strategy, particularly where, as here, the parties have a long

---

[28]      Here, the NFL claims the Union is still functioning as such despite "rebrand[ing]" itself as a "trade association."  (Doc. No. 34, at 30 & n.5 (Mem. at 22 & n.5) (noting Players' statements that, for example, "we'll be back").)  But the offhand, anecdotal comments of individual players are inconclusive.  Moreover, it seems beyond dispute that the defining attribute of a union is its function as the collective bargaining agent of its members.  This Court is unaware of any such activity still occurring here.

history of disagreements punctuated by uneasy and temporary truces.  But because the disclaimer was unequivocal, the Union is not continuing to act as the Players' bargaining representative, and because the Players have given up very significant rights in doing so, any subjective motivation for disclaimer is irrelevant, as the Board's General Counsel has previously advised.

In Pittsburgh Steelers, the General Counsel then dismissed the Section 8(a)(2) charge.  In fact, the NLRB routinely dismisses petitions where unions no longer exist, because the dispute is no longer within its statutory jurisdiction.  E.g. In re Matter of Bonita Ribbon Mills, 88 N.L.R.B. 241 (Jan. 20, 1950).  "The Board has repeatedly held . . . that no question concerning representation exists, and no decertification election may be held, when the union sought to be decertified has, as here, disclaimed interest in representing the employees involved."  Id.

In fact, the present disclaimer is essentially a repeat of the NFLPA's 1990 disclaimer, which occurred in the wake of the Eighth Circuit's November 1989 decision in Powell.  As discussed above, the district court there concluded that labor law no longer applied where no "ongoing collective bargaining relationship" continued to exist after the union elected to dissolve itself.  McNeil v. Nat'l Football League 764 F. Supp. 1351, 1358 (D. Minn. 1991).  The court rejected, as legally unsupported, the NFL's contention that the court must defer to an NLRB decertification proceeding.  Id. at 1356-57.  "Just as certification is not required to create a collective bargaining relationship, a decertification proceedings is not required to end it."  Id. at 1358.  "[A] union may end its duty to

bargain by disclaiming interest in representing the employees as long as it does so in good faith." Id. at 1357 n.6.  Here, as in 1990, the good faith requirement is met.

Here, although the League filed an ULP charge in February, and purported to amend that charge immediately following the Union's disclaimer, it is likely, if not inevitable, that the NLRB will dismiss that charge now that the Players have exercised their right to abandon the collective bargaining framework of labor law in order to pursue individual contracts.[29]

In addition, in light of, and with respect for the NLRB's workload, delay in receiving a response from the NLRB is likely.  See Douglas L. Leslie, Labor Law 13 (4th ed. 2000) ("Delay is a major problem in prosecuting unfair labor practice cases.").  Any substantial delay here would be particularly problematic if, as Plaintiffs allege, they are incurring ongoing irreparable injury that would only be exacerbated while this Court would await the NLRB's answer.

All of these factors–that there is no fixed formula for application of the doctrine of primary jurisdiction; that in light of the Eighth Circuit's admonition that it should be applied "sparingly," referral to the agency is the exception, not the rule; that the advantages of any referral must be gleaned from the facts of each particular case; and that the court must weigh any such advantages against the possibility and severity of any

---

[29]     In fact, in light of the Board's clear and consistent position on disclaimers, this court might be obligated to adhere to the General Counsel's prior decision regarding a disclaimer of the type at issue here.  See Reiter v. Cooper, 507 U.S. 258, 269 (1993) (explaining that where an agency has consistently adhered to a particular position that the court finds to be at least a reasonable one, the court is bound by that agency ruling under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)).

resulting delay and hardship–confirm that the inherent nature of this Court's decision in this regard is one implicating its discretion.  In exercising that discretion, this Court cannot conclude that it should stay this action because this is an issue on which the NLRB has already provided a clear standard for this Court to apply–and on which it has issued a ruling directly on point in <u>Pittsburgh Steelers</u>.  The downside of staying the action plainly outweighs whatever value this Court might derive from an NLRB decision–assuming the General Counsel will in fact proceed to file a Complaint rather than dismiss the League's charge–where the ensuing delay would simply exacerbate the irreparable harm the Players are incurring every day the so-called "lockout" continues.[30]

> **(e)    The Union's Disclaimer of Any Further Role As the Players' Agent in Collective Bargaining Presents An Entirely Separate Issue Than A Labor Law Negotiating Impasse**

The NFL relies substantially on the Supreme Court's decision in <u>Brown</u> to argue that this Court must defer to the NLRB on this issue.  In <u>Brown</u>, however, the Union still existed as the Players' exclusive bargaining agent, and the parties had reached an "impasse" in on-going negotiations.  518 U.S. 231, 234-35 (1996).  As the Court

---

[30]    Here, the NFL states that it filed a charge on February 14, 2011, objecting to the Union's failure to bargain in good faith, and amended the charge after the Union's disclaimer.  The NFL thus states that "[p]roceedings before the Board are ongoing." (Doc. No. 34, at 17 (Mem. at 9).)  It further contends that "the Board is now considering [the] very question" of the Union's disclaimer.  (<u>Id.</u> at 35 (Mem. at 27).)  The Players note, however, that the NLRB proceeding "may never be initiated." (Doc. No. 41, at 19 (Mem. at 14).)  Under NLRB procedure, a ULP case is initiated by a private party that files a "charge," after which the regional office then investigates and, if in its discretion the charge merits proceeding, issues a "complaint."  "Only if a complaint is issued will the case be prosecuted and heard by the Board."  Douglas L. Leslie, <u>Labor Law</u> 10 (4th ed. 2000).  There is no evidence in the record that any Complaint has yet issued.

explained, such an impasse is not only common, but "often temporary." Id. at 245. In fact, impasse "may differ from bargaining only in degree" and "may be manipulated by the parties for bargaining purposes." Id. at 246. Perhaps most importantly for present purposes, "it may occur several times during the course of a single labor dispute, since the bargaining process is not over when the first impasse is reached." Id. In short, "impasse" is inherently *part of* the collective bargaining process under labor law–it occurs *within* the process of negotiating between a labor union and management. See id. at 244-45 (explaining that numerous aspects of collective bargaining under labor law still apply after "impasse").

Thus, the Supreme Court rejected the argument that the non-statutory exemption terminates upon "impasse," as impasse usually does not indicate the end of collective bargaining. Id. at 250 (holding that the exemption does not end upon mere "impasse," as such "conduct took place *during and immediately after a collective bargaining negotiation*"). The Court recognized, however, that the non-statutory labor exemption must end at some point. Id. ("Our holding is not intended to insulate from antitrust review every joint imposition of terms by employers, for an agreement among employers could be sufficiently distant in time and in circumstances from the collective bargaining process that a rule permitting antitrust intervening would not significantly interfere with that process."). But having addressed the precise issue on review, the Court refused to issue any advisory opinion or dicta as to where "to draw that line." Id.[31]

---

[31]     It is clear, however, that the Supreme Court was only deferring any decision
(continued...)

Here, however, this Court faces no issue of any impasse occurring within the ongoing, or likely to continue, process of collective bargaining.  The parties have moved definitively beyond mere impasse within the bargaining process; they have moved beyond collective bargaining entirely.  The CBA expired, with the extensive negotiations between the Union and the League having proved unsuccessful.  The Union promptly and unequivocally disclaimed any further role as the Players' bargaining representative.  And in contrast to the murky boundaries presented by an impasse that occurs within an ongoing collective bargaining process, the dissolution of the Players' former Union provides a clear boundary demarcating the end of collective bargaining under labor law.[32]

---

[31](...continued)
on "whether, or where, *within [certain] extreme outer boundaries* to draw that line."  Id. (emphasis added).  The Court noted that others have suggested two such points delineating that outer boundary.  In particular, it cited the D.C. Circuit's suggestion that the exemption lasts until collapse of the collective-bargaining relationship, as evidence by decertification of the union."  Id. (citing 50 F.3d at 1057).  It also noted the NLRB's suggestion that an "'extremely long' impasse, accompanied by 'instability' or 'defunctness' of multiemployer unit, might justify union withdrawal from group bargaining."  Id. (citing El Cerrito Mill & Lumber Co., 316 N.L.R.B. 1005, 1006-07 (1995)).  And with respect to the question of whether or where *within* the collective bargaining process it might be appropriate to lift the protection provided by the nonstatutory exemption, the Court recognized that the NLRB's views would likely be necessary.  Id. ("Nor would it be appropriate for us to do so without the detailed views of the Board, to whose 'specialized judgment' Congress 'intended to leave' many of the 'inevitable question concerning multiemployer bargaining bound to arise in the future.'").  But again, the Court was addressing where, after impasse but *within* the still-existing collective bargaining framework, it might be appropriate to lift the protection of the non-statutory exemption.  Where the parties are still operating under the collective bargaining umbrella, the views of the NLRB are, of course, at least relevant, if not essential.

[32]      Although the parties often frame the present dispute in terms of whether the non-statutory labor exemption from the antitrust laws has expired, this Court need not, and does not, decide that issue.  On these motions for a preliminary injunction, this Court
(continued...)

The body of labor law governing collective bargaining and impasse–which plainly must be circumscribed by some boundary, a boundary that other courts have defined as the continuing existence of a union that negotiates on behalf of its members–is thus no longer in play.  See Stearns v. NCR Corp., 297 F.3d 706, 710 (8th Cir. 2002) ("In general, an employment contract between an employer and a non-union employee is governed by state law, not by ERISA or by the federal labor laws."); see also Allen Bradley Co. v Local Union No. 3, 325 U.S. 797, 807 (1945) (rejecting contention that "no labor disputes existed" in light of the fact that "Local No. 3 is a *labor union* and its spur to action related to wages and working conditions") (emphasis added); Brown v. Pro Football, Inc., 50 F.3d 1041, 1057 (D.C. Cir. 1995) ("[W]e hold that the nonstatutory labor exemption waives antitrust liability for restraints on competition imposed through the collective bargaining process, so long as such restraints operate primarily in a labor market characterized by collective bargaining."), aff'd, 518 U.S. 231 (1996).

Moreover, in contrast to an impasse, an effective disclaimer operates as an immediate trigger removing the dispute from the NLRB's jurisdictional scope.  There is no need to wait to see if any temporary impasse will be surmounted or prove intractable. An unequivocal disclaimer effects a definitive and immediate renunciation of the labor law framework of collective bargaining.  Moreover–as the NLRB itself has demonstrated

---

[32](...continued)
does not of course decide the merits of the dispute.  Rather, it must only assess whether the movants have shown a "fair chance of success."  Resolution of the merits of Plaintiffs' Sherman Act claims, including the issue of whether the NFL remains exempt from such claims, must await later proceedings.

by dismissing complaints otherwise within its statutory jurisdiction upon a union's valid

and effective disclaimer of its role as bargaining agent–the NLRB has no further role.

The NLRB has provided a clear test that this Court may apply on its own to conclude that

the Union here no longer exists as the Players' bargaining agent.[33]

The League objects, arguing that the Players cannot just flip the "light-switch" and

disclaim the Union.  But again, employees have the right *not* to be a union as much as

they have the right to be or organize as a union. Moreover, if negotiating as a union has

proven unsuccessful, such organized employees also have the right to terminate the union.

There is nothing inherently unfair or inequitable about a disclaimer effecting an

immediate termination of the framework of labor law.[34]  Such an election cannot be

viewed as mere gamesmanship, because it only comes with serious consequences to the

Players making the election.  The Players no longer derive the negotiating benefit of

collective bargaining or any of the other rights they had enjoyed while they were

unionized.[35]  Brown, 50 F.3d at 1057 (explaining that choice "to avail themselves of the

---

[33]     This Court, as well as any federal court, often addresses issues of whether
statements or actions are "unequivocal" (for example, when assessing a waiver of rights
in a criminal action), whether actions are taken in "good faith" (e.g., White v. NFL, ___
F. Supp. 2d___, 2011 WL 706319, *7-*8 (D. Minn. 2011) (addressing contract law)), and
whether statements are "inconsistent" with subsequent actions.

[34]     This Court notes that the legal consequences of many actions are as
immediate as they are clear–marriage ("I now pronounce you husband and wife."),
divorce, executing a will, signing a contract, and entering a guilty plea all have such legal
consequences.

[35]     For example, unionized employees have the right to strike as the
counterpart to management's right to lockout its unionized employees.  But once the

(continued...)

advantage of the collective bargain process" results in the various benefits and protections "as defined by the federal labor laws").  The disclaimer is hardly one-sided, of course, as it also relieves the League from the obligations imposed on it in collective bargaining.

> **(f)     The Disclaimer Is Unequivocal And The Players Have Effectively Disclaimed the Union As Their Bargaining Agent**

The present issue of the effectiveness of the Union's disclaimer does not require that this Court dismiss this antitrust and contract action in deference to the NLRB's exclusive statutory jurisdiction.  Nor is the Garmon preemption doctrine applicable to this federal court action.  In addition, the Supreme Court's decision in Brown is not controlling because, unlike impasse–which occurs within the collective bargaining process of negotiations, but frequently amounts to nothing more than a "timeout"–such a disclaimer removes the dispute from the collective bargaining framework.

In exercising its discretion as to whether to apply the doctrine of primary jurisdiction, this Court concludes that resolution of the disclaimer issue is not one of the "rare" instances where the Court would be assisted by referring the issue to the NLRB. The Board already has articulated the governing standard, which is plainly within this Court's competence to apply here.  On the present facts–which disclose no inconsistent

---

[35](...continued)
Players have renounced their Union, they could not engage in any meaningful "strike." The League could simply fire them all for failure to show up for work.  Correspondingly, it is similarly difficult to understand how the League now purports to be locking out the individual Players.  Such vocabulary and tools of labor negotiations do not translate well into the well-established body of employment law and antitrust law.  But for the labor laws, a strike would be an illegal boycott under the antitrust laws and, similarly, a lockout would be an illegal boycott, as well, under the antitrust laws.

conduct following the Union's disclaimer–this Court sees no basis to dispute the validity and effectiveness of the Union's unequivocal disclaimer of any further role as the Players' agent in collective bargaining with the League.  As noted above, the Players took a calculated risk in order to pursue their present antitrust claims.  The disclaimer was made in good faith as the Players have engaged in no inconsistent conduct.  In fact, the Union (1) amended its bylaws to prohibit it or its members from engaging in collective bargaining with the NFL, the individual teams, or their agents, (2) filed notice with the Department of Labor to terminate its status as a labor organization, (3) filed an application with the IRS to be reclassified for tax purposes as a professional association rather than a labor organization, and (4) informed the NFL that it no longer would represent players in grievances under the soon-to-expire CBA, such that the players would have to pursue or defend on an individual basis any grievance with the NFL or the individual teams.  As the Fifth Circuit explained in Corrugated Asbestos Contractors, Inc. v. NLRB, this Court "cannot force a union to continue, against its wishes, a relationship that is in its very nature predicated upon voluntariness and consent."  458 F.2d 683, 687 (5th Cir. 1972) (denying employer's petition for review of NLRB order dismissing company's unfair labor practice charges upon union's disclaimer that was made in good faith).

### 2.     The Norris-LaGuardia Act Does Not Deprive This Court of Jurisdiction To Issue Injunctive Relief

The League also contends that this Court lacks jurisdiction to issue any injunctive relief against it because the Norris-LaGuardia Act deprives the federal courts from issuing

any injunction in a case "involving or growing out of a labor dispute," including one

sought "by employees challenging a lockout under the antitrust laws."  (Doc. No. 34, at

22 (Mem. at 14).)  Insofar as this argument presents a matter of subject matter

jurisdiction, this Court is obligated to satisfy itself that its jurisdiction is validly

established.[36]

       **(a)**       **History and Purpose of the Norris-LaGuardia Act**

Some historical perspective on the Norris-LaGuardia Act is necessary and useful

to understand the Act's operation.  Before the Act was passed in 1932, employers

routinely used the Sherman Act's prohibition against the restraint of trade against many

union tactics involving organization and economic pressure.  E.g. Loewe v. Lawlor

(Danbury Hatters case), 208 U.S. 274 (1908) (holding union liable for treble damages for

instigating a boycott).  "The popularity of injunctive relief among employers stemmed

from its unique effectiveness in stifling labor disputes" and "enabled employers to defeat

unions instantly by preventing them from using self-help and destroying the momentum

of strikes before substantive legal rights were litigated."  Burlington Northern Santa Fe

---

[36]      The Norris-LaGuardia Act, while removing some jurisdiction from the
federal courts, does not undermine a court's subject-matter jurisdiction entirely as it does
not preclude a court from hearing the action, but only from issuing injunctive relief.  29
U.S.C. §§ 101-104.  Generally, under the Well-Pleaded Complaint Rule, subject-matter
jurisdiction is determined from the face of the complaint, not from any defense.
Caterpillar Inc. v. Williams, 482 U.S. 386, 393 (1987).  Here, the Complaint plainly
discloses federal questions, that is, several claims of antitrust violations under Section 1
of the Sherman Act (with pendent jurisdiction over state-law claims), and the union
representation issue is raised only as a defense.  Thus, the jurisdictional question here is
only whether the Norris-LaGuardia Act removes the jurisdiction this Court otherwise
possesses to issue injunctive relief.

R. Co. v. Int'l Brotherhood of Teamsters Local 174, 203 F.3d 703, 707 (9th Cir. 2000) (*en banc*).[37]

In response, Congress enacted the Clayton Act in 1914, including Section 20, which provides certain substantive and procedural limitations on injunctions sought in any case "involving, or growing out of, a dispute concerning terms or conditions of employment."  38 Stat. 738 (codified at 29 U.S.C. § 52).  The Supreme Court, however, gave a narrow reading to the provisions protecting labor.  Duplex Printing Press Co. v. Deering, 254 U.S. 443, 469-73 (1921).  It confined Section 20 so as to not prohibit injunctions against "secondary boycotts" as opposed to "primary boycotts."  Id. at 474-79.

Accordingly, Congress enacted the Norris-LaGuardia Act, which did not just impose substantive limits on, or procedural conditions for, such injunctions.  See generally Burlington Northern Santa Fe R. Co., 203 F.3d at 706-09 (providing extensive historical background of the Norris-LaGuardia Act).  Rather, Congress took the "extraordinary step" of withdrawing the jurisdiction of federal courts from issuing injunctions in non-violent labor disputes because it "was necessary to remedy an extraordinary problem" of federal courts refusing "to abide by the clear command of § 20 of the Clayton Act."  Burlington Northern R.R. v. Brotherhood of Maintenance of Way Employees, 481 U.S. 429, 437 (1987).  The legislative history discloses that it was

---

[37]   Moreover, as collecting damages from unions proved difficult, employers turned to the federal courts to obtain injunctions against various labor activities.  Douglas L. Leslie, Labor Law 3 (4th ed. 2000).

necessary to remedy the "'disobedience of the law,'" not on the part of "'organized

labor,'" but "'on the part of a few Federal judges'" who refused to administer "even

justice to both employers and employees." Id. at 438-39 (quoting 75 Cong. Rec. 5478

(1932)).

(b)      <strong>Prohibitions and Limitations of the Norris-LaGuardia Act</strong>

The Act imposes several different limitations on the authority of federal courts to

issue injunctive relief in labor disputes.  Section 1 states the general prohibition against

federal courts issuing injunctive relief "in a case involving or growing out of a labor

dispute, except in a strict conformity with the provisions of this chapter," and also permits

injunctions only where not "contrary to the public policy declared in this chapter."  29

U.S.C. § 101.  Section 2 then expressly declares the Act's policy–to facilitate employees'

ability to organize into unions and bargain collectively with employers:

> Whereas . . . the individual unorganized worker is commonly helpless to
> exercise actual liberty of contract and to protect his freedom of labor, and
> thereby to obtain acceptable terms and conditions of employment,
> wherefore, . . . it is necessary that he have full freedom of association, self-
> organization, and designation of representatives . . . to negotiate the terms
> and conditions of his employment, and that he shall be free from the
> interference, restraint, or coercion of employers . . . in . . . concerted
> activities for the purpose of collective bargaining . . . [certain limitations on
> federal injunctions] are enacted.

29 U.S.C. § 102.  "'The Norris-LaGuardia Act . . . expresses a basic policy against the

injunction of activities of labor unions.'"  Burlington Northern R.R. v. Brotherhood of

Maintenance of Way Employees, 481 U.S. 429, 437 (1987) (quoting Machinists v. Street,

52

367 U.S. 740, 772 (1961)).[38] But this Court need not and does not solely rely on this express pro-labor policy of the Act in order to conclude that it does not preclude an injunction against the League here.

Section 104 of the Act enumerates specific acts that are not subject to restraining

---

[38]     The lower courts too have understood Congress's intent and purpose. "The anti-injunction provisions of the Norris-LaGuardia Act were intended to protect workers in the exercise of organized economic power." In re Crowe & Assocs., Inc., 713 F.2d 211, 216 (6th Cir. 1983). Those provisions are not designed "to bolster management's strength against labor." Int'l Paper Co. v. The Inhabitants of the Town of Jay, 672 F. Supp. 29, 33 (D. Maine 1987) (finding Act inapplicable in action by paper mill that hired temporary replacement workers to enjoin enforcement of ordinances prohibiting hiring of strikebreakers). "The court is unwilling to expand the scope of the Act when such an expansion would thwart Congress' clear intent to aid labor by proscribing the use *by management* of certain bargaining tactics." Id. (emphasis in original). "[I]t is clear that the sole purpose of this Act is to prevent injunctive relief against labor unions or employees who are members of a labor union." Keystone Freight Lines, Inc. v. Pratt Thomas Truck Line, Inc., 37 F. Supp. 635, 642 (W.D. Okla. 1941). In Local 205, United Electrical, Radio and Machine Workers of America v. General Electric Co., however, the court stated that "[r]egardless of what may be said about the general purpose clause, § 102, even though the Norris-LaGuardia Act in fact proved to be and doubtless, was expected to be, of far greater use to unions than to employers, I do not believe it was intended to be a one-way street. On the contrary, in the report of the Senate Judiciary Committee Senator Norris stated quite the opposite." 129 F. Supp. 665, 667 (D. Mass. 1955). Although the court of appeals vacated the district court's judgment, it too noted that "although the Norris-LaGuardia Act is not a 'one-way street' . . . it certainly was intended and has application mainly as a protection for union and employee activities. Where its terms can be read to include employer conduct, that conduct should also be protected." 233 F.2 85, 93 (1st Cir. 1956). Note, however, that the quoted history on which the court relies states that "'[i]t will be observed that this section (106), as do most all of the other prohibitive sections of the bill, applies both to organizations of labor and organizations of capital. The same rule throughout the bill, wherever it is applicable, applies both to employers and employees, and also to organizations of employers and employees.'" 129 F. Supp. at 667 n.2 (quoting legislative history). Section 6, however, unlike Sections 4 and 7, does not address prohibitions against injunctions, but rather vicarious liability. 29 U.S.C. § 106 (providing that "officer[s]" and "member[s]" of "any association or organization," and any "association or organization" shall not be liable for illegal acts of "individual officers, members, or agents" absent proof of actual participation in, or authorization or ratification of, such illegal acts).

orders or injunctions under any circumstances.  29 U.S.C. § 104.  Section 104 expressly deprives, from federal courts, jurisdiction to issue any injunctive relief "in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of" nine enumerated acts.  Id.  Of those nine, the League relies on the first:  "[c]easing or refusing to perform any work or to remain in any relation of employment."  Id. § 104(a).

As the NFL observes, Section 4(a) of the Norris-LaGuardia Act "'forbids courts to enjoin work stoppages 'in any case involving or growing out of any labor dispute.'" (Doc. No. 34, at 18 (Mem. at 10) (quoting West Gulf Maritime Ass'n v. ILA Deep Sea Local 24, 751 F.2d 721, 726 (5th Cir. 1985).)[39]  There is no dispute that the plain language of this provision covers employees' right to strike.  West Gulf Maritime Ass'n, 751 F.2d at 726 (vacating injunction against work stoppage by longshoreman's union).

It is not as clear that Section 4(a) could also cover, as the NFL argues, an employer's right to lock out its employees.  As the Players note, they "are requesting an

---

[39]      The League asserts that "'Section 4 is a flat prohibition of certain types of injunctive orders.'"  (Id. at 24 n.4 (Mem. at 16 n.4) (quoting Chicago Rock Island & Pac. R.R. v. Switchmen's Union of North America, 292 F.2d 61, 62 (2d Cir. 1961)).)  The Players, however, contend that federal courts may issue injunctive relief "'even in some of the circumstances covered by section 4's outright ban.'"  (Doc. No. 41, at 17 n.3 (Mem. at 12 n.3) (quoting Camping Const. Co. v. Dist. Council of Iron Workers, 915 F.2d 1333, 1343 (9th Cir. 1990)).)  But in Camping Construction Company, the court was addressing the limited exception recognized in Boys Markets, which permits injunctions requiring a party to abide by its agreement to arbitrate, and injunctions permissible under the Railway Labor Act.  915 F.2d at 1243-44.  Neither exception appears implicated here. Nevertheless, this Court need not resolve this dispute.

injunction so that they <u>can</u> work." (Doc. No. 41, at 17 (Mem. at 12) (emphasis in original).)  As the NFL correctly contends, the "Act was meant to 'end the granting of injunctions . . . based upon complaints charging conspiracies to violate the Sherman Antitrust Act.'" (Doc. No. 34, at 18 (Mem. at 10) (quoting <u>Milk Wagon Drivers' Union , Local No. 753 v. Lake Valley Farm Prods.</u>, 311 U.S. 91, 101 (1940)).)  But in <u>Milk Wagon Drivers Union</u>, the Supreme Court ruled that the Act precluded an injunction against a local union and its officials.  311 U.S. at 93-94.  In fact, the Supreme Court recounted the history of some federal courts ignoring Section 20 of the Clayton Act, such that its restrictions "have become more or less valueless to labor."  <u>Id.</u> at 102.[40]

As Justice Frankfurter ruled in addressing a comparable issue under the National Labor Relations Act, which was enacted in 1935 just a few years after the Norris-LaGuardia Act,

> [u]nlike mathematical symbols, the phrasing of such social legislation as this seldom attains more than approximate precision of definition.  That is why all relevant aids are summoned to determine meaning.  Of compelling consideration is the fact that *words acquire scope and function from the history of events which they summarize*.

<u>Phelps Dodge Corp. v. National Labor Relations Board</u>, 313 U.S. 177, 185-86 (1941) (emphasis added).  In rejecting the proposed interpretation offered by the employer, the

---

[40]  Likewise, the other authorities cited by the NFL in support of its reading of the intent of the Norris-LaGuardia Act all concerned actions *against* unions.  <u>H.A. Artists & Assocs., Inc. v. Actors' Equity Ass'n</u>, 451 U.S. 704, 710 (1981); <u>Marine Cooks & Stewards, AFL v. Panama Steamship Co.</u>, 362 U.S. 365, 365-72 (1960) (reversing order for injunctive relief sought by plaintiffs against the union); <u>Brotherhood of Railroad Trainmen v. Chicago River and Indiana R.R.</u>, 353 U.S. 30, 32, 40 (1957) (explaining that railroad sought injunction against union's strike).

Court stated that "[c]ontemporaneous legislative history, and above all, the background of industrial experience forbid such textual mutilation." Id. at 186.  As Judge Doty observed in Jackson, "[i]t would be ironic if a statute that had been enacted to protect the rights of individual employees from improper actions by employers and the courts were turned against those employees and used to justify the continued application of a system found illegal under the Sherman Act."  802 F. Supp. at 233.

Here, as discussed in greater detail above, the Norris-LaGuardia Act was enacted to protect labor from the injunctions that some federal courts were granting to employers despite Section 20 of the Clayton Act.  This Court is not convinced that the Act should be extended or interpreted to protect the NFL under its reading of Section 104(a).  But this Court need not rely on its reading of the plain language of Section 104(a) to issue the injunction requested by the Players here, because this Court concludes that the Norris-LaGuardia Act does not apply here at all, now that the Union has effectively renounced its status as the Players negotiating agent.[41]

(c)     **The Norris-LaGuardia Act, Although Broad, Governs Labor Disputes**

The League's argument that the Act prohibits the requested injunction is entirely

---

[41]     The League also contends that, even if Section 4 does not flatly prohibit the injunction that the Players seek, the Players must still meet the requirements of Section 7, which governs the issuance of all remaining injunctions "in any case involving or arising out of a labor dispute." 29 U.S.C. § 107 (requiring a testimonial hearing and findings that essentially parallel those required to establish the basis for any injunction issued under Rule 65).  But this issue is moot in light of this Court's conclusion that the Act in its entirety does not apply here.  And as will be discussed below, the Players have met the standards for the issuance of a preliminary injunction under Rule 65.  See infra Section II.B.

dependent on its contention that the present dispute–between itself and the individual

Players–is still one involving collective bargaining governed by the federal labor laws.

But the CBA has expired and the Union effectively disclaimed its status as the Players'

representative for purposes of negotiating labor disputes with the League.  The League

contends, quite accurately, that the definition of "labor dispute" under the Norris-

LaGuardia Act, like that under the Labor Management Relations Act, is quite broad.

Under the Norris-LaGuardia Act, a

> "labor dispute" includes any controversy concerning terms or conditions of
> employment, or concerning the association or representation of persons in
> negotiating, fixing, maintaining, changing, or seeking to arrange terms or
> conditions of employment, regardless of whether or not the disputants stand
> in the proximate relation of employer or employee.

29 U.S.C. § 113(c).[42]

In particular, the League contends that the present dispute between it and the

Players either involves a "labor dispute" or at least "'grows out of' a 'labor dispute.'"

(Doc. No. 34, at 19-22 (Mem. at 11-14).)  The NFL claims that the Union's "purported

disclaimer also does nothing to change the *origins* of this action," that is, that the present

action by the individual Players after their Union disclaimed any further role as their

agent in collective bargaining is one that "'grow[s] out of' a labor dispute."  (Id. at 21

(Mem. at 13) (emphasis in original).)

But the broad definition of a "labor dispute" has uniformly been interpreted by the

courts as a dispute between a union and employer, or contextually, in relation to such a

---

[42]     The NLRA, enacted just three years later, defines "labor dispute" in almost
identical terms.  Id. § 152(9).

dispute.  The League has identified no legal support for its attempt to place a *temporal*

gloss on that definition, that is, to extend the Act's application not only to parties other

than the employer and the union and its member employees at the time a union exists, but

also to the realm of non-labor employment disputes after a union ceases to exist as the

employees' collective bargaining agent.  To propose, as the NFL does, that a labor

dispute extends indefinitely beyond the disclaimer of union representation is fraught with

peril.  For example, in light of the fact that employees come and go over time, it would be

patently unfair to impose labor law restrictions or conditions upon employees who began

working for the employer only after a union had disclaimed representation of other

employees.  Similarly, if an employer was in a dispute with its unionized employees over

wages or conditions of employment, and the union then disclaimed representation, the

dispute would still be governed, under the League's analysis, by labor law for weeks or

months, if not years, after the disclaimer.[43]

_____

[43]      The League contends that Section 4 applies "regardless of whether or not
plaintiffs are represented by a union."  (Doc. No. 34, at 20 (Mem. at 12).)  The League
cites Section 13(a) in support of its position that the "Act applies to disputes between
employers and 'employees *or* associations of employees.'"  (Id. (emphasis added by the
League).)  But Section 13(a) provides, in relevant part, that "[a] case shall be held to
involve or to grow out of a labor dispute . . . whether such dispute is (1) between one or
more employers or associations of employers and one or more employees or associations
of employees; (2) between one or more employers or associations of employers and one
or more employers or associations of employers; or (3) between one or more employees
or associations of employees and one or more employees or associations of employees."
29 U.S.C. § 113(a).  Section 13(a) thus casts a wide net, but not wide enough to support
the League's position.  The NFL seizes on the term "employee" in an attempt to expand
the scope of the Act beyond "labor disputes," that is, disputes involving unions.  But the
phrase "employees or associations of employees" does not mean "individual non-union
employees or unions."  It is better understood to mean that a "labor dispute" includes all
(continued...)

Congress employed its broad definition not to reach conduct by individual employees who have rejected their union as their bargaining agent under labor law, but to reach both "primary activity"–that is, where a union directs pressure against its members' own employer–and "secondary activity"–where a union directs pressure against third parties.  Burlington Northern Santa Fe R. Co. v. Int'l Brotherhood of Teamsters Local 174, 203 F.3d 703, 708 (9th Cir. 2000) (*en banc*) (explaining that Congress intended to reject the narrow reading of the Clayton Act provided by the Court in Duplex Printing Press Co. v. Deering, 254 U.S. 443 (1921)).

There is no dispute that where a union is engaged in a dispute with management, the Norris-LaGuardia Act extends beyond those two parties to also encompass those that are not in the immediate relation of employer and employee.  Thus, if an organization of fans had picketed the League's premises–while the League and the Union were still negotiating under the collective bargaining umbrella–demanding that the League concede on an issue of free agency, the League might have an argument that the Norris-LaGuardia Act precluded any injunction against those fans.

But here, the Players are not third parties tangential to an ongoing labor dispute so as to be governed by the Act.  Rather, the Players–now individual employees (or prospective employees) after having disclaimed their Union–have proceeded outside of the framework of labor law.  Cf. Jackson v. National Football League, 802 F. Supp. 226,

_____

[43](...continued)
disputes between an employer and either the union (an "association of employees") or an individual unionized employee or employees (or between two employers or between two such employee(s)).

233 (D. Minn. 1992) (holding that Norris-LaGuardia Act no longer applies to preclude

injunctive relief after court concludes that "any bargaining relationship between players

and defendants ended").[44]   Thus the Players presently are in the same legal position as

---

[44]      The Brady Plaintiffs rely on Boise Cascade Int'l, Inc. v. Northern Minn. Pulpwood Producers Ass'n, 294 F. Supp. 1015 (D. Minn. 1968), for the proposition that the Act does not protect a group boycott.  (Doc. No. 41, at 16 (Mem. at 11).)  Granted, the court ruled that it was "clear that the Norris-LaGuardia Act . . . does not apply to the facts of this case so as to prevent preliminary injunctive relief.  It would seem that this is not a 'labor dispute' in the traditional sense and thus that [A]ct has no application."  294 F. Supp. at 1024.  "Rather what is presented . . . is an apparent violation of the Sherman Act by virtue of what appears to be an illegal boycott by what the trier [of] fact ultimately may well find to be a legal organization."  Id. at 1024-25 (granting injunction in action asserting claims based on Section 1 of the Sherman Act).  And as the court explained, the defendants that the plaintiff sought to be enjoined were not a union, but only "an 'ad hoc' unincorporated association and three individuals."  Id. at 1017.  These "operators" (essentially individual loggers who "enter individual contracts with [the] plaintiff," a paper mill and wallboard manufacturer) "have never been organized on any sort of group basis before nor presented any concerted or uniform demands to plaintiff."  Id. at 1019.  Moreover, even though the individual operators formed some sort of informal association, "[t]he operators have been determined *not* to be a labor organization, at least within the meaning of the National Labor Relations Act."  Id. (emphasis added).  But as the court also explained, these "open market operators meet the classic definition of independent contractors," and were not employees as "[t]hey receive no wages, but merely a price for their product."  Id. at 1018.  Thus, the court's conclusion that the Norris-LaGuardia Act did not apply because the case did not present a "labor dispute" was based on the fact that the dispute was not a controversy over the terms and conditions of employment, but a dispute over the sale of commodities, that is, the lumber that the defendant "operators" sold to the plaintiff paper mill.  The court thus cited in support of its ruling Columbia River Packers Ass'n, Inc. v. Hinton, 315 U.S. 143 (1942), and Los Angeles Meat and Provision Drivers Union, Local 626 v. United States, 371 U.S. 94 (1962).  Each of the cases rejected application of the Norris-LaGuardia Act because the disputes did not concern labor, but the sale of goods.  Hinton, 315 U.S. at 145 ("That a dispute among businessmen over the terms of a contract for the sale of fish is something different from a 'controversy concerning terms or conditions of employment, or concerning the association . . . of persons . . . seeking to arrange terms or conditions of employment,' [29 U.S.C. § 113], calls for no extended discussion."); see Los Angeles Meat and Provision Drivers Union, 371 U.S. at 102-03 (affirming injunction against grease peddlers because, as in Hinton, they "were sellers of commodities, who became 'members' of the union

(continued...)

employees who are not, and never were, represented by a union.  This Court is not

convinced that the Norris-LaGuardia Act applies, absent the present existence of a union,

so as to prohibit or condition injunctions.

The NFL relies on several cases that it claims support the proposition that the Act

prohibits an injunction here in favor of the Players and against the League's "lockout."

(Doc. No. 34, at 21-22 (Mem. at 13-14); Doc. No. 75, at 9-10 (Mem. at 4-5).)[45]  But even

assuming that Section 4(a) extended to protect lockouts in addition to strikes, none of

these cases hold that employees may not obtain injunctive relief against their employers

---

[44](...continued)
only for the purpose of bringing upon power to bear in the successful enforcement of the
illegal combination in restraint of the traffic in yellow grease").

[45]      Conversely, the League contends that both sets of Plaintiffs "fail to cite a
single case in which an injunction was issued against a lockout."  (Doc. No. 75, at 8
(Mem. at 3).)  Putting aside whether this is true, it is difficult to conceive of how or why
an employer would "lockout" its employees when they are not part of a union.  If an
employer is unwilling to accept the demands of non-unionized employees, it can simply
terminate and replace them (subject, of course, to whatever contracts might apply and the
limited prohibitions of employment law such as the Age Discrimination in Employment
Act and Title VII).  Moreover, the cases relied upon by the NFL do not support its
position.  The League's reliance on West Gulf Maritime Ass'n v. ILA Deep Sea Local 24
is misplaced because there the *employer* brought the action for injunctive relief seeking to
enjoin the union's work stoppage (and to compel arbitration as allegedly required by the
collective bargaining agreement).  751 F.2d 721, 724 (5th Cir. 1985).  The Fifth Circuit's
statement that the Norris-LaGuardia Act "forbids courts to enjoin work stoppages 'in any
case involving or growing out of any labor dispute'" is accurate but provides no support
for the League's effort to extend that prohibition beyond the context of a labor dispute.
Likewise, the case that West Gulf quotes for this proposition also concerned the
conventional scenario of an injunction sought by an *employer* against a union and its
president.  Jacksonville Maritime Ass'n v. Int'l Longshoremen's Ass'n, 571 F.2d 319,
321 (5th Cir. 1978). (Finally, the decision in West Gulf ultimately turned on questions not
at issue here:  (1) the Boys Town exception to the Norris-LaGuardia Act, and (2) whether
the action should be dismissed, transferred or stayed in light of a separate but similar
action previously filed in another district.)

after those employees renounce their collective bargaining agent and proceed as

individuals against their employers for those employers' concerted refusal to deal with

those employees.  Indeed, by phrasing the issue in terms of whether the present dispute

"grows out of a labor dispute," the NFL fails to offer support or authority for the crucial

temporal extension of the definition of "labor dispute" that it proposes.

Similarly, the League contends that "courts have found that the Act bars

injunctions in cases in which no union is involved at all."  (Doc. No. 34, at 21 (Mem. at

13).)  But the Supreme Court's 1938 decision in New Negro Alliance v. Sanitary Grocery

Co., 303 U.S. 552 (1938), on which the League relies for this assertion, does not so

hold.[46]  It only held that the Norris-LaGuardia Act's prohibition against

---

[46]        Nor does the Ninth Circuit's decision in Burlington Northern Santa Fe R.
Co. v. Int'l Brotherhood of Teamsters Local 174, which the League also cites in support
of its interpretation of the Norris-LaGuardia Act.  There the Ninth Circuit stated that
"[o]wing to this broad definition, the Supreme Court has found the term 'labor dispute' to
capture a wide range of controversies."  203 F.3d 703, 709 n.6.  True enough, but all of
the other cases the Ninth Circuit then cites, as that court's own assessment highlights,
undermine the League's effort here to extend the Norris-LaGuardia Act's prohibition
against injunctions to the employment context where the employees have renounced their
union.  "Bhd. of Maintenance Way Employees, 481 U.S. at 441-42 . . . (holding that
Norris-LaGuardia prevents injunctions *against union* picketing of terminals through
which employer's trains ran); Jacksonville Bulk Terminals, 457 U.S. at 712 . . . (holding
that *union's* refusal to unload goods shipped from the Soviet Union in protest of the
Soviet invasion of Afghanistan was a 'labor dispute'); Marine Cooks & Stewards v.
Panama Steamship Co., 362 U.S. 365, 370 . . . (holding that *union* dispute with foreign
ship over substandard wages and working conditions of employees of foreign employer is
a Norris-LaGuardia labor dispute); Order of R.R. Telegraphers v. Chicago N.W. Ry., 362
U.S. 330, 335 . . . (holding that a *union's* demand that no existing position be abolished
except by agreement between employer and *union* is a 'labor dispute' under Norris-
LaGuardia); Hutcheson, 312 U.S. at 234-35 . . . (holding that jurisdictional dispute
between two *unions* is a labor dispute); Milk Wagon Drivers' Union, 311 U.S. at 103 . . .
(finding that a dispute between a *union* and an employer over the employer's use of
(continued...)

injunctions–consistent with the statutory definition's broad but not unlimited

reach–extends beyond the immediate employer-employee relationship to also preclude an

injunction against an organization of African-Americans that was picketing the employer,

but had no relationship with the employees other than its desire to advance the cause of

jobs for African-Americans.

Nor do the cases where injunctions against employers were prohibited provide

authority that the Players cannot now pursue injunctive relief against the League.  For

example, in Chicago Midtown Milk Distributors, Inc. v. Dean Foods Co., the Seventh

Circuit addressed an antitrust action brought by non-retail purchasers of dairy products

(who then resold them) against two dairy producers, Dean Foods Company and Borden,

Inc.  1970 WL 2761, at *1 (July 9, 1970).  In a brief, unpublished, per curiam opinion, the

Seventh Circuit only concluded that the record was nonetheless sufficient to conclude

"that the plaintiffs are at the least indirectly involved in the *labor dispute currently*

*existing between the union*" and a third seller, Sidney Wanzer & Sons, which then "spread

to include Dean and Borden by reason of the latters' lockout as a countermeasure against

the strike of Wanzer by" the local union.  Id. (emphasis added).[47]  Hence, Midtown Milk

---

[46](...continued)
independent vendors is a labor dispute)."  203 F.3d at 709 n.6 (emphases added) (parallel
citations omitted).  And in Burlington Northern itself, the Ninth Circuit vacated a
preliminary injunction because the Norris-LaGuardia Act prohibited a railway from
obtaining an injunction enjoining *a union* from picketing.  Id. at 705-07.

[47]      The district court had issued a temporary restraining order enjoining
defendants from refusing to sell dairy products to the plaintiffs.  Id.  The Seventh Circuit
ruled that a federal district court "is precluded by law from issuing 'any restraining order
(continued...)

is clearly distinguishable because the plaintiffs there were involved, albeit indirectly, in a labor dispute involving a union.

Likewise, the NFL, relies on Automobile Transport Chauffeurs, Etc. v. Paddock Chrysler-Plymouth, Inc., but that case concerned an injunction under the Boys Markets exception to the Norris-LaGuardia Act.  365 F. Supp. 599, 601-02 (E.D. Mo. 1973).[48] Thus–contrary to the NFL's contention that the  Automobile Transport Chauffeurs court "held that the Norris-LaGuardia Act prohibits a court from entering an injunction against a lockout" (Doc. No. 75, at 9 (Mem. at 4))–the court instead denied the injunction not because the Norris-LaGuardia Act prohibited it, but simply because "the plaintiff has not

[47](...continued)
or temporary or permanent injunction,' 29 U.S.C. § 101," because the court found that "this is a case involving or growing out of a labor dispute within the meaning of the Norris-LaGuardia Act."  Id.  The court, citing only the general prohibition of Section 1, did not expressly address whether Section 4(a) of that Act encompassed employer lockouts as well as employee strikes within its prohibition of issuing injunctions against "[c]easing or refusing to perform any work."  29 U.S.C. § 104(a).  But even if the Seventh Circuit had expressly considered and ruled that Section 4(a) extends beyond a strike by labor to also include employer lockouts, it is clear that in Midtown Milk a "labor dispute" plainly existed at the time the plaintiffs sought to enjoin the defendants.  There the court merely gave the governing statutory language–"involving or growing out of a labor dispute"–the contextually broad scope it plainly possesses to include not only the striking union, but also those, such as the plaintiffs, who were "at the least indirectly involved in the labor dispute *currently existing* between the *union*" and Wanzer.  1970 WL 2761, at *1.  Here, however, the labor dispute has ended, the Players having dissolved their union as their collective bargaining agent.

[48]         In Boys Markets, Inc. v. Retail Clerks Union, Local 770, the Supreme Court recognized a limited exception to the prohibition against injunctive relief in labor disputes where parties to a collective bargaining agreement had agreed to arbitrate their disputes. 398 U.S. 235, 253-54 (1970).  The Court thus permitted injunctions to enforce that agreement by requiring the recalcitrant party to comply with their agreement, provided, of course, that "issuance of an injunction would be warranted under ordinary principles of equity," including the requirement of irreparable harm.  Id. at 254.

met the requirements for injunctive relief against concerted activity as provided by

Section 7 of the Norris-LaGuardia Act and Section 301(a) of the Labor Management

Relations Act as interpreted by the United States Supreme Court in <u>Boys Markets, Inc. v.

Retail Clerks</u>, 398 U.S. 235 . . . (1970)."  365 F. Supp. at 601-02.[49]

 The other cases on which the NFL relies also are confined to situations where a

labor dispute presently existed and the courts simply applied the Norris-LaGuardia Act's

broad language to also encompass individuals or entities beyond those that were the

immediate parties to the labor dispute, that is, the employer and employees.  In <u>Plumbers

& Steamfitters Local 598 v. Morris</u>, the court likewise addressed an antitrust action by a

union and its employees against their employers and a multiemployer collective

bargaining agent.  511 F. Supp. 1298, 1303 (E.D. Wash. 1981).  There, the court

concluded that, under the circumstances, "any indirect effect on competition" fell "within

the context of a collective bargaining relationship," such that "Defendants would be

entitled to claim [the] nonstatutory exemption."  <u>Id.</u> at 1307 & n.4.[50]  The court found that

the plaintiffs "would not be entitled to an injunction" because "this case grows out of a

labor dispute as defined in the Norris-LaGuardia Act."  <u>Id.</u> at 1311.  There, the dispute

---

[49] Recognizing that Section 7 largely reiterates the general standard for
injunctive relief under Rule 65, the court found that the contract at issue "does not
provide for arbitration and that the principles of equity, namely occurring and continuing
breaches, irreparable injury, and the balancing of hardships, do not warrant the issuance
of an injunction."  365 F. Supp. at 602.

[50] The court's holding was confined to granting defendants' motions for
summary judgment (or dismissal) on the grounds that, independent of any labor law
exemptions from antitrust law, Plaintiffs could not prove any violation of the antitrust
laws.  <u>Id.</u> at 1305, 1306-07.

was plainly in the context of an *ongoing* labor dispute–that is, a dispute (1) between on the one hand, a union and the employees it represented, and on the other hand, their employers and the multi-employer bargaining agent, and (2) within the context of a collective bargaining agreement.  Id. at 1303-04 (explaining relationships between the plaintiffs and defendants and other non-party employers and employer representatives, and that parties had reached a point where the goal of collective bargaining had been "postponed").[51]

In sum, the League provides this Court with no controlling or even persuasive authority for its assertion that the Norris-LaGuardia Act continues to apply in the post-collective bargaining, post-union world of employment law.  Any such argument would seem to run headlong into the right of employees, seemingly without exception or limitation, to choose not to organize into a union, or having been once represented by a union, to decertify that organization or otherwise disclaim its function as their negotiating

---

[51]      After the parties reached an "impasse" in their negotiations, each side resorted to their permissible negotiating tools:  the union struck all but one of the defendants, and that remaining employer, in conjunction with two others, "locked out" their employees.  Id. at 1304-05.  In short, insofar as the facts of Plumbers & Steamfitters are analogous to the relationship between the NFL and the Players, the analogy tracks the present dispute only until the factual situation addressed in Brown–that is, only up to the point of impasse that occurred within a collective bargaining context, but *before* the Players disclaimed the Union as their bargaining agent.  There was no issue in Plumbers & Steamfitters of the union having disbanded in order to permit the individual employees the right to negotiate independently–and to do so free of the constraint of the non-statutory labor exemptions from the antitrust laws.  Recognizing that "[t]he lawfulness of conduct in the traditional economic struggle between *labor and management* is generally measured under the standards of labor law," the court thus rejected the plaintiffs attempt "to apply the Sherman Act to conduct that [the] Court determines is within the economic heart of labor-management relations."  Id. at 1304 (emphasis added).

agent.  In fact, Judge Doty, in this district, came to the same conclusion in 1992.  Jackson

v. Nat'l Football League, 802 F. Supp. 226, 233 (D. Minn. 1992) (concluding that the

Norris-LaGuardia Act "does not preclude injunctive relief in the present case because

such relief will not undermine any labor policy set forth in the Act," once the bargaining

relationship ended).  This Court is, of course, not the first to have issued injunctive relief

against the NFL despite its objections that such relief was precluded by the Norris-

LaGuardia Act.  White v. NFL, ___ F. Supp. 2d ___, 2011 WL 706319, *11 (D. Minn.

Mar. 1, 2011) (remanding for consideration of injunctive relief in action alleging League

violated SSA with respect to broadcast contracts); NFLPA v. NFL, 598 F. Supp. 2d 971,

978 (D. Minn. 2008) (extending preliminary injunction, over NFL's Norris-LaGuardia

argument, against suspensions of players for alleged violations of drug policy); Mackey v.

NFL, 543 F.2d 606, 622-23 (8th Cir. 1976) (affirming judgment awarding injunctive

relief, over NFL's Norris-LaGuardia argument, that was sought by the players to set aside

the Rozelle Rule as an unreasonable restraint of trade).

Accordingly, this Court holds that the Norris-LaGuardia Act does not apply to the

present dispute between the League and the Players, now that the Players have effectively

and unequivocally elected to disband the Union and proceed individually, rather than

under the labor law umbrella of collective bargaining.  Thus, this Court possesses subject-

matter jurisdiction over the dispute, and the Norris-LaGuardia Act does not remove this

Court's jurisdiction to award the Players the injunctive relief they presently seek.

CASE 0:11-cv-00639-SRN-JJG   Document 99   Filed 04/25/11   Page 68 of 89

**B.      A Preliminary Injunction Under Rule 65 Is Necessary To Prevent The Irreparable Harm To The Players**

As addressed above, this Court has jurisdiction of the overall dispute and there is no need to refer any issue to the NLRB.  Having satisfied itself that the Norris-LaGuardia Act does not remove its jurisdiction to award injunctive relief here, this Court now addresses whether the Players' motions for a preliminary injunction are warranted under Rule 65.[52]

At the outset, this Court clarifies that the present motion for injunctive relief differs from that in a typical case in which a plaintiff seeks a preliminary injunction.  For example, in a patent infringement action, in which the claim, of course, is that the defendant is infringing the plaintiff's patent, the patentee might seek a preliminary injunction enjoining the alleged infringer from selling or distributing the infringing products.  In order to grant the motion for a preliminary injunction, the court must assess the patentee's likelihood of success on its claim of infringement.

Here, however, the injunctive relief requested here is limited and does not extend to the majority of the underlying claims.  In the present motion, the Brady Plaintiffs are

---

[52]      For purposes of the present motion, the Brady Plaintiffs and the Eller Plaintiffs seek essentially the same relief here–a preliminary injunction prohibiting the League's "lockout."  (Doc. Nos. 2, 58, & 60 (characterizing motion as "consistent" with that of Brady Plaintiffs.)  The Eller Plaintiffs, however, are in a somewhat different factual position than the Brady Plaintiffs, who are either current or prospective Players. With the exception of Antawan Walker, who was added as a plaintiff in their First Amended Complaint, the Eller Plaintiffs are all retired Players.  (Doc. No. 73, ¶¶ 13-17.) But as will be seen, this Court need not reach the Eller Plaintiffs' motion because the Court grants the Brady Plaintiffs' motion, thereby mooting the Eller Plaintiffs' request for the same relief.

not asking this Court to enjoin the NFL's Player restrictions that are alleged to violate the

Sherman Act.  Rather, the Brady Plaintiffs only ask this Court to enjoin the League's

lockout.

A preliminary injunction "is an extraordinary remedy never awarded as a matter of

right."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 S. Ct. 365, 376 (2008).

In  Planned Parenthood Minnesota v. Rounds, the *en banc* Eighth Circuit clarified the

analysis for preliminary injunctive relief.  530 F.3d 724 (8th Cir. 2008) (*en banc*).  The

court noted that under its earlier *en banc* decision in Dataphase Systems, Inc. v. C L

Systems, Inc., issuance of preliminary injunctive relief

> depends upon a "flexible" consideration of (1) the threat of irreparable harm
> to the moving party; (2) balancing this harm with any injury an injunction
> would inflict on other interested parties; (3) the probability that the moving
> party would succeed on the merits; and (4) the effect on the public interest.

Rounds, 530 F.3d at 729 (citing 640 F.2d 109, 113 (8th Cir. 1981) (*en banc*)).  With

respect to succeeding on the merits, the Rounds court clarified that unless the movant is

seeking to enjoin "government action based on presumptively reasoned democratic

processes," courts "should still apply the familiar 'fair chance of prevailing' test."  Id. at

732.  The "fair chance" standard is less demanding than the "likely to prevail" standard

applicable to injunctions sought against governmental action such as a statute, and a "fair

chance of prevailing" does not require a greater than fifty per cent likelihood of prevailing

on the merits.  See Rounds, 530 F.3d at 731 (quoting Dataphase, 640 F.2d at 113).[53]

---

[53]     The application of the four-factor analysis must be a "flexible" one.
Rounds, 530 F.3d at 729 n.3.  Thus any "effort to apply the probability language with
(continued...)

The other key factor in any analysis of preliminary injunctive relief is, of course, irreparable harm.  <u>Chicago Stadium Corp. v. Scallen</u>, 530 F.2d 204, 206 (8th Cir. 1976). Indeed, "'[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.'"  <u>Rounds</u>, 530 F.3d at 732 n.5.  Thus, lack of irreparable harm will preclude preliminary injunctive relief regardless of the other factors. <u>Dataphase</u>, 640 F.2d at 114 n.9 ("[T]he absence of a finding of irreparable injury is alone sufficient ground for vacating the preliminary injunction.").  Therefore, to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm.  <u>Bandag, Inc. v. Jack's Tire & Oil, Inc.</u>, 190 F.3d 924, 926 (8th Cir. 1999) (per curiam); <u>see</u>, <u>Winter</u>, 555 U.S. 365, 129 S. Ct. at 375-76 (explaining that its "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction" (emphasis in

---

[53](...continued)

mathematical precision is misplaced."  <u>Dataphase</u>, 640 F.2d at 113.  Thus, courts usually apply a "sliding-scale" approach.  <u>See generally</u> 11A Charles Alan Wright et al., <u>Federal Practice and Procedure</u> § 2948.3 (2d ed. 1995) (explaining flexible relationship between success on the merits and irreparable injury).  The Supreme Court's recent decision in <u>Winter v. Natural Resources Defense Council, Inc.</u> does not undermine the application of this flexible analysis here.  In <u>Winter</u>, the Court held that the requisite showing of irreparable harm may not be lessened to a mere "'possibility' of irreparable harm" based upon "a strong likelihood of prevailing on the merits."  555 U.S. at __, 129 S. Ct. at 375. In other words, while the overall analysis of the four relevant factors is generally a flexible one, a likelihood of actual irreparable harm remains essential and the movant's burden on that factor may not be diminished based on a strong showing of the other three factors.  <u>Id.</u> at __, 129 S. Ct. at 391-92 (Ginsburg, J., dissenting) (explaining that because "[f]lexibility is a hallmark of equity jurisdiction," the "Court has never rejected [the sliding-scale] formulation, and I do not believe it does so today").  As was discussed above and now here, the Brady Plaintiffs have made a very strong showing of irreparable harm that is not only likely, but presently ongoing, and they have more than a negligible chance of prevailing on the merits.

original)).

Beyond these two key factors of irreparable harm and success on the merits, the other two relevant factors are the balance between that harm and the harm injunctive relief would cause to the other litigants and the public interest.  Dataphase, 640 F.2d at 114; accord Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) (quoting Dataphase).  The League contends that none of the four factors relevant to the decision to award preliminary injunctive relief favor the Plaintiffs.  (Doc. No. 34, at 36 (Mem. at 28).)  This Court disagrees.

In applying these factors, this Court must "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene."  Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999).  The burden of establishing the four Dataphase factors lies, of course, with the party seeking injunctive relief.  Watkins, 346 F.3d at 844.

### 1.   The Players Have Demonstrated They Are Suffering, And Will Continue To Suffer, Irreparable Harm

Here, even on the present preliminary record, the Brady Plaintiffs have shown not only that they likely would suffer irreparable harm absent the preliminary injunction, but that they are in fact suffering such harm now.[54]  "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated

---

[54]     As relevant here, the record discloses no genuine issues of material fact in dispute.  The irreparable injuries the Players are incurring are significant and, in effect, established by previous litigation.  The NFL's arguments to the contrary are legally based, not factually based.

through an award of damages."  Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d

312, 318-19 (8th Cir. 2009).

The NFL argues that the Players will not suffer irreparable harm in the absence of

injunctive relief.  While strenuously arguing that the non-statutory labor exemption bars

Plaintiffs' antitrust claims, the NFL contends that if, however, the antitrust laws do apply,

the availability of treble damages will adequately compensate Plaintiffs.  Focusing on

Plaintiffs' alleged economic injuries, the NFL argues that any deprivation of contracted

salaries or bonuses is "obviously compensable in monetary damages."  (Doc. No. 34, at

51 (Mem. at 43).)  As to Plaintiffs' alleged non-economic injuries, the NFL impliedly

argues that the Players will suffer no harm from career-ending injury or physical wear and

tear, if they are locked out of the season.  (Id.)  Finally, the NFL contends that there is no

merit to the Players' claim that "they face immediate irreparable harm in not being able to

practice with or work out with their teammates."  (Id. at 52 (Mem. at 44).)

This Court finds the NFL's arguments unpersuasive.  The Court recognizes that

the employment relationship between the parties reflects a commercial enterprise

producing substantial income for both parties.  But the particular facts of this case refute

any argument that damages alone would suffice to compensate the Players if this Court

were not to issue such injunctive relief.

As recognized by the district court in the parties' earlier litigation in this district,

the various restrictions imposed by the League over the several decades of this on-going

dispute often inflict irreparable injury on the Players.  Nat'l Football League Players

Ass'n v. Nat'l Football League, 598 F. Supp.2d 971, 982 (D. Minn. 2008); Jackson v. Nat'l Football League, 802 F. Supp. 226, 231 (D. Minn. 1992); see also Powell v. Nat'l Football League, 690 F. Supp. 812, 818 (D. Minn. 1988) (denying injunctive relief for unrestricted free agency rules, but finding that at least some of the players would likely suffer irreparable injury as a result of the NFL's restriction).  Specifically as to professional football players, this Court has found that  "[t]he existence of irreparable injury is underscored by the undisputed brevity and precariousness of the players' careers in professional sports, particularly in the NFL."  Jackson, 802 F. Supp. at 231 (citing Linseman v. World Hockey Ass'n, 439 F. Supp. 1315, 1319 (D. Conn. 1977) ("[The career of a professional athlete is more limited than that of persons engaged in almost any other occupation. Consequently the loss of even one year of playing time is very detrimental.").

Moreover, this Court has observed that the threat of irreparable harm has been found, and preliminary injunctive relief granted, in cases in which professional athletes' ability to play, or to play for their team of choice, was threatened.  Id. (citing McCourt v. California Sports, 460 F. Supp. 904, 912 (E.D. Mich.1978) (enjoining operation of player reserve system and finding that hockey player suffered irreparable harm when he was traded as compensation for another player), vacated on other grounds, 600 F.2d 1193 (6th Cir.1979); Linseman, 439 F. Supp. at 1319-20 (granting injunctive relief and finding that money could not adequately compensate player for the loss of his ability to play professional hockey for one season); Bowman v. National Football League, 402 F. Supp.

754, 756 (D. Minn. 1975) (recognizing players suffered irreparable harm when the NFL's

boycott of former World Football League players prevented them from playing); <u>Denver</u>

<u>Rockets v. All-Pro Management, Inc.</u>, 325 F. Supp. 1049, 1057 (C.D. Cal. 1971)

(enjoining NBA rule that prohibited players from signing with NBA until four years after

high school graduation and recognizing that "a professional basketball player has a very

limited career")).

Once again, the threat of harm shown by the Brady Plaintiffs here, including lost

playing time, constitutes irreparable harm.  Declarations submitted by the Brady Plaintiffs

in support of the instant motion attest to the likelihood of both collective and

individualized harm occasioned by a lockout.  Richard Berthelsen, the NFLPA's General

Counsel, contends that this harm is not fully compensable by damages, due to the

relatively short careers of most NFL players.  (Berthelsen Decl. ¶ 29.)  Moreover, players'

unique abilities and circumstances compound the difficulty in determining the salary and

benefits that each player might have earned in a competitive market.  (<u>Id.</u>)  A common

refrain in the declarations offered by the Brady Plaintiffs' agents and others is that the

careers of NFL players are of short duration, typically less than four years.  (Bauer Decl.

¶ 11; Agnone Decl. ¶ 9; Berthelsen Decl. ¶ 30; Condon Decl. ¶ 12; Cornrich Decl. ¶ 7;

McElroy Decl. ¶ 13; Schwartz Decl. ¶ 14.)

Plaintiffs contend that the brevity of professional football players' careers is due to

both the ever-present risk of career-ending injury and the constant physical wear and tear

on players' bodies – risks faced by every NFL player.  (<u>Id.</u>)  In addition, Plaintiffs

maintain that they must constantly demonstrate their skill and value on the practice and playing fields.  (Bauer Decl. ¶ 12; Agnone Decl. ¶ 10; Berthelsen Decl. ¶ 31; Condon Decl. ¶ 14; Cornrich Decl. ¶ 8; McElroy Decl. ¶ 14; Schwartz Decl. ¶ 15.)  Because of this constant pressure to prove their physical and economic worth, Plaintiffs submit that the loss of an entire year in a short professional athletic career cannot be recaptured. (Bauer Decl. ¶ 12; Agnone Decl. ¶ 10; Berthelsen Decl. ¶¶ 31 35; Condon Decl. ¶ 13; Cornrich Decl. ¶ 8; McElroy Decl. ¶ 14; Schwartz Decl. ¶ 15; Decl. of Donald Yee ¶ 8.) Moreover, time spent off the playing and practice fields diminishes players' skills. (Bauer Decl. ¶ 12; Agnone Decl. ¶ 10; Berthelsen Decl. ¶ 31; Condon Decl. ¶ 13; Cornrich Decl. ¶ 8; Schwartz Decl. ¶ 15; Yee Decl. ¶ 8.)   In the course of sitting out a season, this diminishment in skills could shorten or end the careers of some players. (Agnone Decl. ¶ 10; Condon Decl. ¶ 13; Cornrich Decl. ¶ 8; McElroy Decl. ¶ 14; Schwartz Decl. ¶ 15.)  Thus, there is no dispute that, based on the typically short duration of their professional careers and the constant risk of injury, Plaintiffs have shown it likely that they will suffer irreparable harm if injunctive relief is not granted.

Plaintiffs have also demonstrated the threat of more particularized irreparable harm related to their status as free agents, under-contract players, or rookies.  Plaintiffs Vincent Jackson, Logan Mankins, Peyton Manning, Ben Leber and Mike Vrabel, are not under the terms of a current contract, and are ostensibly free agents.  An unrestricted free agent is free to negotiate and sign with any team in the NFL–a status which typically entails more competition for a player's services, and therefore, higher compensation.

(See McElroy Decl. ¶ 7.)  Under a lockout, however, these five free agent players are in a state of contractual limbo, unable to negotiate a contract with any team.  The employment contracts for Jackson, Mankins, Manning, Leber and Vrabel expired on March 3, 2011. (See Schwartz Decl. ¶ 11; Bauer Decl. ¶ 6; Condon Decl. ¶¶ 3-4; McElroy Decl. ¶¶ 3, 7; Cornrich Decl. ¶¶ 4-5.)  However, just a few weeks prior to the expiration of three of these five players' contracts, their respective teams sought to change the players' status. Peyton Manning received a letter from his team, the Indianapolis Colts, in February 2011, purporting to designate him an "Exclusive Franchise Player" under the CBA, which would restrict him from signing a contract with any other NFL team for 2011 season. (Condon Decl. ¶ 4.)  Players Jackson and Mankins received similar letters in February from their respective teams, purporting to designate them as "Franchise Players" under the CBA.[55]  (Schwartz Decl. ¶ 11; Bauer Decl. ¶ 6.)

The facts as to Jackson and Mankins present a particularly compelling showing of the threat of irreparable harm.  Both Jackson and Mankins, 2005 rookies, had hoped to become unrestricted free agents in 2010, but due to the NFL's opting out of the CBA in 2008, the NFL's unrestricted free agency period  was increased to six years.  In light of the NFL's rule change, Jackson and Mankins ultimately became restricted free agents. (See Schwartz Decl. ¶ 6; Bauer Decl. ¶ 5.)  Mankins' agent contends that "the opt-out locked Mr. Mankins into a tender system of restricted free agency for the 2010 NFL

---

[55]  While the term "Franchise Player" was a designation under the SSA, Plaintiffs allege that there is no agreement between Defendants and Players as to the enforcement of such a term after the expiration of the SSA and CBA.  (Complaint ¶ 76.)

season under which the Patriots [Mankins' team] enjoyed the unilateral option to retain Mr. Mankins' services under a one-year contract at cost substantially below market value." (Bauer Decl. ¶ 5.)

Jackson, a 2010 restricted free agent, was similarly unable to negotiate with any teams other than the San Diego Chargers, for whom he had played since he was drafted in 2005. (Schwartz Decl. ¶ 7.) The Chargers tendered a one-year contract, reduced to the absolute minimum amount of $682,000 for the 2010 season. Ultimately, Jackson filed a grievance against the Chargers, which was resolved by a settlement permitting Jackson to seek offers from other teams, subject to the Chargers and the other team working out a trade. (Id. ¶ 8.) Jackson subsequently negotiated a two-year tentative agreement with the Minnesota Vikings in which he would receive $8 million, prorated for the number of games played in the 2010 season, and $10 million in the 2011 season. The Vikings would also have agreed to no further restrictions on Jackson at the end of that period. (Id. ¶ 9.) However, because the Chargers refused to trade Jackson, he signed the Charger's minimum tender offer in order to ensure his status as a free agent at the end of the 2010 season. (Id. ¶ 10.) Jackson, who was the most valuable receiver for the Chargers for the remainder of the 2010 season, received $280,824 in base salary for the number of games played in the season. (Id.)

Even if Manning, Mankins and Jackson are limited to negotiating with their most recent respective teams, they, like Leber and Vrabel, have shown that, under a lockout, they are unable to negotiate and market their services in any respect. A lockout "deprives

them of new contracts that would be negotiated in a free market, whose precise terms will be impossible to recreate." (Schwartz Decl. ¶ 16; Bauer Decl. ¶ 13; Cornrich Decl. ¶ 9.) Therefore, there can be no real dispute that all of the free agent players–Jackson, Leber, Mankins, Manning and Vrabel–have demonstrated a  sufficient threat of irreparable harm warranting the issuance of injunctive relief.

In addition to the free agent Plaintiffs, rookie players contend that they face particular harms unique to their status as entering players.  Entering players who are forced to forego a season, will, Plaintiffs contend, "miss out on a year of experience and exposure that comes from playing against NFL-level competition and receiving NFL-level coaching, both of which are a must for young players." (Berthelsen Decl. ¶ 32.) Moreover, they maintain that if the 2011 season is canceled, rookies will be an unfair disadvantage when they must compete subsequently against a new group of rookies who have had the benefit of a full season's worth of active competition.  (Id.; Doc. No. 8 (Decl. of John Branion) ¶ 11.)  In addition, the loss of a year in a young player's career may diminish that player's value in the future, as "[y]oung players often maximize their value by negotiating extensions of their current contracts before they reach free agency." (Berthelsen Decl. ¶ 32; Branion Decl. ¶ 15.)

Plaintiff Vonn Miller, a college football player at Texas A & M, has chosen to enter the 2011 NFL draft and, as an All-American 2010, All-Big 12 honoree and Butkus Award 2010 recipient, his agent avers that he is likely to be one of the first players selected.  (Branion Decl. ¶ 7.)  Under a lockout, Miller's agent attests that his client will

not only lose the experience of NFL-level competition and coaching, but, by foregoing training camp, Miller risks losing the opportunity of becoming a starting player, or even to make the team.  (Branion Decl. ¶ 11.)  Thus, it is clear that Plaintiffs have demonstrated a threat of irreparable harm as to rookie players.

Finally, the under-contract Plaintiffs–Tom Brady, Drew Brees, Brian Robison and Osi Umenyiora–contend that they face particular harms as well.  Mr. Umenyiora, a defensive end, was selected to the Pro Bowl in 2005 and 2007, was a member of the New York Giants Superbowl championship team, and in, 2010, set the NFL record for most forced fumbles in a single season.  (Agnone Decl. ¶ 3.)  Because his current contract with the Giants runs through the 2012 season, Umenyiora's agent attests that the 2011 season is a critical season, both in terms of Umenyiora's performance and his ability to negotiate the terms of his next contract at a time when he most marketable.  (Id. ¶ 11.)  This lost opportunity, he contends, is irreparable.  (Id.)  Players Brady, Brees and Robison also point to Defendants' refusal to pay amounts owed under their respective contracts and the refusal to allow them to report to work in support of their showing of irreparable harm.  (Yee Decl. ¶ 9; Condon Decl. ¶ 15; McElroy Decl. ¶ 16.)

In sum, the Brady Plaintiffs have met their burden of showing that it is likely that they will suffer irreparable harm absent the preliminary injunction.  The facts of this case, and similar decisions by this Court and others, refute Defendants' argument that money damages alone would sufficiently compensate Plaintiffs if this Court were not to issue injunctive relief.

### 2.    The Irreparable Harm To The Players Outweighs Any Harm An Injunction Would Cause the NFL

A related Dataphase factor requires this Court to balance the harm alleged by Plaintiffs against the harm an injunction would cause other parties.  Rounds, 530 F.3d at 729 (citing Dataphase, 640 F.2d at 113).  The NFL argues that the balance of harms weighs in their favor, because if the Court grants the requested injunction, the NFL "undoubtedly would be subject to additional antitrust claims."  (Doc. No. 34, at 53 (Mem. at 45) (citing Ruocco Decl. ¶ 5).)

But the requested injunction at issue is confined solely to the NFL's lockout.  This Court is not addressing the merits of the Players' other antitrust claims–those regarding Player restraints.  This Court is not presently addressing whether the non-statutory antitrust exemption would still apply, after the NFLPA's unequivocal disclaimer of representation, to the mandatory terms of collective bargaining, that is, the terms and conditions of the Players' employment.  And in issuing a *preliminary* injunction against the lockout, this Court is, of course, only ruling that the Brady Plaintiffs have a fair chance of prevailing on that particular claim.  Such an injunction is not an adjudication that the NFL is liable for any antitrust violation.

The NFL's argument that an order of this Court enjoining the lockout will cause the League harm because such an order will necessarily expose them to antitrust liability is unpersuasive.  Insofar as such liability would flow from the League's lockout violating the Sherman Act, the League cannot predicate harm on the results of its illegal conduct.  Insofar as such liability would flow from the League being found liable on the other

80

claims of the Brady Plaintiffs' Complaint, the alleged harm is entirely speculative as this Court is not presently addressing those claims.

The League also contends that "an injunction would lead" to "the more favorably situated teams signing the best players" and thus "harm the NFL by destroying the competitive balance that is essential" to its business. (Doc. No. 34, at 54-55 (Mem. at 46-46).) But again, that argument rests on the misconception that an injunction against the lockout addresses the merits of the Players' antitrust claims regarding the various Player restraints such as "'restrictions on player free agency.'" (Id. (quoting Complaint, ¶ 132).) This Court is not presently addressing the merits of the antitrust claims regarding Player restrictions and is not ruling on whether the non-statutory labor exemption shields the League from such claims.

**3.    The Players Have Established A Fair Chance of Success on The Merits**

As noted above, where, as here, the movant has made a strong showing of irreparable harm, and that such injury plainly outweighs that which would be imposed on the other party if the injunction is granted, the movant need only show that they have a "fair chance of prevailing" on their claims. Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008). Obviously, "[a]n injunction cannot issue if there is no chance on the merits." Mid-Am. Real Estate Co. v. Ia. Realty Co., 406 F.3d 969, 972 (8th Cir. 2005). The question is not, however, whether Plaintiffs have "prove[n] a greater than fifty percent likelihood that [they] will prevail," PCTV Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1143 (8th Cir. 2007), but rather whether any of their

claims provide a "fair ground for litigation," Watkins, 346 F.3d at 844. "In considering the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win." PCTV Gold, 508 F.3d at 1143.

And as discussed in Section II.A, there are no jurisdictional impediments to this action. This Court need not defer to the NLRB to conclude that the Union's disclaimer, having been unequivocal and made in good faith, is effective to remove this action from the reach of the Norris-LaGuardia Act.

The NFL argues that the Brady Plaintiffs cannot show a likelihood of success on the merits because: (1) the nonstatutory labor exemption protects lockouts by multiemployer bargaining units; (2) the exemption continues to apply until the challenged conduct is sufficiently distant in time and in circumstances from the collective bargaining process; (3) the exemption protects the challenged lockout from antitrust scrutiny; and (4) Plaintiffs' 'waiver' argument lacks merit. (Doc. No. 34 at 10-12 (Mem. at 2-4).)

As clarified above, although the Brady Plaintiffs' Complaint asserts that various restrictions imposed by the NFL on the Players violate the Sherman Act (and that the NFL has breached certain contractual obligations), the injunctive relief requested here does not extend to the merits of most of those claims. (Doc. No. 1 (Complaint) ¶¶ 116-60 (asserting three Sherman Act claims, one claim for breach of contract, two claims for tortious interference with existing or prospective contractual relations, and one declaratory judgment claim).) Rather, the Players' motion is confined to a very precise and narrow issue regarding only one of the antitrust claims–whether the NFL may lock

out the Players after the NFLPA disclaimed its role in serving as their collective bargaining agent.

In ruling upon that request for injunctive relief, this Court need not–and does not–address whether the non-statutory labor exemption still applies so as to shield the NFL from the Players' other antitrust claims, that is, those regarding the various restraints the League imposes on the Players. Resolution of the issue of whether the exemption precludes relief on the NFL's various Player restraints must await another day. As the Supreme Court explained in <u>Jewel Tea</u>, that exemption protects from antitrust scrutiny, in the context of a labor dispute, only agreements that address the terms and conditions subject to mandatory collective bargaining. The present motion requires this Court only to address whether that exemption protects the League's lockout.

The Players allege that the lockout itself violates Section 1 of the Sherman Act. (Doc. No. 1 (Complaint, Count I) ¶¶ 116-24.) As the Players contend, the NFL's lockout "constitutes an agreement among competitors to eliminate competition for the services of major league professional football players" in the relevant United States market, which operates "as a perpetual horizontal group boycott and price-fixing agreement" that is either a *per se* violation of Section 1 or, under the Rule of Reason, a concerted refusal to deal that constitutes an unreasonable restraint of trade. (<u>Id.</u> ¶¶ 117-20.)

As the Brady Plaintiffs observe, the NFL does "not contest that their 'lockout' is a *per se* unlawful group boycott and price-fixing agreement in violation of antitrust law." (Doc. No. 41, at 6 (Mem. at 1).) Rather, the NFL's defense is confined to their argument

that the non-statutory labor exemption from antitrust liability continues to protect the

League because the NFLPA's disclaimer was invalid and ineffective and that resolution

of that issue is for the NLRB and not this Court.  Because this Court has disposed of those

arguments, the NFL presently has identified no defense against Count I of the Brady

Plaintiffs' Complaint.  That the policies and decisions of the individual teams constitute

"concerted action" seems plain.  Cf. American Needle, Inc. v. National Football League,

___ U.S. ___, 130 S. Ct. 2201, 2212-17 (2010).  Accordingly, the Brady Plaintiffs have

established the requisite fair chance of success on the merits of their claim in Count I that

the lockout now constitutes a violation of Section 1 of the Sherman Act.

    As discussed above with respect to the validity of the Union's disclaimer, the

League's reliance on Brown for the proposition that the exemption still applies is

misplaced.  Brown concerned an impasse occurring within the context of a collective

bargaining relationship that likely could continue.  Here, in contrast, the parties have left

the collective bargaining framework entirely.  Although it remains to be decided whether

the nonstatutory labor exemption still applies to protect the League from antitrust claims

regarding player restraints, it is clear that the holding of Brown, which is confined to

impasse, offers no absolute shield against such claims.

    Both the Supreme Court in Brown and the Eighth Circuit in Powell, while

rejecting impasse as the point where the labor exemption terminates, nevertheless

recognized that the exemption does not extend *ad infinitum*.  Brown v. Pro Football, 518

U.S. 231, 250 (1996) ("Our holding is not intended to insulate from antitrust review every

joint imposition of terms by employers."); Powell, 930 F.2d 1293, 1303 (8th Cir. 1989)

(rejecting view that once a collective bargaining agreement is entered, "management is

forever exempt from the antitrust laws").  Moreover, the Supreme Court noted that the

court below had suggested that the exemption ends upon "collapse of the collective-

bargaining relationship, as evidenced by decertification of the union."  Brown, 518 at

250.

        And as Judge Doty ruled in McNeil, once the union disclaims its role as the

bargaining agent for its members or formally obtains decertification, the protection

provided employers by the non-statutory labor exemption is lifted.  764 F. Supp. 1351,

1357-58 (D. Minn. 1991).  Although Judge Doty was not addressing the issue of a

lockout, the factual context in which he was ruling provides no basis to distinguish his

decision because, under his broad ruling, the exemption is lifted entirely.  The fact that

substantial time had passed in McNeil since the Union's disclaimer is not controlling

here, because Judge Doty did not condition his ruling on the legal effect of disclaimer

based on any such temporal restrictions.

        Moreover, as the Eighth Circuit recognized in Mackey, the exemption does not

protect any and all actions by employers.  Rather, federal labor policy trumps the contrary

policies of the antitrust laws only where, among other requirements, the agreement sought

to be exempted concerns mandatory subjects of collective bargaining.  543 F.2d 606, 614

(8th Cir. 1976).[56]  The dispute at issue here, however, is not one regarding wages, hours or

_____

[56]         As the Supreme Court later clarified, the non-statutory, or "implicit," labor

(continued...)

conditions of employment.  See 29 U.S.C. § 158(d) (providing that mandatory subjects of bargaining pertain to 'wages, hours and other terms and conditions of employment").  A lockout is not a substantive term or condition of employment.  Rather, it is a procedural tool that the courts permit an employer to use to pressure a union back to the bargaining table.  American Ship Building Co. v. NLRB, 380 U.S. 300, 310-11 (1965) (holding lockouts are a permissible negotiating tactic (within limits) for the purpose of bringing economic pressure on union).  The union, in turn, has the right to strike to pressure the employer back to the table.

As the Supreme Court explained in Jewel Tea, the propriety of the exemption is a function of what terms and conditions the labor laws require employers and unions to bargain over.  381 U.S. 676, 689 (1965).  The issue is whether the particular restriction at issue "is so intimately related to wages, hours and working conditions that the unions' successful attempt to obtain that provision through bona fide, arm's-length bargaining in pursuit of their own labor union policies, . . ., falls within the protection of the national labor policy" so as to be exempt from the Sherman Act.  Id. at 689-90.  The NFL has identified no legal authority, controlling or otherwise, that stands for the proposition that the non-statutory labor exemption from antitrust liability, extends to protect the labor negotiation tool of a "lockout," as opposed to a mandatory term of collective bargaining,

---

[56](...continued)
exemption is not strictly confined "to labor-management *agreements*."  Brown, 518 U.S. at 243 (emphasis in original) (citing the lower court's opinion).  Rather, the exemption is based on the collective-bargaining "*process*," "not merely on the *product* of that process–the collective bargaining agreement."  Brown, 50 F.3d at 1050.

after a union has disclaimed any further representation of its members.

### 4.      The Public Interest Does Not Favor The "Lockout"

The final factor in this analysis is consideration of the public interest.  Indeed, the Supreme Court has reiterated that courts "'should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'"  <u>Winter</u>, 555 U.S. at __, 129 S. Ct. at 376-77.  Here, the NFL argues that labor law policies in favor of collective bargaining weigh against any injunction and that any countervailing antitrust policies must give way.  (Doc. No. 34, at 55-57 (Mem. at 47-49).)

But because the Union's disclaimer is valid and effective, the labor law policies of collective bargaining must give way to the antitrust policies in favor of competition.  On an economic level, the public has an interest in the enforcement of the Sherman Act, which, by seeking to ensure healthy competition in the market, has a broad impact beyond the immediate parties to this dispute.  Moreover, the public ramifications of this dispute exceed the abstract principles of the antitrust laws, as professional football involves many layers of tangible economic impact, ranging from broadcast revenues down to concessions sales.  And, of course, the public interest represented by the fans of professional football–who have a strong investment in the 2011 season–is an intangible interest that weighs against the lockout.  In short, this particular employment dispute is far from a purely private argument over compensation.

The Brady Plaintiffs have made a strong showing that allowing the League to continue their "lockout" is presently inflicting, and will continue to inflict, irreparable

harm upon them, particularly when weighed against the lack of any real injury that would

be imposed on the NFL by issuing the preliminary injunction.  The public interest favors

the enforcement of the antitrust laws and their underlying pro-competition policy, and the

countervailing labor-law policy favoring collective bargaining is no longer implicated

here.  Finally, the Brady Plaintiff's "fair chance of success" on the merits of the

lockout–which again does not require that success is "likely" or even greater than fifty

percent–shifts the balance decisively in favor of issuing the injunction against the

lockout.[57]

## III.   ORDER

The nation's labor laws have always applied only where an action involves or

grows out of a labor dispute.  Such a labor relationship exists only where a union exists to

bargain on behalf of its members.  Where those employees effectively renounce the union

as their collective bargaining agent–and accept the consequences of doing so–and elect to

proceed in negotiating contracts individually, any disputes between the employees and

their employers are no longer governed by federal labor law.  Likewise, the Norris-

LaGuardia Act, which applies only to preclude some injunctions in the context of "labor

---

[57]        As noted above, although the two motions for a preliminary injunction seek
the same relief, the two groups of Plaintiffs are in different factual circumstances.  Thus
with respect to the Eller Plaintiffs, the NFL contends that their motion for a preliminary
injunction "suffers from all of the legal deficiencies that undermine the *Brady* plaintiffs'
motion plus one more"–that is, "the *Eller* plaintiffs do not–and cannot–allege antitrust
injury" and thus lack standing  (Doc. No. 75, at 6-7 (Mem. at 1-2).)  But in light of the
fact that this Court grants the Brady Plaintiffs' motion for a preliminary injunction, it
need not reach, at this time, these additional issues because an order enjoining the NFL's
purported "lockout" also inures to the Eller Plaintiffs' benefit and thus moots their
motion.

disputes," also no longer applies here to preclude injunctive relief.  The NFL urges this

Court to expand the law beyond these traditional dictates and argues that the protections

of labor law should apply for some indefinite period beyond the collapse and termination

of the collective bargaining relationship.  In the absence of either persuasive policy or

authority, this Court takes a more conservative approach, and declines to do so.

This Court, having found that the Union's unequivocal disclaimer is valid and

effective, concludes there is no need to defer any issue to the NLRB.  Because that

disclaimer is valid and effective, the Norris-LaGuardia Act's prohibition against

injunctive relief does not preclude granting the Player's motion for a preliminary

injunction against what the League characterizes as a "lockout."

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.      The Brady Plaintiffs' motion for a preliminary injunction [Doc. No. 2] is

**GRANTED**;

2.      The Eller Plaintiffs' motion for a preliminary injunction [Doc. No. 58] is

**MOOT**; and

3.      The "lockout" is enjoined.


Dated:   April 25, 2011                          s/ Susan Richard Nelson
                                                 SUSAN RICHARD NELSON
                                                 United States District Judge